**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **TYRA KIRKSEY,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION 15-0115-WS-N** |
| | ) |
| **SCHINDLER ELEVATOR** | ) |
| **CORPORATION,** *et al.*, | ) |
| | ) |
|     **Defendants.** | ) |

**ORDER**

    This matter comes before the Court on defendant Sears Roebuck & Co.'s Motion for Summary Judgment (doc. 56), defendant Schindler Elevator Corporation's Motion for Summary Judgment (doc. 59), defendants' Motion to Strike Portions of Plaintiff's Evidentiary Submission (doc. 74), and Plaintiff's Motion for Limited Discovery under Rule 56(d) (doc. 80). All of these Motions are ripe for disposition.[1]

**I.    Nature of the Case.**

    This case arises from a tragic accident at a Sears retail store in Mobile, Alabama. An 11-year old boy named Jakobe Kirksey fell to his death from the moving handrail of an escalator on the second floor of the store. His mother, next friend, and legal heir, Tyra Kirksey, brought a

---

    [1]    Defendants have also filed a Motion for Oral Argument (doc. 77), in which they request that the Court set their Rule 56 Motions for hearing. According to defendants, oral argument would be beneficial in analyzing the record, parsing out inadmissible evidence proffered by plaintiff, applying the record to plaintiff's legal theories, and understanding defendants' "unique claim based on the Fourteenth Amendment." (Doc. 77, at 2.) After careful review of the parties' summary judgment submissions, including the approximately 150 pages of briefing and hundreds of pages of exhibits, the undersigned concludes that oral argument would not be substantially likely to assist the Court in resolving the pending motions. On that basis, the Motion for Oral Argument is **denied**, pursuant to Civil L.R. 7(h).

wrongful death suit against Sears Roebuck & Co. and Schindler Elevator Corporation.[2]  The Complaint also generically listed as defendants "Fictitious Parties 1-10," identified only as "individuals or entities who are or may be liable for the acts and/or omissions alleged in this Complaint, but whose identities are not presently known to Plaintiff."  (Doc. 1-1, ¶¶ 22-24.) Kirksey never sought to amend her pleadings to name any additional defendants and the allotted time for doing so has long since expired.[3]

The well-pleaded allegations of the Complaint reflect Kirksey's theory that both Sears Roebuck & Co. (which owned and operated the escalator, and made it available for public use) and Schindler Elevator Corporation (which manufactured the escalator and was responsible for maintaining it) were under a duty "to provide an escalator that was non-defective, safe, and suitable for all foreseeable public use."  (Complaint, ¶¶ 7-9.)  The Complaint further alleges that defendants were subject to "an even heightened duty of care" because "an escalator is a common carrier."  (*Id.*, ¶ 10.)  Plaintiff's pleading posits that defendants knowingly "allowed an unreasonably dangerous and defective condition to exist with the Escalator," and that they failed to implement available, reasonable safety measures to prevent accidents involving that escalator. (*Id.*, ¶¶ 11, 15-16.)  Kirksey's position is that these purportedly negligent acts or omissions proximately caused Jakobe's death.

---

[2]     Kirksey initially filed suit in the Circuit Court of Jefferson County, Alabama; however, defendants removed the action to the United States District Court for the Northern District of Alabama in January 2015, predicating federal jurisdiction on the diversity provisions of 28 U.S.C. § 1332.  (*See* doc. 1.)  Subsequently, the Northern District of Alabama transferred the case to this judicial district pursuant to 28 U.S.C. § 1404, reasoning that "[b]ecause all parties consent to transfer to the Southern Division of the Southern District of Alabama, transfer to that district and division is appropriate."  (Doc. 14, at 5.)

[3]     Fictitious-party pleading is generally not permitted in federal court, absent certain circumstances that are not present here.  *See, e.g., Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) ("As a general matter, fictitious-party pleading is not permitted in federal court."); *John Hancock Life Insurance Company (USA) v. Andrews*, 2015 WL 8346965, *1 n.1 (N.D. Ga. Dec. 8, 2015) ("Fictitious party pleading is not permitted in federal court, unless Plaintiff describes the defendants with enough specificity to determine their identities."); *Dubose v. City of Hueytown*, 2015 WL 5011383, *4 (N.D. Ala. Aug. 24, 2015) ("Fictitious party practice is generally not permitted in federal court."); *see generally* Rule 10(a), Fed.R.Civ.P. ("The title of the complaint must name all the parties …."). In accordance with this general rule, and the inapplicability of the narrow exceptions to same, plaintiff's claims against Fictitious Parties 1-10 are **dismissed**.

Both defendants now move for summary judgment, contending that there are no genuine issues of material fact and that they are entitled to entry of judgment in their favor as a matter of law.

## II.   Defendants' Motion to Strike.

Before reaching the Motions for Summary Judgment, the Court must address defendants' multipronged (and extensively briefed) Motion to Strike because that Motion challenges whether specific facts presented in the record by Kirksey are properly considered on summary judgment. In the Motion to Strike, defendants seek exclusion from the record of the following materials: (i) paragraphs 3 through 12 of the Affidavit of Tyra Kirksey; (ii) a "Safe Ride Video" created by the Elevator Escalator Safety Foundation; (iii) ASME meeting notes from August 26, 1997; (iv) articles and reports supporting plaintiff's experts' opinions; and (v) certain "other falls" evidence. Each of these categories of evidence will be addressed in turn.[4]

### A.   The Kirksey Affidavit.

First, in opposition to the summary judgment motions, plaintiff offered the Affidavit of Tyra Kirksey (doc. 70, Exh. M). Defendants object that paragraphs 3 through 5 of this Affidavit contradict Kirksey's prior deposition testimony. The so-called "sham affidavit" rule provides that, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Croom v. Balkwill*, 645 F.3d 1240, 1253 n.18 (11th Cir. 2011). The sham affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case," and applies only where there is an "inherent inconsistency between an affidavit and a deposition." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) (citations omitted). No such "inherent

---

[4]     Some 18 days after the Motion to Strike was filed, plaintiff filed a lengthy Response Brief (doc. 79), with accompanying exhibits. Pursuant to the Local Rules, "[u]nless the Court orders otherwise, the non-movant must file any brief, exhibit, or other paper in opposition to a motion … within fourteen (14) days of service of the motion." Civil L.R. 7(c). Even after taking into account the 3-day period added pursuant to Rule 6(d), Fed.R.Civ.P., plaintiff's filing is late, and plaintiff neither requested leave to file it out of time nor showed cause to excuse her untimeliness. Notwithstanding the foregoing, the Court in its discretion will consider plaintiff's Response Brief. And on May 24, 2016, defendants filed a Reply (doc. 84) in further support of their Motion to Strike. The Court has reviewed and considered that Reply.

inconsistency" exists here; rather, the objected-to portions of the Kirksey Affidavit merely refer to other portions of her deposition to provide context to the excerpt on which defendants rely, and refute defendants' interpretation of unclear verbiage in the deposition.[5]  These are permissible uses for a summary judgment affidavit; therefore, the sham affidavit rule has no application here, and defendants' objection is **overruled**.

Defendants' next objection to the Kirksey Affidavit relates to paragraphs 6 through 12, wherein she repeatedly employs the formulation, "Until Jakobe's death and discovery in this lawsuit, I did not know …" certain enumerated facts.  (Kirksey Aff., ¶¶ 6-12.)  Defendants object to each of these paragraphs because the "facts" following the introductory clause in each are "not based on her personal knowledge."  (Doc. 75, at 6.)  It is correct, of course, that summary judgment affidavits must be based on personal knowledge.  *See* Rule 56(c)(4), Fed.R.Civ.P. ("An affidavit or declaration used to support or oppose a motion ***must be made on personal knowledge*** ….") (emphasis added).  But defendants' objection misses the point.  Paragraphs 6 through 12 of the Kirksey Affidavit are offered not to prove the veracity of the identified "facts,"

---

[5]     Specifically, defendants' summary judgment filings make much of Kirksey's deposition testimony that she had instructed Jakobe with regard to escalators "[n]ot to play on them and watch your feet."  (Kirksey Dep. (doc. 70, Exh. N), at 60.)  In her Affidavit, Kirksey identifies other deposition testimony regarding Jakobe's previous experiences with escalators and professes disagreement with defendants' characterization of her testimony as meaning she "knew of the particular danger to Jakobe … falling over escalator handrails."  (Kirksey Aff., ¶ 5.)  There is nothing improper about a party using a summary judgment affidavit to provide context to a deposition passage cited by the opposing party by citing other sections of the same transcript, or to express disagreement with an inference drawn by the opposing party from an ambiguous bit of testimony.  On summary judgment review, all reasonable inferences from the evidence must be taken in the light most favorable to Kirksey anyway.  As such, the Court will not read Kirksey's ambiguous testimony about not playing on escalators and watching his feet as meaning that she must have appreciated the particular danger to Jakobe falling over the side of the escalator.  Stated differently, while defendants are correct that plaintiff's testimony reflects her awareness that Jakobe "could be injured if he played on escalators" (doc. 75, at 5), there is nothing inherently inconsistent between that deposition testimony and her Affidavit statements disclaiming awareness of a particular danger of Jakobe plummeting to his death over an escalator's handrail.  Nor is there an inherent inconsistency between Kirksey's deposition testimony that she had cautioned Jakobe not to play on escalators and her Affidavit statement that she "had no reason to believe that Jakobe ever would have a problem with escalators." (Kirksey Aff., ¶ 4.)  Of course, parents may caution their children to be careful even in the absence of a specific reason to believe that the children will not.  Thus, Kirksey's deposition testimony and the objected-to portion of her Affidavit may be readily harmonized.

but rather to establish Kirksey's lack of knowledge of any of them at the time of Jakobe's accident.  Obviously, a summary judgment affiant satisfies the "personal knowledge" requirement by averring that she did not know certain things at relevant times.  In other words, Kirksey's representations about the state and limitations of her personal knowledge as of June 14, 2014 are themselves facts within her personal knowledge.  This objection is unfounded.

Finally, defendants take issue with paragraph 13 of the Kirksey Affidavit, wherein she avers as follows: "The knowledge of Sears and Schindler of the risk and reality of children and other users falling from escalators was far superior to mine.  I knew nothing of it, while they knew everything."  (Kirksey Aff., ¶ 13.)  This paragraph is improper.  It cannot reasonably be suggested that Kirksey has personal knowledge of what defendants knew or did not know at a particular point in time; therefore, paragraph 13 is **stricken** as violative of the personal knowledge requirement prescribed by Rule 56(c)(4).

### B.     The Safe Ride Video.

Second, defendants object to plaintiff's "Safe Ride Video" as extraneous.  Included amidst plaintiff's 40 summary judgment exhibits is a DVD labeled "A Safe Ride Video, Elevator Escalator Safety Foundation, Provided on DVD."  (Doc. 70, Exh. T.)  The undersigned has scoured plaintiff's summary judgment brief in vain for references to this exhibit.  Courts have frowned on the unfortunate, all-too-prevalent litigation practice of stuffing a court record with unreferenced exhibits, providing no inkling of how such exhibits purportedly advance a litigant's position, and leaving it to the court to sift through a mass of uncited materials and to hypothesize why the litigant might have chosen to include them.  *See, e.g., Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it."); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 642 (S.D. Ala. 2005) ("the parties may not, by the simple expedient of dumping an undifferentiated mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions").  Moreover, the Federal Rules of Civil Procedure provide that "[t]he court need consider only the cited materials, but it

may consider other materials in the record." Rule 56(c)(3), Fed.R.Civ.P.  The Court exercises its discretion not to consider plaintiff's uncited Exhibit T.[6]

### C.     The ASME Meeting Notes.

Third, defendants object to plaintiff's Exhibit W, which purports to be "A17/B44 Escalator & Moving Walk Committee Minutes" from a meeting that occurred on August 26 and 27, 1997.  The significance of these meeting minutes is, apparently, that the Committee recommended a "Proposed Rule" that a guardrail of not less than 42 inches in height be installed at every escalator adjacent to an open wellway.  Defendants' objection is that plaintiff has not authenticated Exhibit W and that "it is unclear that she can present [Exhibit W] in an admissible form at trial."  (Doc. 75, at 9.)

"It is well settled that exhibits are properly considered for summary judgment purposes as long as they may be reduced to admissible form at trial."  *Johnson v. Mobile Infirmary Medical Center*, 2015 WL 1538774, *1 (S.D. Ala. Apr. 7, 2015); *see also* Rule 56(c)(2), Fed.R.Civ.P. ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  The trouble with defendants' objection to Exhibit W is that they offer no reason to believe this exhibit cannot be reduced to admissible form at trial.  To be sure, defendants complain that Exhibit W has not been authenticated, but they do not assert that Kirksey will be unable to do so at trial, instead suggesting only that it is "unclear" whether she can do so without offering facts to justify their doubts.  As defendants recognize, in ordinary circumstances a litigant would authenticate meeting minutes via testimony from the custodian or other qualified witness.  All appearances are that Kirksey is capable of doing just that here; indeed, plaintiff identifies expert Joseph Stabler, who is a member of the ASME Escalator & Moving Walk Committee, as the witness through which she intends to authenticate

---

[6]     That said, the Court will not strike Exhibit T from the summary judgment record. Movants provide no explanation for why the draconian step of striking this exhibit (rather than simply exercising judicial discretion not to consider it) is an appropriate remedy here.  After all, "[e]xhibits are not stricken (and motions to strike should not be filed in federal court) as a kneejerk reaction whenever a litigant is unhappy with either the contents of an exhibit or the other side's arguments drawn from that exhibit."  *Morgan v. Bill Vann Co.*, 2013 WL 4657554, *1 n.1 (S.D. Ala. Aug. 30, 2013); *see generally Zukowski v. Foss Maritime Co.*, 2013 WL 1966001, *3 (S.D. Ala. May 10, 2013) ("Motions to strike are generally disfavored as time wasters that distract the court from the merits of a party's claim.") (citations omitted).

the subject meeting minutes at trial.  (*See* doc. 79, at 7-8.)  At any rate (and without definitively ruling on the validity of any of the myriad proposals for authentication proffered by plaintiff in briefing the Motion to Strike), defendants have articulated no reason to doubt Kirksey's ability to proffer such a witness and authenticate Exhibit W.  For that reason, defendant's objection to Exhibit W is **overruled**, and it will be considered on summary judgment.[7]

### D. *Materials Supporting Plaintiff's Experts' Opinions.*

Fourth, defendants object to plaintiff's inclusion in the summary judgment record of various materials on which her designated experts relied in forming their opinions in this case. In particular, defendants' objection encompasses the following items: (i) a 2011 "tabulation of identified incidents" prepared by David Cooper in a paper entitled "An Investigation into Falls Over or From the Side of Escalators: Recommendations for Fall Prevention Involving Minors" (doc. 70, Exh. F); (ii) a 1993 article by Dr. John Fruin published in *Elevator World* magazine, entitled "Open Side Guarding of Escalators" (doc. 70, Exh. G); and (iii) a synopsis from the Toronto Public Library purporting to refer to a 1966 *Toronto Star* photograph relating to boys and escalator accidents (doc. 70, Exh. NN).

Defendants' objection is that an expert's "mere reliance on inadmissible evidence does not render such evidence admissible," and that print articles are generally deemed inadmissible hearsay.  (Doc. 75, at 10.)  That statement is accurate as far as it goes; however, defendants do not take the analysis far enough.  The Federal Rules of Evidence specifically allow an expert to engage in hearsay testimony based on the type of evidence reasonably relied on by those in his or her field.  *See, e.g., United States v. Floyd*, 281 F.3d 1346, 1349 (11th Cir. 2002) ("hearsay

---

[7]    Contemporaneously with her Response Brief in opposition to the Motion to Strike, plaintiff filed a Motion for Limited Discovery under Rule 56(d).  In the Motion for Limited Discovery, plaintiff posits that if the Court is not satisfied that she can authenticate the ASME meeting minutes at trial, then plaintiff wishes to serve requests for admission on defendants requesting them to admit the minutes' authenticity, or alternatively to subpoena ASME's custodian of records.  Rule 56(d) authorizes the sort of relief requested by Kirksey only "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" on summary judgment.  Rule 56(d), Fed.R.Civ.P. Plaintiff has made no such showing; indeed, the proposed discovery relates solely to the question of authentication, which a party is not even required to do at the summary judgment stage, so long as the subject exhibit can be authenticated at trial.  The Motion for Limited Discovery would take this case far afield and needlessly delay adjudication of the pending Rule 56 Motions; therefore, the Motion for Limited Discovery is **denied**.

testimony by experts is permitted if it is based upon the type of evidence reasonably relied upon by experts in the particular field"); Rule 703, Fed.R.Evid. ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").  Literature reviews have been deemed to lie within the ambit of Rule 703.  *See United States v. Steed*, 548 F.3d 961, 975 (11th Cir. 2008) (observing that objecting party does not dispute that "literature about trends in law enforcement are reasonably relied upon by experts in the law enforcement field," and that "we have previously determined similar sources to be reasonably reliable for purposes of Rule 703").  So, if Kirksey's experts relied on Exhibits F, G and NN in forming their opinions in this case, and if experts in their field(s) would reasonably rely on those kinds of facts or data in forming such opinions, then the experts may base their opinions on Exhibits F, G and NN even if those exhibits would otherwise be inadmissible, and may disclose their contents to the jury if their probative value substantially outweighs their prejudicial effect.  *See* Rule 703.

The point is simple:  Exhibits F, G and NN may well be inadmissible hearsay.  However, all indications are that Kirksey may disclose the cited portions of those exhibits to the jury by eliciting testimony from her experts about the contents of those articles and the experts' reliance on same in forming their expert opinions.[8]  Rule 703 creates a specific procedure through which Kirksey's experts may be able to testify as to the contents of those exhibits.  *See, e.g., United States v. An Easement and Right-of-way Over 6.09 Acres of Land*, --- F. Supp.3d ----, 2015 WL 6444983, *22 (N.D. Ala. Oct. 21, 2015) ("in giving their opinions, experts are authorized to consider and at times reference evidence that is hearsay or that would otherwise be inadmissible

---

[8]      To be sure, in her Response Brief in opposition to the Motion to Strike, Kirksey argues at length that the articles themselves are admissible as long as plaintiff's experts testify that such articles are standard or trustworthy authorities on the subject.  However, plaintiff has identified no federal authorities that would authorize such a result, and has failed (for example) to invoke the learned treatise exception of the Federal Rules of Evidence.  Admissibility of evidence of trial in this case will be determined by the Federal Rules of Evidence, not the Alabama Rules of Evidence.  At any rate, the Court need not and will not make any ultimate determinations at this time as to whether the challenged exhibits are admissible; rather, it suffices for purposes of the Motion to Strike to recognize that Rule 703 may authorize plaintiff's experts to disclose portions of those exhibits to the jury in any event, such that the information therein is properly considered for summary judgment purposes.

as independent evidence").[9]  Defendants make no attempt to assert that the Rule 703 procedure for disclosure of this "basis evidence" could not be satisfied here; to the contrary, they concede that it may apply.  (Doc. 84, at 6.)  Instead, defendants protest that the articles themselves are inadmissible hearsay.  If the contents of those articles can be presented in admissible form via expert testimony through the "basis evidence" mechanism of Rule 703, however, then the admissibility *vel non* of the underlying articles is of no consequence.  Stated differently, there is no indication, and no reason to believe, that the pertinent aspects of Exhibits F, G and NN cited in Kirksey's summary judgment filings cannot be reduced to admissible form at trial via Rule 703.  For that reason, defendants' Motion to Strike is **denied** as to plaintiff's Exhibits F, G and NN.

> ### E.        *"Other Falls" Evidence.*

Plaintiff's summary judgment submission points to deposition testimony from Sears corporate representative Todd Charles Lemmert relating to other escalator falls at Sears stores pre-dating the June 14, 2014 incident at issue here.  In particular, Lemmert testified that he was aware of three other incidents in which individuals fell from escalators at Sears stores, to-wit: (i) a 2005 incident in Hawaii where a small child riding on an escalator handrail fell over the side; (ii) a 2008 incident in California involving a man with Lou Gehrig's disease who lost his balance and slipped at the top of the escalator; and (iii) a 2013 incident in Chicago in which a teenage girl leaning over an escalator handrail fell to the level below.  (Lemmert Dep. (doc. 70, Exh. P), at 61-62.)[10]  In addition to this evidence of Sears' knowledge, plaintiff submits evidence of Schindler's knowledge of escalator falls prior to the incident that killed Jakobe Kirksey.  Indeed,

---

[9]        *See also Williams v. Illinois*, --- U.S. ----, 132 S.Ct. 2221, 2239-40, 183 L.Ed.2d 89 (2012) (explaining that under Rule 703, "'basis evidence' that is not admissible for its truth may be disclosed even in a jury trial under appropriate circumstances" because "[t]he Rule 703 approach … is based on the idea that the disclosure of basis evidence can help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion").

[10]        Lemmert also acknowledged awareness of a fourth escalator fall that happened in Auburn, Massachusetts; however, he distinguished it from the others as being a "pinch point case."  (*Id.* at 93.)  It is not clear from the summary judgment record what he meant by that characterization.  Another witness described the Massachusetts incident as involving a four-year old boy who tried to ride the escalator handrail down, but his hands could not hold his weight and he fell to his death.  (Dull Dep. (doc. 70, Exh. H), at 23.)

Schindler's corporate representative John Dull was aware of pre-June 2014 escalator falls involving Schindler-maintained equipment in Indiana, Atlantic City, and Philadelphia, in which "people actually fell over the side of a handrail." (Dull Dep. (doc. 70, Exh. H), at 19.) Another Schindler representative, David Evans, testified to having "been involved in three cases where someone has fallen" from an escalator "in such an open atrium." (Evans Dep. (doc. 70, Exh. K), at 28.) Plaintiff's point is that, prior to June 2014, Sears and Schindler were "on notice of the risk posed by escalators of this type in general." (Doc. 71, at 21.)[11]

In their Motion to Strike, defendants assert that all of plaintiff's "other falls" evidence should be stricken from the record because it is not relevant. According to defendants, the touchstone of relevance for such evidence is "substantial similarity," which they maintain plaintiff has not shown. In this regard, defendants rely on a pair of Alabama Supreme Court cases, namely *Kmart Corp. v. Peak*, 757 So.2d 1138, 1141 (Ala. 1999), and *Cloninger v. Wal-Mart Stores, Inc.*, 794 So.2d 364, 366 (Ala. 2001), as imposing a "substantial similarity" requirement for admissibility of "other accidents" evidence. (Doc. 72, at 13.) They cite no federal law. The threshold problem with defendants' position is that it would have the Court apply Alabama law to an evidentiary matter governed by federal law. *See, e.g., Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1396 (11th Cir. 1997) (rejecting argument that trial court erred in allowing evidence of other incidents without a showing of substantial similarity, as required under Georgia law, reasoning that "[u]nder this circuit's controlling precedent regarding diversity jurisdiction cases, the admissibility of evidence is a procedural issue, and therefore is governed by the Federal Rules of Evidence," and concluding that "[g]iven that Heath's argument on the evidence is predicated on the application of state law, we find no merit to his position").[12]

---

[11]     More generally, plaintiff submits evidence of the frequency of escalator falls. That evidence includes research identifying 361 falls over or from the side of escalators worldwide through 2007. (Cooper Dep. (doc. 70, Exh. D), at 62; doc. 70, Exh. F.) Such incidents date back at least as far as 1928 and occurred in such far-flung locales as Singapore, Honduras, Malaysia, Northern Ireland, Israel and China. (Doc. 70, Exh. F.)

[12]     Both sides make this same error in arguing various aspects of the Motion to Strike. Because the admissibility of evidence at trial in this case is governed by federal law, not Alabama law, counsel should henceforth tailor their legal arguments accordingly.

More fundamentally, defendants' Motion to Strike fails because defendants have not asserted that Kirksey will be unable to reduce this "other falls" evidence to admissible form at trial. That is to say, the Motion to Strike does not frame defendants' objection as being that Kirksey <u>cannot</u> show substantial similarity between the conditions resulting in Jakobe Kirksey's fatal escalator fall and the other known incidents. By arguing merely that plaintiff <u>has not</u> presented this evidence in admissible fashion, defendants lodge an improper objection. The Federal Rules of Civil Procedure allow a party to object that proffered evidence "cannot be presented in a form that would be admissible in evidence," Rule 56(c)(2), Fed.R.Civ.P., not that such evidence has not been presented in an admissible form. *See, e.g., Abbott v. Elwood Staffing Services, Inc.*, 44 F. Supp.3d 1125, 1135 (N.D. Ala. July 31, 2014) ("under current Rule 56, … the objection must be that evidence *cannot* be presented in admissible form, not that the evidence *has not* been presented in admissible form") (citation omitted).[13]

For these reasons, the Motion to Strike is **denied** as to "other falls" evidence.[14]

## III.   Background Facts. [15]

---

[13]      *See also Ridgell v. Astrue*, 2012 WL 707008, *9 (D. Md. Mar. 2, 2012) (where litigant "does not actually argue that Defendant cannot produce admissible versions of the same for trial," such objection "may not be proper under Rule 56"); *Richardson v. Mississippi Dep't of Human Services*, 2012 WL 568285, *3 (S.D. Miss. Feb. 21, 2012) ("DHS committed procedural error by failing to make the correct objection under Rule 56(c)(2). Ultimately, there is no argument or indication that the exhibits could not be offered [in] admissible form, and this matter should be decided on the merits."); *Foreword Magazine, Inc. v. Overdrive, Inc.*, 2011 WL 5169384, *2 (W.D. Mich. Oct. 31, 2011) ("Significantly, the objection contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be."). Defendants' attempt to recast their "has not" objection as a "cannot" objection in their Reply (doc. 84, at 7) comes too late, as new arguments are not properly raised via reply.

[14]      In so concluding, the Court is not endorsing plaintiff's position in her Response Brief to the Motion to Strike that "Plaintiff has established that the type of accident and layout of the escalator installation is similar in these cases." (Doc. 7, at 16.) Rather, this ruling is confined to the grounds that defendant raised an improper "has not" objection predicated on a state-law evidentiary rule.

[15]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by (Continued)

###### A.     History of the Subject Escalator.

More than a half century ago, in 1965, defendant Sears Roebuck & Co. ("Sears") leased space at the Bel Air Mall in Mobile, Alabama, to open a new retail store (the "Store").  (Doc. 70, Exh. DD.)  Three decades later, in approximately 1995, Sears embarked on an extensive renovation project at what had previously been a single-level store.  Specifically, Sears and its landlord agreed to "[a] complete renovation and expansion to two full levels," thus enlarging the premises by roughly 90,000 square feet.  (Doc. 70, Exh. EE, ¶ 1.n.)  Because the Store was expanding from a single level to two levels, Sears chose to have escalators installed as part and parcel of the renovation project.  (Lemmert Dep., at 31.)  To effectuate that decision, in 1996 Sears purchased escalators from defendant Schindler Elevator Corporation, whose promotional materials describe it as "one of the leading global manufacturers of elevators, escalators and moving walks."  (*Id.* at 31-33; doc. 70, Exh. FF.)

To redesign and expand the Store, Sears retained the services of an architect, non-party Butner Architectural Group.  (Doc. 62, Exh. 8.)  Sears further hired non-party Hardin Construction Group to complete the Store's renovation.  (Doc. 62, Exh. 9.)  In terms of selecting the location and configuration of crisscrossing escalators in an open-atrium setting for the redesigned Store, Sears relied on its architect (Butner).  (Lemmert Dep., at 35-36.)[16]  Similarly,

---

one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [Kirksey's] version of the facts drawing all justifiable inferences in [her] favor."  *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

[16]     Plaintiff attacks defendants' evidence on this point, arguing that the cited witness, Todd Lemmert, was employed by Kmart at the time and had no involvement with the Store's expansion project.  (Doc. 71, at 17.)  Plaintiff thus advances a lack-of-personal-knowledge challenge to this testimony.  However, Lemmert was testifying as a Rule 30(b)(6) witness for Sears, in which capacity his testimony constituted "information known or reasonably available to the organization."  Rule 30(b)(6), Fed.R.Civ.P.  As a Rule 30(b)(6) deponent, Lemmert's lack of direct personal knowledge is no impediment to his testimony, and Kirksey's objection is unfounded.  *See, e.g., QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 688 (S.D. Fla. 2012) ("a Rule 30(b)(6) witness need not have personal knowledge of the designated subject matter"); *E.E.O.C. v. Winn-Dixie, Inc.*, 2010 WL 2202520, *3 (S.D. Ala. May 28, 2010) ("the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee") (citation omitted).

Sears did not design the escalators, but "rel[ied] on Schindler for that." (*Id.* at 35.) An Owner-Contractor Agreement was executed between Sears and Schindler in April 1996, pursuant to which Schindler agreed to furnish and install two escalators whose specifications (model, speed, travel, width, power supply, balustrade, decks, skirts and contract maintenance) were set forth in the Agreement. (Doc. 62, Exh. 10, at 3.) A Schindler representative testified that architects typically determine the placement of escalators in a building and that "[w]e're told where to put the escalator, and we put the escalator." (Elliott Dep. (doc. 62, Exh. 3), at 90.) The witness elaborated that "[w]e install a code-compliant elevator or escalator based on where we're told to put that unit." (*Id.* at 92.)

Sears relied on Schindler to install the escalators. (Lemmert Dep., at 34.) In that regard, Schindler records confirm that the two escalators were delivered to the Store on January 22, 1997; that Schindler finished the installation job on February 7, 1997; and that the escalator / elevator portion of the project "was completed and turned over to [Sears] on March 14, 1997." (Doc. 70, Exhs. II, JJ & KK.) However, Schindler's involvement with the escalators in the Mobile store did not terminate at that time; to the contrary, Schindler was responsible for maintaining the Store's escalators from their installation in 1997 through the June 2014 events giving rise to this lawsuit. (Lemmert Dep., at 34.) In fact, Schindler has a "national maintenance contract" with Sears, pursuant to which Schindler provides maintenance, repairs and callbacks on all elevator and escalator equipment for certain Sears locations (including the Mobile store). (Harty Dep. (doc. 70, Exh. LL), at 13-15 & 18.) Under the terms of this contract, Schindler is responsible for escalator code compliance. (*Id.* at 20.) More generally, Schindler is contractually obligated to keep the escalators "in proper, safe, efficient and code-compliant operating condition, twenty-four (24) hours per day, seven (7) days per week …." (Doc. 62, Exh. 12, Att. 2.2, § 10.1.) Sears also retained the consulting services of non-party Lerch Bates to perform escalator inspections and to follow up on Schindler's work from time to time. (Lemmert Dep., at 95; doc. 62, Exh. 13.) Although Sears owns the escalators, it looks to Schindler and Lerch Bates for their expertise in how to maintain and safely operate those escalators. (Lemmert Dep., at 114-15, 117, 121.)

The "down" escalator at the Store has been assigned a number by the State of Alabama, signifying that the "unit is a code-compliant unit." (Elliott Dep., at 92-93.) At no time prior to June 2014 did Lerch Bates (Sears' escalator consultant) recommend more or different guards or

fall protection for Sears' escalators at the Store.  (Lemmert Dep., at 117.)  At no time prior to June 2014 did the Alabama Department of Labor notify Sears that its escalators at the Store were not code-compliant.  (*Id.* at 122.)  Prior to June 2014, Sears officials were aware of no incidents, accidents or falls involving the subject escalators at the Store.   (Henderson Dep. (doc. 62, Exh. 6), at 37-38, 52.)  That said, both Sears and Schindler had actual knowledge of other falls from other escalators they owned or maintained.  A Sears official testified to knowledge of at least three previous escalator falls in its stores, including a child who fell when riding on an escalator handrail in Hawaii in 2005, a man who lost his balance and fell at the top of an escalator in California in 2008, and a teenager who fell while leaning over an escalator handrail in Chicago in 2013.  (Lemmert Dep., at 61-62.)  And Schindler representatives were aware of at least three incidents in which someone fell over the side of handrails on Schindler-maintained escalators in open atriums in Indiana, Atlantic City and Philadelphia.  (Dull Dep., at 19; Evans Dep., at 28.)

> B.      **Configuration of the Subject Escalator.**

As noted, the escalators that Sears purchased (and that Schindler installed and maintained) in the Store were configured in a crisscrossing pattern with an open atrium.  (Lemmert Dep., at 35.)  The top of the "down" escalator on the second floor of the Store was positioned 13 feet away from a cash register serving the maternity and children's departments of the retail store.  (Rodowicz Dep. (doc. 70, Exh. S), at 52.)  On both sides of the entrance to that escalator was a guardrail fashioned of glass and metal.  (Doc. 70, Exh, P, at Exh. 5.)[17]  On the right side of the down escalator (the closed side), the perimeter guardrail extended all the way to the far end of the open atrium on the second floor.  On the left side of that escalator (the open side), however, the guardrail ended after approximately 12 to 18 inches' overlap with the escalator handrail.  (*Id.*; Lemmert Dep., at 70-71.)  What this means is that after roughly a foot and a half, the left side of the down escalator was completely open, with no protection (other than the handrail itself) from the open atrium.  As a result, if a person were to sit on or lean over

---

[17]     Plaintiff's counsel represents in their summary judgment brief that the guardrail stood 42.5 inches tall.  (Doc. 71, at 6.)  However, plaintiff cites no record evidence in support of that measurement.  Of course, a court on summary judgment cannot accept counsel's *ipse dixit* for a particular fact.  *See, e.g., Ely v. Mobile Housing Bd.*, 13 F. Supp.3d 1216, 1218 n.1 (S.D. Ala. 2014) ("This Court cannot and will not simply take counsel's word for it that particular unsupported facts are correct.").

the left handrail of the down escalator in the Sears store in the Bel Air Mall and then lose his or her balance, there was no fall protection in place to prevent the person from experiencing a potentially long and dangerous drop to the crisscrossing up escalator below.

###### C.    *Jakobe Kirksey's Fall.*

On Saturday, June 14, 2014, 11-year old Jakobe Kirksey ("Jakobe") accompanied his mother, plaintiff Tyra Kirksey ("Kirksey"), and Kirksey's adult cousin Daphne Kirksey ("Daphne") on a shopping excursion to Bel Air Mall. (Kirksey Dep. (doc. 70, Exh. N), at 43-44, 64; D. Kirksey Dep. (doc. 70, Exh. L), at 36.) They entered the Sears store and took the elevator to the second floor, where they used the restrooms. (Kirksey Dep., at 64-65.) The Kirkseys then looked at a discount clearance rack, where Jakobe and his mother picked out some socks. (*Id.* at 67.) Kirksey got in the check-out line for the cash register near the escalators to pay for the socks. (*Id.*) Meanwhile, Daphne and Jakobe stood closer to the top of the escalator, waiting for Kirksey to complete her purchase. (D. Kirksey Dep., at 38.)[18] During this time, Jakobe and Daphne were "just standing there talking," and Jakobe was not playing on the escalator. (*Id.* at 44.) While they waited, Jakobe told Daphne he was planning to get his father (an Auburn fan) something Alabama-branded as a joke. (*Id.* at 38-39.) Daphne (who was standing closer to Jakobe than to Kirksey, albeit not close enough to "grab him or anything") turned away from Jakobe to tell Kirksey what he had said. (*Id.* at 39.) Daphne heard what sounded like an "ooh" then whirled back around, but Jakobe was gone. (*Id.* at 43.) Daphne yelled out Jakobe's name, prompting Kirksey (who had her back turned at the cash register, facing away from Jakobe, and did not see him standing near the handrail for the down escalator) to turn around from the cash register and look around for her son. (Kirksey Dep., at 67-68, 77-78.)

---

[18]    Jakobe's mother testified that, at some unspecified time in the past, she had cautioned Jakobe with regard to escalators "[n]ot to play on them and watch your feet." (Kirksey Dep., at 60.) When asked if she had said that because Jakobe was playing on escalators, Kirksey answered, "No, because the side was rolling and, you know, they lean and don't pay attention, and I told him." (*Id.*) So Jakobe might have placed his arm on an escalator handrail, prompting a rebuke from his mother along the lines of "don't play around." (*Id.* at 61.) That said, Kirksey's testimony was clear that she never had any issue with Jakobe on escalators, and never had problems with his feet or him slipping or tripping on an escalator. (*Id.*) Kirksey had no reason to believe that Jakobe would have any problem with the escalators in the Sears store in June 2014. (Kirksey Aff., ¶ 4.)

Neither Daphne nor Kirksey actually saw Jakobe fall, and the parties have identified no eyewitnesses.  However, there is limited, shadowy, grainy video surveillance footage depicting the incident from some distance away.  Screen shots from that footage appear to show Jakobe leaning back into the top of the left handrail of the down escalator, and lifting himself (or being lifted) onto the railing.  (Doc. 62, Exh. 14, at 1-3.)  After doing so, and while still on the horizontal portion of the handrail at the top of the escalator, Jakobe appears to have lost his balance.  The next screen shots show him plunging headfirst over the side of the escalator into the open atrium, falling toward the crisscrossing up escalator below.  (*Id.* at 4-5.)  Based on her analysis of the video and 3D modeling software, defense expert Kathleen Rodowicz, Ph.D., P.E., opined that Jakobe had lifted himself and actually sat on the moving handrail, then fell over the side after moving approximately two feet.  (Rodowicz Dep. (doc. 62, Exh. 7), at 79, 91-92.)[19] The point at which Jakobe fell was just after the metal-and-glass guardrail alongside the left handrail ended (recall that the guardrail and handrail overlapped for a period of 12 to 18 inches before the guardrail stopped), while the handrail was still horizontal, and before the escalator handrail became diagonal for the downward slope toward the first floor.  (*Id.* at 115-16.)

It appears undisputed that Jakobe fell approximately 20 feet.  (Rodowicz Dep., at 44.)  When he landed, Jakobe's head struck the metal stairs of the up escalator.  (*Id.* at 44-45.)  He sustained, among other injuries, a severe head injury.  (*Id.* at 45.)  Jakobe was transported to a local hospital, where he died a few days later.  (Kirksey Dep., at 95-96.)

---

[19]     In her summary judgment brief, plaintiff tries to create a genuine issue of material fact as to whether Jakobe pulled himself onto the escalator handrail.  Specifically, she cites Daphne's testimony that the escalator "grabbed his pants leg, you know, that's what I thought." (D. Kirksey Dep., at 44.)  By Daphne's own admission, however, she was looking in the other direction when the incident occurred; therefore, Daphne lacks personal knowledge of what transpired as between Jakobe and the escalator in the moments before he fell.  Her speculation that the escalator "grabbed his pants leg" cannot be credited on summary judgment because it is obviously not based on personal knowledge.  Plaintiff also points to her expert Traci Campbell's testimony; however, Campbell's narrative bears substantial similarity to that of Rodowicz.  In particular, Campbell testified that Jakobe "turns his back toward the moving handrail and appears to back up with enough force for the moving handrail to start to pull him." (Campbell Dep. (doc. 70, Exh. B), at 90.)  And another plaintiff's expert witness opined in his report that "[i]t may appear to some that [Jakobe] may have tried to elevate himself onto the handrail but the footage is, in my opinion, inconclusive." (Doc. 70, Exh. E, at 26.)  Whether Jakobe intentionally sat on the handrail or not, both sides agree that he backed into it with enough force that – through his own actions – he ended up on the rail, and ultimately fell over the side.

IV.     **Summary Judgment Standard.**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

V.      **Analysis of Defendant Sears' Motion.**

A.      *Duty and Premises Liability.*

As an initial matter, Sears moves for summary judgment on a theory that it owed no duty to Jakobe to provide additional guardrail protection around the down escalator.  Under well-settled Alabama law, "a storekeeper is under a duty to exercise reasonable care to provide and maintain reasonably safe premises for the use of his customers."  *Maddox By and Through Maddox v. K-Mart Corp.*, 565 So.2d 14, 16 (Ala. 1990).  That said, a "storekeeper is not an insurer of the safety of his customers, but rather is liable only if he negligently fails to exercise reasonable care to maintain the premises of the store in a reasonably safe condition."  *Strahsburg v. Winn-Dixie Montgomery, Inc.*, 601 So.2d 916, 917-18 (Ala. 1992) (citation omitted); *see also Dolgencorp, Inc. v. Hall*, 890 So.2d 98, 101 (Ala. 2003) ("No presumption of negligence arises from the mere fact of injury to the customer.") (citation omitted).  Thus, "an invitee seeking to impose liability on a premises owner generally must show not only that she was injured as a

result of a defective condition on the owner's premises, but also that the owner knew or should have known of the defective condition." *Burlington Coat Factory of Alabama, LLC v. Butler*, 156 So.3d 963, 969 (Ala.Civ.App. 2014) (citations and internal marks omitted).  Sears' position is that neither the defective condition prong nor the knowledge prong of the legal test for premises liability are satisfied here.

With regard to a dangerous condition, Sears argues there was none because the Store's down escalator was designed by the architect, approved by the general contractor, compliant with applicable codes and standards, issued an escalator number by the State of Alabama, and periodically inspected.  In a nutshell, Sears' position is that it "did not owe  a duty to Plaintiff to install additional guarding because the escalator was not defective or unsafe without such guarding." (Doc. 57, at 10.)  This argument overlooks plaintiff's evidence that the termination of the guardrail approximately 12 to 18 inches after the left handrail began at the entrance to the down escalator was indeed dangerous and unsafe.  For example, plaintiff's expert David Cooper opined that "the fixed guard does not extend far enough beyond the newel to prevent a fall over the side." (Doc. 70, Exh. E, § 5.12.)  Cooper further asserted that "the escalator presented a dangerous condition due to the layout of the incident escalator in an open atrium and due to a number of dimensions of the escalator." (*Id.*, § 7.1.2.)  Additional plaintiff's evidence suggests that applicable building codes require a 42-inch guardrail at the location where Jakobe fell, yet no such guardrail was in place.  (Doc. 70, Exh. G at 32; Weeks Dep. (doc. 70, Exh. AA), at 123-24.)[20]  Plaintiff's evidence also supports an inference of longstanding awareness by the escalator industry that, because of the safety risks of falling over the side of escalators, "guardrails should be mandatory where there are open atriums or other spaces." (Doc, 70, Exh. W, at § 10.1.)  These and other record facts give rise to genuine issues of fact as to whether the unguarded nature of the down escalator at the Store was a dangerous condition for purposes of premises liability under Alabama law.

---

[20]     The Court recognizes, of course, that defendants take issue with Weeks' opinions and cite to other excerpts of his deposition that they say undermine the expert opinion set forth above. (Doc. 72, at 11.)  Such testimony may prove fertile ground for cross-examination at trial; however, it is not a viable basis for rejecting Weeks' expert opinions outright at the summary judgment stage based on fragmentary deposition excerpts that fall well short of conveying the full picture of his asserted opinions and the grounds for same.

Sears also seeks summary judgment on the ground that it lacked actual or constructive knowledge of any such dangerous condition.  It is true, of course, that as a general proposition, "[a]ctual or constructive notice of the presence of the [dangerous condition] must be proven before the proprietor can be held responsible for the injury."  *Dolgencorp*, 890 So.2d at 101 (citation omitted).  The linchpin of Sears' "no knowledge" defense is that no one had ever fallen over the side of the Bel Air Mall store escalator before, and that neither state regulators nor contractors with whom it partnered had ever told Sears that additional guardrails were needed on the down escalator.  (Doc. 57, at 10-11.)  But plaintiff has come forward with substantial record evidence from which a reasonable finder of fact could conclude that Sears was on notice of the safety hazard created by the open, unguarded side of its escalator at the Bel Air Mall Store, given Sears' actual knowledge of multiple previous incidents in which children had fallen over the side of escalators at other Sears stores.[21]  Summary judgment is inappropriate on this point.

### B.    Foreseeability.

As its next ground for summary judgment, Sears maintains that "it was unforeseeable as a matter of law … that a parent will fail to protect a child from a risk known to the parent."  (Doc. 57, at 12.)  Sears relies exclusively for this principle on an Alabama case styled *Williamson v. Tyson Foods, Inc.*, 626 So.2d 1261 (Ala. 1993).  *Williamson* was a factually unusual case in which a father brought his four-year old son into the father's workplace, a chicken house where the father was repairing the motor of an automatic feeder for new chicks.  The son lost his finger after sticking it into a hole in the automatic feeding system.  The son's family then sued the owner of the chicken farm on a premises liability theory.  The Alabama Supreme Court affirmed summary judgment in favor of the defendant, reasoning that it was unforeseeable to the owner that its employee would bring his young child to work and then fail to do anything to protect the child from a risk that was well known to the father.  In so doing, the *Williamson* court cautioned that "[t]his decision is based on the specific facts in the record on appeal and it does not abrogate

---

[21]    Sears knew, for example, that in 2005 a small child had ridden the handrail of an escalator in one of its stores in Hawaii when the child fell over the side and suffered head contusions.  (Lemmert Dep., at 61.)  Sears also knew that in 2013 a teenage girl had been leaning over the handrail an escalator she was riding at a Sears store in Chicago when she fell over the side from the third floor to the second floor.  (*Id.* at 62.)  And Sears knew that a four-year old boy named Mark DiBona had fallen to his death from a Sears escalator handrail in Auburn, Massachusetts in 2011. (*Id.* at 93; Dull Dep., at 22-23.)

any other decision defining the scope of liability of a landowner." *Id.* at 1266.  Despite this express limiting admonition, Sears urges the Court to apply *Williamson* to dismiss Kirksey's claims as a matter of law because it was legally unforeseeable to Sears that Kirksey would not prevent Jakobe from playing on or around an escalator.

Sears' reasoning is unpersuasive.  Defendants have not cited, and the Court has been unable to find, any cases in which Alabama courts have extrapolated the *Williamson* rule to the premises liability of a storekeeper.  The facts in the light most favorable to Kirksey are significantly and materially distinguishable from those in *Williamson*.  Unlike *Williamson*, where a father improperly brought his child into the workplace, here Jakobe and his relatives were all business invitees whom Sears welcomed into the Store.  It was entirely foreseeable to Sears that children would be present on its premises and that they would stand near and ride on its escalator equipment.  Moreover, it was entirely foreseeable to Sears that a child might interact with its escalator while a parent or guardian's gaze was averted or their attention was distracted, such as when completing a retail transaction with a Sears cashier.  And Sears knew a parent might not protect a child fully from safety risks on its escalators because Sears had past experience with children falling over the side of its escalators at other stores.  By contrast, it was not foreseeable to the chicken house owner in *Williamson* that an employee would bring his small child into the workplace in the first place, much less that such employee would encourage the four-year old child to go look at dangerous machinery, and then fail to pay any attention to the child while he did so.  In light of these glaring and material discrepancies, the Court cannot agree with defendants' characterization that "[t]he scenarios in *Williamson* … bear a striking resemblance to the facts of the present case."  (Doc. 72, at 15.)

More generally, any suggestion by Sears that it could not have foreseen that a parent might not prevent a child from momentarily sitting on an escalator handrail approaches frivolity.  Again, Sears knew children had done it before because it had experience with children falling from its store escalators.  Moreover, this kind of escalator misuse appears to be commonly understood by anyone who spends any time in multilevel shopping malls or retail outlets.  After all, a Schindler 30(b)(6) deponent answered "[a]bsolutely" when asked whether "sitting on a handrail is a … known and foreseeable misuse of an escalator."  (Elliott Dep., at 79-80.)  News stories and trade articles in the record document those propensities.  (Doc. 70, Exhs. G, NN.)  Under the circumstances, it is not apparent how Sears can argue with a straight face that – much

-20-

less demand judgment as a matter of law because – it never could have fathomed that a parent shopping in its store might not actively supervise her child at every single moment (such as while waiting in line at the cash register to make a purchase), or that such a momentarily unsupervised child might misuse its escalator by sitting on the handrail.  The Court readily concludes that Sears is not entitled to summary judgment on the ground of foreseeability.[22]

### C.   *Contributory Negligence.*

As its next ground for seeking summary judgment, Sears contends that Kirksey's contributory negligence in failing to supervise Jakobe bars her claim as a matter of law. Alabama law has long provided that a parent's contributory negligence may indeed be a defense to liability in a wrongful death action involving the death of a minor child.  *See, e.g., Alabama Power v. Stogner*, 95 So. 151, 156 (Ala. 1922) ("in an action by a parent under the statute for the wrongful act, omission, or negligence causing death to a minor child under the age of discretion, the concurrent contributory negligence of such parent may be pleaded as a defense to such action").[23]  Sears maintains that Kirksey negligently failed to supervise Jakobe properly, and that

---

[22]     There is an undercurrent running through defendants' briefs that Kirksey possessed some special knowledge that Jakobe was particularly susceptible to misuse of escalators. (Doc. 57, at 13; doc. 72, at 15.)  Indeed, Sears suggests that Kirksey "knew that Jakobe had a tendency to lean on escalator handrails, … [y]et, she turned her back on him as he was near an escalator."  (Doc. 72, at 15.)  However, in the light most favorable to plaintiff, the record evidence shows that Kirksey was unaware of any issues or problems that Jakobe had or might have with escalators and that, furthermore, while Kirksey's back was turned on her son to make a purchase, she had left him under the supervision of an adult family member, Daphne, who was watching and talking with him at a close distance, then averted her gaze for just a moment before the accident occurred.  On these facts, a reasonable jury could categorically reject Sears' attempt to chalk up the accident to inattentive parenting in the face of a known risk.

[23]     *See also Shirley v. Shirley*, 73 So.2d 77, 84 (Ala. 1954) ("It is true that the negligence of a parent … is a good defense to an action by the parent charging negligence in causing the death of a minor child."); *Alabama G.S.R. Co. v. Dobbs*, 12 So. 770, 774 (Ala. 1893) ("[i]t is the assertion of a plain and obviously just principle to say if parents permit a child of tender years to run without a protector, in exposed and dangerous places, where it is liable to be damaged, they … are guilty of such knowledge as will preclude them from a recovery of damages from any injury resulting therefrom"); Marsh, Jenelle Mims, *Alabama Law of Damages* § 37:7 (6th ed.) ("In an action for the wrongful death of a minor, the contributory negligence of a parent will result in a judgment in favor of the defendant unless the defendant's conduct was more culpable than ordinary negligence.").

such omission requires dismissal of her wrongful death claims on a theory of contributory negligence.

As an initial response, plaintiff counters that Sears is misstating Alabama law, and that a parent's contributory negligence is actually no bar to recovery for the wrongful death of a child in an action brought by an administrator or representative of the child.  In so doing, plaintiff urges the Court to distinguish between wrongful death suits brought by an administrator of the decedent child's estate (where plaintiff says the parent's contributory negligence does not operate as a bar) and those brought on behalf of a parent individually (where plaintiff admits it does).  The trouble with Kirksey's proposed distinction is that the Alabama Supreme Court has expressly rejected it.  *See Peoples v. Seamon*, 31 So.2d 88, 91 (Ala. 1947) ("We cannot adhere to the theory that a father by electing to be administrator … and suing as such, rather than as the parent … his contributory negligence is no defense, whereas it would be a defense in a suit by the parent personally, when the damages recoverable by such administrator would belong to such parent solely to the same extent as if the suit were by him personally.").  In arguing otherwise, Kirksey urges the Court to follow an earlier line of authority exemplified by *City of Birmingham v. Crane*, 56 So. 723 (Ala. 1911).  In *Peoples*, however, the Alabama Supreme Court opined that *Crane* "has not been followed on that question in such a situation, and we think did not correctly apply the principle of contributory negligence."  *Peoples*, 31 So.2d at 91.  The parent/ administrator distinction advocated by Kirksey is therefore irreconcilable with the current state of Alabama law, and will not be adopted here.[24]

Notwithstanding that defendants have properly stated the law of contributory negligence, summary judgment is inappropriate on this ground.  Under Alabama law, contributory negligence is almost always a question for the jury.  *See, e.g., Electric Service Co. of Montgomery, Inc. v. Dyess*, 565 So.2d 244, 246 (Ala. 1990) ("Ordinarily, contributory negligence is a question for the jury.").[25]  Viewing the summary judgment record in the light

---

[24]      *See also* Marsh, *Alabama Law of Damages* at § 37:4 ("It also has been held that the **contributory negligence of the parent precludes recovery** unless the defendant is guilty of more culpable conduct than ordinary negligence **regardless of whether the parents or the personal representative brings the action**.") (emphasis added).

[25]      *See also Chilton v. City of Huntsville*, 584 So.2d 822, 824 (Ala. 1991) ("Although contributory negligence may be found to exist as a matter of law when the evidence is such that (Continued)

most favorable to plaintiff, the Court readily concludes that reasonable minds could differ as to whether Kirksey was negligent, and whether any such negligence proximately contributed to Jakobe's death.  Indeed, a reasonable finder of fact could conclude on this record that Kirksey was not negligent at all because (i) Jakobe was standing within 13 feet of his mother at the moment of the accident; (ii) another adult relative, Daphne, was standing much closer to Jakobe, interacting with and supervising him at the time; and (iii) Kirksey had no notice and no reason to believe that Jakobe had problems or issues with escalators, that the Sears escalators posed a danger to him, or that he was in any way predisposed to play or sit on the escalator handrail during the brief period in which she stood in line at the cash register to purchase socks.[26]

Because the evidence of Kirksey's contributory negligence *vel non* is not entirely free of doubt or adverse inference, and because all reasonable people need not reach the same conclusion on that issue, the question of contributory negligence is not amenable to resolution on summary judgment, but instead presents a triable issue.  Sears is not entitled to summary judgment on this ground.

### D.    Causation and Extending the Guardrail.

As an additional ground for its Motion for Summary Judgment, Sears posits that Kirksey cannot establish causation.  In particular, Sears maintains that, while Kirksey faults Sears for not installing a 42-inch guardrail along the horizontal portion of the escalator handrail, such a guardrail would not have prevented Jakobe's fall.  Succinctly put, defendants' position is that

---

all reasonable people must reach the same conclusion, the question of the existence of contributory negligence is normally one for the jury."); *Patterson v. Craig*, 394 So.2d 948, 949 (Ala. 1981) ("We likewise find no error in the court's submitting the issue of contributory negligence to the jury.  Unless completely free of doubt, this issue should always be submitted to the jury."); *Yates v. De Mo*, 118 So.2d 924, 926 (Ala. 1960) ("unless the evidence of contributory negligence is entirely free of doubt or adverse inference, the question must be submitted to the jury").

[26]    This third point is potentially significant because contributory negligence requires a showing that "the party charged had knowledge of the dangerous condition" and that "he appreciated the danger under the surrounding circumstances."  *Chilton*, 584 So.2d at 824.  Of course, plaintiff's evidence is that Kirksey was unaware of the dangerous condition posed by the escalator and did not appreciate any danger to Jakobe because he had never previously had problems with escalators.

"[p]laintiff's claims fail as she lacks evidence that Jakobe's death was caused by the absence of a 42-inch guardrail alongside the escalator handrail." (Doc. 72, at 17.)  In support of this assertion, Sears relies on the opinions of its expert, Dr. Rodowicz, that "if the guardrail had been extended he still would have fallen over the handrail." (Rodowicz Dep., at 84.)[27]

Defendants' summary judgment position is perplexing from its inception because Kirksey does not appear ever to have confined herself to a theory of liability that defendants should have placed a 42-inch guardrail along the entire horizontal portion of the escalator handrail.  Indeed, plaintiff's Complaint identifies a variety of "available and reasonable safety measures" that could have prevented Jakobe's fall, "including but not limited to additional safety railings, safety barricades, and higher railings as well as additional signage, warnings, training, and procedures," and asserts that defendants were wanton or negligent because they "failed to implement any such safety measures at the Store." (Complaint, ¶¶ 15-16.)  It is thus unclear why defendants believe Kirksey has irretrievably committed herself to a singular theory of liability (to the exclusion of all others) that Sears and Schindler should have installed a 42-inch guardrail along the entire horizontal section of the escalator handrail.[28]

Leaving aside that conceptual question, even if defendants were correct that Kirksey's case hinges on defendants' failure to extend a 42-inch guardrail along the horizontal portion of the escalator's handrail, the record contains adequate evidence of causation.  For example, plaintiff's expert Traci Campbell testified that if Sears had extended the guardrail for the full length of the horizontal portion of the handrail on the down escalator, "the extension of the guardrail would have given Jakobe Kirksey additional time in order to exercise a different course

[27]    Dr. Rodowicz elaborated on her reasoning as follows: "[A] portion of that opinion is because the location of his center of gravity on the rail would have been above the handrail height.  It also would be due to his motions towards the handrail.  So, as he leaned back and as he positioned himself on the handrail he was unsteady and he tended to move and rotate in that direction.  And all of these things considered would have resulted in him falling over this guardrail if it had been extended." (*Id.*)

[28]    In their reply, defendants balk at "Plaintiff's amorphous and ever-changing version" of the guarding she contends defendants should have installed. (Doc. 72, at 17.)  But defendants do not show either (i) that plaintiff ever professed allegiance to a single, narrow, specific form of safety measure that animates her case; or (ii) that any law, procedural rule or order of this Court compelled her to do so.

of action, which may have included not going over the rail." (Campbell Dep. (doc. 70, Exh. B), at 123.) Campbell elaborated that "[m]ore likely than not," extending the guardrail would have afforded Jakobe "additional time to have reacted differently" and prevented a fall. (*Id.*) Furthermore, plaintiff's expert David Cooper opined that if the fixed guardrail "had only extended the length of the floor plate (stopping where the escalator goes into downward transition begins) it would, in my opinion, have prevented the accident." (Doc. 70, Exh. E, § 5.12.) The Court understands, of course, that Cooper's opinions are in conflict with those of Dr. Rodowicz. But defendants identify no legal principle under which it would be appropriate for this Court to resolve such conflicting expert opinions on summary judgment. Assuming no *Daubert* gatekeeping exclusions, it will ultimately be for the finder of fact to determine which side's experts are more persuasive.

Inasmuch as plaintiff has come forward with sufficient record evidence to support a reasonable inference that Jakobe's fall could have been avoided had defendants merely extended the guardrail out further along the length of the floor plate, Sears is not entitled to summary judgment on the proximate causation element.

## VI.    Analysis of Defendant Schindler's Motion.

As noted, defendant Schindler Elevator Corporation has brought a Motion for Summary Judgment of its own. Certain issues (foreseeability, proximate causation, contributory negligence) raised in Schindler's Motion are identical to those presented in Sears' Motion. No constructive purpose would be served by reiterating the reasons why defendants are not entitled to summary judgment on theories that Kirksey's purported failure to protect Jakobe from falling was unforeseeable as a matter of law pursuant to *Williamson v. Tyson Foods*, that an extended guardrail would not have prevented Jakobe from falling, and that Kirksey's claim is barred by her own contributory negligence in failing to monitor Jakobe's activities in the Store. Those arguments are unavailing as to Schindler's Rule 56 Motion for precisely the same reasons that they are unavailing as to Sears' Rule 56 Motion, and those identical aspects of both motions are denied on precisely the same grounds.

In contrast to Sears, as to which Kirksey's claims are rooted in a premises liability theory, Schindler is sued both on a products liability theory (based on its role as having manufactured and installed the escalator) and on a negligent maintenance theory (based on its role in accepting a contractual obligation to Sears to keep the escalator in good working order).

Not surprisingly, then, Schindler's Motion for Summary Judgment asserts, in addition to the aforementioned duplicative grounds for summary judgment, certain additional arguments specific to the products liability and negligent maintenance claims that Kirksey brings against Schindler.  The summary judgment arguments as to each such category of claim will be considered in turn.

> ### A.   Products Liability Claim.

To establish liability under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), a plaintiff must show, among other things, "that an injury was caused by one who sold a product in a defective condition that made the product unreasonably dangerous to the ultimate user or consumer."  *Tillman v. R.J. Reynolds Tobacco Co.*, 871 So.2d 28, 31 (Ala. 2003) (citations omitted).  A "defective product" is defined as one that is "unreasonably dangerous, i.e., not fit for its intended purpose," with "the important factor" being whether the product "is safe or dangerous when the product is used as it was intended to be used."  *Yarbrough v. Sears, Roebuck and Co.*, 628 So.2d 478, 480-81 (Ala. 1993) (citation omitted).[29]  Schindler's fundamental argument is that the escalator was not defective when it was manufactured and installed in 1997, thereby precluding AEMLD liability as a matter of law.

Plaintiff's first response to Schindler's "no defect" argument is to insist that "Schindler is liable as a common carrier."  (Doc. 71, at 26.)  It may be a legally correct statement that escalators are common carriers under Alabama law.[30]  Nonetheless, this argument is a *non*

---

[29]   Under Alabama law, "misuse of an allegedly defective product is an affirmative defense to liability under the AEMLD, which the defendant must plead and prove."  *Sears, Roebuck and Co. v. Harris*, 630 So.2d 1018, 1028 (Ala. 1993).  For a defendant to prevail on the product misuse defense, "the plaintiff's misuse of the product **must not have been reasonably foreseeable by the seller or manufacturer**."  *Id.* (emphasis added and citation omitted).  Defendant Schindler cannot obtain summary judgment on a product misuse defense because (i) Schindler's own representatives testified in this case that sitting on an escalator handrail is a known and foreseeable misuse of the product (Elliott Dep., at 79-80; Evans Dep., at 73-74); and (ii) "[o]rdinarily, the plaintiff's misuse of an allegedly defective product is a factual issue for the jury."  *Harris*, 630 So.2d at 1028.

[30]   After all, the Alabama Supreme Court "has held that an elevator, whether passenger or freight, is a common carrier and, as such, is to be operated and maintained with the highest degree of care."  *Container Corp. of America v. Crosby*, 535 So.2d 154, 156 (Ala. 1988).  Although Alabama has not expressly extended this reasoning to escalators, courts in other jurisdictions have done so.  *See, e.g., Suarez v. Trans World Airlines, Inc.*, 498 F.2d 612, 616 (7th (Continued)

*sequitur*.  The "common carrier" doctrine imposes a heightened duty of care on those who operate and maintain elevators and (arguably) escalators in Alabama.  *See Container Corp. of America v. Crosby*, 535 So.2d 154, 156 (Ala. 1988) ("an elevator, whether passenger or freight, is a common carrier and, as such, is to be operated and maintained with the highest degree of care").[31]  But Schindler's "no defect" argument goes to the question of AEMLD liability in its capacity as the manufacturer and installer of the escalator nearly 20 years ago.  Plaintiff does not explain, and the Court does not perceive, how the common carrier doctrine's heightened duty of care imposed on commercial operators has any bearing on an escalator manufacturer's liability under the AEMLD.

Plaintiff's alternative counterargument is that the subject escalator was indeed unreasonably dangerous because of the fall hazard created by insufficient guardrails and the open-atrium design.  Plaintiff points to ample summary judgment evidence supporting a reasonable inference that the escalator installed in the Sears store in Bel Air Mall in 1997 was unreasonably dangerous, and that Schindler knew it.  In particular, plaintiff has submitted evidence that, among other things, (i) plaintiff's expert David Cooper has rendered an opinion that "the escalator presented a dangerous condition to patrons" of Sears because of the "the layout of the incident escalator in an open atrium and due to a number of dimensions of the escalator" (Doc. 70, Exh. E, §§ 7.1.1 – 7.1.2); (ii) industry literature from March 1993 highlighted the risk of falls from unguarded, open-side escalators, and recommended that "the

_____

Cir. 1974) ("Under Illinois law even such conveyances as elevators and escalators are common carriers of passengers … (the) operators (of which), upon the grounds of public policy, are required to exercise the highest degree of care and diligence") (citations, footnotes, and internal quotation marks omitted); *Gomez v. Superior Court*, 113 P.3d 41, 45 (Cal. 2005) ("It now is well established that commercial operators of elevators and escalators are carriers of persons for reward."); *Millar Elevator Service Co. v. O'Shields*, 475 S.E.2d 188, 191 (Ga.App. 1996) ("The owner or operator of an elevator or escalator is not a common carrier in the sense that he is bound to serve all the public; yet his duty as to protecting passengers in the elevator is the same … as that chargeable to carriers of passengers by other means.") (citation and internal quotation marks omitted).

[31]    *See generally Broussard v. State ex rel. Office of State Bldgs.*, 113 So.3d 175, 186 (La. 2013) ("Louisiana law places 'a high degree of care' upon elevator owners"); *Beach v. B.F. Saul Property Co.*, 694 S.E.2d 147, 151 (Ga.App. 2010) ("owners or operators of an elevator, like common carriers of passengers, must exercise extraordinary diligence").

manufacturer should advise the owner of guarding requirements" (doc. 70, Exh. G, at 34); (iii) Schindler is aware that people may ride escalator handrails, which is a foreseeable misuse of the product; and (iv) the A17/B44 Escalator and Moving Walk Committee (which included Schindler representatives) proposed a rule in 1995 that "[e]very escalator or bank of escalators adjacent to an open wellway shall have a guardrail," with the genesis of such proposal being an "unexpected history of falls over the sides of escalators" and the committee finding that "guard rails should be mandatory where there are open atriums or other spaces" (doc. 70, Exh. W), at 3).[32]  Considering this and other record evidence in the light most favorable to plaintiff, the Court finds that genuine issues of material fact remain as to whether the escalator was unreasonably dangerous (and thereby qualifying as defective under the AEMLD) when Schindler manufactured and installed it in 1997.

Schindler retorts that it cannot be liable under a product liability theory because the escalator that it manufactured and installed was in accordance with specifications and requirements established by the architect and general contractor for the Store's expansion project.  Alabama law is not as one-sided on this point as Schindler might hope.  It is true enough that "[a]n independent contractor owes no duty to third persons to judge the plans, specifications or instructions which he has merely contracted to follow."  *McFadden v. Ten-T Corp.*, 529 So.2d 192, 200 (Ala. 1988) (citation omitted).  However, it is equally true that the Alabama Supreme Court "has adopted the view that an independent contractor ***is not free to comply with obviously defective plans and specifications that the contractor should know may create unreasonably dangerous conditions***.  Rather, a contractor is expected to act reasonably under the particular circumstances in order to avoid accidents."  *Aldridge v. Valley Steel Const., Inc.*, 603 So.2d 981,

---

[32]     In their reply brief, defendants object that the Escalator and Moving Walk Committee meeting minutes "cannot be used in support of a product liability claim against an escalator manufacturer" because they relate to "building design as opposed to escalator design." (Doc. 72, at 4-5.)  Defendants' logic is difficult to follow.  As noted *supra*, the "unreasonably dangerous" inquiry for AEMLD hinges on whether the escalator was fit for its intended purpose. In the context of the specific escalator at issue here, that "intended purpose" was for Sears to operate the escalator to transport customers from the second floor to the first floor in an open-atrium environment in the Bel Air Mall without the guardrails recommended by the Escalator and Moving Walk Committee.  A reasonable finder of fact could rely on those meeting minutes in determining that Schindler's escalator was unreasonably dangerous, *i.e.*, not fit for its intended purpose, where it was to be installed in an atrium without adequate guardrails.

984 (Ala. 1992) (emphasis added).[33]  In light of the *Aldridge* line of authority, genuine issues of material fact remain as to whether, given what it knew or should have known about the hazards associated with open-side escalators, Schindler acted reasonably or prudently when it installed the escalator as indicated on the plans and specifications, without taking additional reasonably available steps to avoid accidents.  Summary judgment is not warranted on this basis.

Notwithstanding the foregoing, Schindler makes one more attempt at dismissal of the AEMLD claim by arguing that "Plaintiff cannot demonstrate a feasible alternative design in existence in 1997 that would have prevented the subject accident."  (Doc. 60, at 10.)  Alabama law is clear that, under the AEMLD, a plaintiff "has the burden of showing that a safer, practical, alternative design was available."  *Ex parte Delta Int'l Machinery Corp.*, 75 So.3d 1173, 1179 (Ala. 2011).[34]  Where Schindler's argument fails, however, is in its insistence that "[t]here is no evidence that any such additional guarding even existed in the United States in 1997" and that plaintiff's proposed alternative design "did not exist."  (Doc. 60, at 11.)  In fact, Kirksey has presented substantial evidence that such alternative measures did exist at the time of the escalator's installation.  For example, plaintiff's expert Traci Campbell indicated that Jakobe's accident could have been prevented had the Sears escalator been designed like a Dillard's escalator where "the top flat portion of the escalator is guarded by the floor."  (Campbell Dep., at 130.)  Campbell also noted that back in 1993, an industry expert named Dr. Fruin had "provided examples of then existing alternative designs," some of which Campbell highlighted in her

---

[33]      *See also Hanna v. Gregg, Bland & Berry, Inc.*, 840 So.2d 839, 847-48 (Ala. 2002) ("the mere fact that GB & B followed the plans and specifications supplied by Reynolds does not, in and of itself, shield GB & B from liability if GB & B should have been aware that complying with those plans and specifications would create an unreasonably dangerous condition"); *see generally Galloway v. Ozark Striping, Inc.*, 26 So.3d 413, 422 (Ala.Civ.App. 2009) (opining that rule in *Aldridge* and *Hanna* applies "to contractors who construct, install, or modify a device that subsequently causes injury").

[34]      *See also McMahon v. Yamaha Motor Corp., U.S.A.*, 95 So.3d 769, 772 (Ala. 2012) (to show that a product is defective in an AEMLD case, plaintiff must prove "that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the allegedly defective product"); *General Motors Corp. v. Jernigan*, 883 So.2d 646, 662 (Ala. 2003) (to prove a defect for AEMLD purposes, "a plaintiff must prove that … a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]") (citations and internal quotation marks omitted).

report.  (Doc. 70, Exh. E, § 7.1.11 & 30-38.)  Similarly, plaintiff's expert Joseph Stabler submitted an affidavit on summary judgment expressly rejecting the proposition that additional guarding did not exist or was not available prior to installation of the subject escalator, and identifying specific examples of available alternatives.  (Stabler Aff. (doc. 70, Exh. X), ¶¶ 4-7.)  Schindler is not entitled to summary judgment on this basis.[35]

Before moving on from the AEMLD claim against Schindler, the Court pauses to consider the "failure to warn" aspect of this claim identified in Kirksey's principal brief.  According to plaintiff, "not only did Schindler fail to provide such guardrails, Schindler failed to provide any warning to Sears or the public.  This is an actionable failure to warn."  (Doc. 71, at 29.)  Schindler correctly argues that this theory fails as a matter of law.  Under Alabama law, a manufacturer has a duty to warn "only when [it] has 'no reason to believe that the user will realize the 'dangerous condition' of the product ….'  [T]he objective of placing a duty to warn on the manufacturer … of a product is to acquaint the user with a danger of which he is not aware."  *Abney v. Crosman Corp.*, 919 So.2d 289, 294 (Ala. 2005) (citation omitted); *see also Ex parte Chevron Chemical Co.*, 720 So.2d 922, 925 (Ala. 1998) (manufacturer's duty to warn is limited to "those dangers which the owner or user would not be aware of under the particular circumstances of his use of the product") (citation omitted).  Plaintiff's extensive summary judgment evidence reflects that Sears was well aware of the risk that its customers might fall

---

[35]    In its Reply, Schindler reframes its "alternative design" argument by focusing on the feasibility requirement, insisting that there is no evidence that Kirksey's proffered alternative designs were "feasible."  (Doc. 72, at 8.)  The Reply marks the first time that Schindler raised the feasibility argument; indeed, as noted, its position in its principal brief was that Kirksey had identified no alternative designs at all, even though extensive discovery materials reflected otherwise.  By raising the feasibility objection for the first time in its Reply, Schindler has effectively denied Kirksey an opportunity to be heard as to same.  This is one reason why new arguments are not authorized for reply briefs in federal court.  *See, e.g., Herring v. Secretary, Dep't of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotes omitted); *Brown v. CitiMortgage, Inc.*, 817 F. Supp.2d 1328, 1332 (S.D. Ala. 2011) ("As a threshold matter, it is improper for a litigant to present new arguments in a reply brief, as Citi has done here. … New arguments presented in reply briefs are generally not considered by federal courts.").  The Court will not grant summary judgment in Schindler's favor based on a previously available "feasibility" argument developed for the first time in its reply brief.

over the side of the escalator; therefore, Schindler had no legal obligation to provide a warning of that known risk to Sears.

Nor does plaintiff offer any explanation or reasoning why Schindler might owe an independent duty to warn end users nearly two decades after it installed the escalator.  If Sears as premises owner had an obligation to warn its patrons about the fall risks to its escalator, then Schindler could not owe such a duty, as a matter of law.  *See McGhee v. Oryx Energy Co.*, 657 So.2d 853, 855 (Ala. 1995) ("where a third party has an independent duty to warn the ultimate user of the dangers associated with the use of a product, the manufacturer is justified in relying upon that third party to perform its duty"); *see also Chevron Chemical*, 720 So.2d at 926 n.3 ("a manufacturer who sells an industrial product to a sophisticated purchaser has no duty to provide warnings to the employee of that purchaser where the purchaser has an obligation to inform its employees") (citation omitted).  In light of these principles, Kirksey's failure-to-warn claim against Schindler as manufacturer/installer of the escalator appears both factually and legally unfounded.  Schindler's Motion for Summary Judgment will be **granted** as to that aspect of Kirksey's claim.

> ### B.    *Negligent Maintenance Claim.*

Schindler also moves for summary judgment on Kirksey's claims against it based on a theory of negligent maintenance of the escalator.  As noted, Schindler entered into a national maintenance contract with Sears, pursuant to which Schindler assumed a duty to maintain and repair the escalator and to keep it in good working order.  Under Alabama law, assuming a duty in this manner may provide a cognizable basis for imputing liability in favor a third party who suffers a foreseeable injury pursuant to the contracting entity's breach of such duty.  *See, e.g., Keck v. Dryvit Systems, Inc.*, 830 So.2d 1, 9-10 (Ala. 2002) ("[w]here one party to a contract assumes a duty to another party to that contract, and it is foreseeable that injury to a third party – not a party to the contract – may occur upon a breach of that duty, the promissor owes that duty to all those within the foreseeable area of risk") (citations omitted).  While Schindler concedes that it assumed a duty to maintain the escalator via the national maintenance contract, it insists that this contract did not obligate Schindler to install additional guarding, to retrofit the product or to recommend modifications to the escalator at any time.  (Doc. 60, at 13.)  On that basis, Schindler argues, it cannot be held liable on a theory of negligent failure to maintain the

escalator because it never agreed to install additional guarding or make guardrail recommendations to Sears pursuant to the subject maintenance contract.

Plaintiff does not respond directly to Schindler's argument. She certainly does not identify any aspect of the national maintenance contract that she claims would impose a duty on Schindler to retrofit guardrails on the escalator or to issue guidance or directives for Sears to do so. At most, Kirksey presents evidence that the escalator "was in violation of the escalator code at the time of Jakobe's fall" for reasons wholly unrelated to guardrails. (Doc. 71, at 9.) In particular, Lerch Bates performed a post-accident inspection of the escalator in June 2014 and found at least the following code violations: a missing code data plate, broken cleats on a step, missing start-up logs, and a missing brake data tag. (Shanks Dep., at 78, 83.)[36] Plaintiff also points to testimony in which Schindler acknowledged its official stance that an escalator with code violations should be taken out of service. (Elliott Dep., at 71.) Seizing on this testimony, and evidence of code violations predating and postdating the subject fall, Kirksey posits that the escalator in question should have been taken out of service for code violations and that if it had been, "then Jakobe would still be alive today." (Doc. 71, at 10.)

The fundamental misfire in plaintiff's reasoning is that it overlooks the critical difference between but-for cause and proximate cause. To establish negligence under Alabama law, a plaintiff must prove proximate causation as "an essential element" of her claim. *Martin v. Arnold*, 643 So.2d 564, 567 (Ala. 1994). "Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred." *Id.* By contrast, "[f]actual causation, or 'but for' causation, is that part of causation analysis that asks if the complained-of injury or damage would have occurred but for the act or omission of the defendant." *Springer v. Jefferson County*, 595 So.2d 1381, 1383 (Ala. 1992). Plaintiff's evidence of broken cleats, missing data tags and so on may well establish deficient performance of the maintenance contract by Schindler, and may also establish but-for causation, in the sense that if Schindler had recognized those violations and taken the escalator out of service to correct those problems, then the escalator

---

[36]     Such findings were consistent with those of plaintiff's expert David Cooper, who opined that "the escalator had not been well looked after" based on observed defects such as a missing handrail entry cover, damaged step fins, worn/damaged safety covering on comb plate, and exposed newel rollers. (Doc. 70, Exh. E, at 19-21.)

might not have been operational on June 14, 2014 and Jakobe's fall could not have happened.  If proven, that line of reasoning may establish factual causation.  But there is no proximate causation here.  The aspects of the national maintenance contract that plaintiff says Schindler performed deficiently had nothing to do with Jakobe's fall and cannot reasonably be deemed the legal or proximate cause of the accident.  Experts on both sides agree.  Indeed, while plaintiff's expert David Cooper recognized that "[t]he escalator wasn't well maintained," he hastened to add in his expert report as follows: "I do not believe this to be causative of the accident."  (Doc. 70, Exh. E, § 5.13.)  Defendant's expert Davis Turner reached the same conclusion.  (Turner Dep. (doc. 70, Exh Z), at 129 (acknowledging that portions of the escalator were out of code compliance at the time of Jakobe's fall, but that such violations "had nothing to do with the incident").)  Thus, the deficient aspects of Schindler's performance of the maintenance contract are irrelevant to Kirksey's wrongful death claims here because no reasonable finder of fact could deem them to be the proximate cause of Jakobe's fall.

This brings us back to the original point.  Kirksey has purported to bring a claim of negligent maintenance against Schindler based on the latter's contractual obligation to Sears to keep the subject escalator in good working order.  But plaintiff makes no showing that the maintenance agreement imposed any duty on Schindler to add guarding to the escalator after the fact or to recommend additional guarding to Sears.  In its maintenance capacity, Schindler had no such duty – and therefore cannot be liable to third persons such as Kirksey for failure to perform that duty – because the maintenance contract included no such obligations.  To be sure, Schindler did assume the duty of keeping the escalator in good working order and in compliance with escalator codes.  Plaintiff has substantial evidence that Schindler breached that duty by allowing the escalator to be out of compliance in multiple respects (missing data tags, broken cleats and so on); however, those breaches of duty cannot form the basis of an actionable negligent maintenance claim for Kirksey against Schindler because there is no evidence that might support a reasonable inference that those breaches of duty proximately caused Jakobe's fall from the escalator in June 2014.

For all of the foregoing reasons, the Court finds that Schindler is entitled to summary judgment as to plaintiff's theory of liability predicated on negligent maintenance of the escalator, or negligent performance of the national maintenance contract for servicing that escalator.

VII.   **Constitutional Challenge to the Alabama Wrongful Death Act.**

At the conclusion of each Motion for Summary Judgment, defendants construct a purely legal argument that Kirksey's claims should be dismissed because the Alabama Wrongful Death Act is unconstitutional as applied to the facts of this case.

A.   *The Wrongful Death Act and Defendants' Theories of Unconstitutionality.*

Alabama's statute for wrongful death of a minor provides that "[w]hen the death of a minor child is caused by the wrongful act, omission, or negligence of any person …., the father, or the mother … may commence an action." Ala. Code § 6-5-391(a); *see also* Ala. Code § 6-5-410(a) ("[a] personal representative may commence an action and recover such damages as the jury may assess in a court of competent jurisdiction within the State of Alabama … for the wrongful act, omission, or negligence or any person …, whereby the death of the testator or intestate was caused"). "This statute is the sole remedy for the tortious infliction of death in the state of Alabama … and plaintiffs bringing actions under it may recover *only* punitive damages." *Entrekin v. Internal Medicine Associates of Dothan, P.A.*, 689 F.3d 1248, 1253 (11th Cir. 2012) (citations and internal quotation marks omitted). Significantly, mere negligence by the tortfeasor is all that is necessary to trigger liability for punitive damages under the statute. *See, e.g., Hanna v. Riggs*, 333 So.2d 563, 566 (Ala. 1976) ("The gravamen [of] a wrongful death action is the 'wrongful act, omission, or negligence' of anyone causing another's death.").

Defendants' constitutional attack on the Alabama Wrongful Death Act (the "Act") has two prongs. First, defendants maintain that the Act violates the Equal Protection Clause of the Fourteenth Amendment by creating liability in punitive damages for conduct as to which punitive damages would be unavailable as a matter of law had Jakobe survived because defendants had complied with applicable state escalator codes. (Doc. 60, at 20-22.) Second, defendants theorize that the Act violates substantive due process because "it arbitrarily imposes punitive damages. It permits punitive damages, only, for mere negligence resulting in death. Punitive damages, however, would not be awarded for the same conduct when the injured party does not die." (*Id.* at 24.) Neither constitutional theory can withstand meaningful scrutiny.[37]

---

[37]   Before reaching the merits of defendants' arguments, the Court points out an important procedural error. The Federal Rules of Civil Procedure require that a party filing a motion "drawing into question the constitutionality of a federal or state statute must promptly … file a notice of constitutional question stating the question and identifying the paper that raises it (Continued)

### B.   *Equal Protection.*

Defendants' Equal Protection challenge fails because there is plainly a rational basis for the challenged distinction. *See generally Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) ("this Court's cases are clear that, unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.").[38] Simply put, "[t]he Legislature

---

… if … a state statute is questioned and the parties do not include the state, one of its agencies, or one of its officers or employees in an official capacity." Rule 5.1(a)(1)(B), Fed.R.Civ.P. In addition to filing such a notice, the party asserting the constitutional challenge must "serve the notice and paper … on the state attorney general if a state statute is questioned," after which the state attorney general has 60 days to intervene. Rule 5.1(a)(2), (c). Review of the docket sheet reveals that defendants failed to comply with the notice requirements of Rule 5.1. As such, even if defendants' constitutional challenges to the Act had merit, which they do not, this Court could not strike down the Act without the requisite notice having been given. *See* Advisory Committee Notes to Rule 5.1 ("[T]he court may not enter a final judgment holding a statute unconstitutional before the attorney general has responded or the intervention period has expired without response."); *Oklahoma ex rel Edmondson v. Pope*, 516 F.3d 1214, 1216 (10th Cir. 2008) ("The public interest is not well served when a federal statute is challenged and potentially invalidated in litigation among private parties … in the absence of input from the institution that has the responsibility and expertise to defend Acts of Congress."); *Hunter v. Hamilton County Bd. of Elections*, 850 F. Supp.2d 795, 842 (S.D. Ohio 2012) ("if a party calls into question the constitutionality of a state statute, the state attorney general must be given notice and an opportunity to intervene before the court can declare the statute unconstitutional"). Although the Court herein rejects defendants' constitutional challenge to the Act, and notwithstanding defendants' failure to comply with Rule 5.1, the judicial certification procedure delineated in Rule 5.1 and 28 U.S.C. § 2403 appears mandatory. Therefore, in accordance with these provisions, the Court **certifies** to the Alabama Attorney General that the constitutionality of the Alabama Wrongful Death Act has been drawn into question by Sears and Schindler via their Motions for Summary Judgment. If the Alabama Attorney General chooses to intervene within 60 days after this certification, the Court will (upon appropriate motion) reconsider its ruling denying the defendants' Equal Protection and Due Process challenges to the Act.

[38]     *See also Armour v. City of Indianapolis, Ind.*, --- U.S. ----, 132 S.Ct. 2073, 182 L.Ed.2d 998 (2012) ("This Court has long held that a classification neither involving fundamental rights nor proceeding along suspect lines … cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.") (citation omitted); *Lofton v. Secretary of Dep't of Children and Family Services*, 358 F.3d 804, 818 (11th Cir. 2004) ("Because the present case involves neither a fundamental right nor a suspect class, we review the Florida statute under the rational-
(Continued)

-35-

has elected to treat wrongful death tort-feasors differently from other tort-feasors, and the ability to so classify is a power inherent in the Legislature, so long as the classification bears a rational relationship to a state interest not prohibited by the United States Constitution." *Killough v. Jahandarfard*, 578 So.2d 1041, 1044 (Ala. 1991). The test, then, turns on the presence or absence of a rational basis for the challenged classification.

The distinction employed by the Alabama legislature here is between negligent conduct not causing a fatality (as to which punitive damages are unavailable as a matter of law) and negligent conduct causing a fatality (as to which the Act allows punitive damages).[39] The Court readily concludes that a rational basis for the challenged distinction exists. After all, "[t]he purpose of Alabama's wrongful-death statute is the protection of human life and the prevention of homicides by wrongful act, omission, or negligence of persons or corporations." *Ex parte Rodgers*, 141 So.3d 1038, 1042 (Ala. 2013) (citations omitted); *see also Mack v. Carmack*, 79 So.3d 597, 611 (Ala. 2011) ("The wrongful-death statutes seek to prevent homicides.");

---

basis standard. … Under this deferential standard, a legislative classification is accorded a strong presumption of validity … and must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.") (citations and internal quotation marks omitted).

[39]     To be sure, defendants frame the distinction as being between code-compliant conduct that does not result in death, on the one hand, and code-compliant conduct that does result in death, on the other. (Doc. 60, at 22; doc. 72, at 20.) But "code compliance" is a red herring. As defendants themselves admit, code compliance is never a guaranteed insulator from liability; rather, it is merely evidence of due care. *See, e.g., Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994) ("Appellant's compliance with both federal regulations and industry practices is some evidence of due care."); *Dunn v. Wixom Bros.*, 493 So.2d 1356, 1359 (Ala. 1986) ("The law in Alabama … is that customary practices or standards do not furnish a conclusive test of negligence."). In other words, a defendant may be adjudged liable on a negligence theory whether or not its conduct was code-compliant. The issue – and the relevant distinction for purposes of the Equal Protection analysis here – is that the Act allows a negligent defendant to be held liable for punitive damages where its negligent conduct causes death, whereas a negligent defendant cannot be liable for punitive damages for mere negligent conduct that does not cause death. *See generally Lafarge North America, Inc. v. Nord*, 86 So.3d 326, 335 (Ala. 2011) ("[p]unitive damages cannot be awarded on a negligence claim" in Alabama); *CP & B Enterprises, Inc. v. Mellert*, 762 So.2d 356, 362 (Ala. 2000) ("Punitive damages are not recoverable for simple negligence, but the recovery in such case is for compensatory damages.") (citation omitted).

*Geohagan v. General Motors Corp.*, 279 So.2d 436, 439 (Ala. 1973) ("Our decisions since the enactment of our wrongful death acts have made it clear that such acts are intended to protect human life, to prevent homicide, and to impose civil punishment on takers of human life.").  As for the solely punitive-damages nature of the remedy created by the statute, "[t]he primary purpose in awarding damages under the homicide statute … is to punish the defendant and to deter others from like conduct." *Nettles v. Bishop*, 266 So.2d 260, 262 (Ala. 1972); *see also Eich v. Town of Gulf Shores*, 300 So.2d 354, 356 (Ala. 1974) ("the damages recoverable under this section are entirely punitive and are based on the culpability of the defendant and the enormity of the wrong, and are imposed for the preservation of human life").  In a nutshell, "the aim of the present statute is to strike at the evil of the negligent destruction of human life by imposing liability, regardless of fault, upon those who are in some substantial measure in a position to prevent it." *Louis Pizitz Dry Goods Co. v. Yeldell*, 274 U.S. 112, 116, 47 S.Ct. 509, 71 L.Ed. 952 (1927).

The Alabama legislature's reasoning for allowing only punitive damages in wrongful death actions has been succinctly summarized as follows: "The sanctity of human life, the noble goal of preserving human life, and society's desire to punish those whose conduct results in the loss of human life, have all been accepted by our Legislature as criteria outweighing the seeming anomaly of permitting punitive damages for simple negligence.  This view rests on the premise that one may be adequately compensated for his injuries, but the value of a human life has no measure.  Punishing the tort-feasor dissuades others from engaging in life-endangering conduct." *Central Electric Co-op. v. Tapley*, 546 So.2d 371, 376 (Ala. 1989).  The desire to punish and deter those who engage in life-endangering conduct is plainly a legitimate governmental purpose that might rationally justify punishing mere negligence differently when it results in death than when it does not.[40]

---

[40]     Such a determination lies well within the permissible, recognized boundaries of legislative authority.  After all, "[i]t is … clearly within legislative competency, of course, to punish negligence as it is to punish wantonness, willfulness, or intentional wrong doing.  It is not controverted at all that the common-law doctrine by which the imposition of punishment through a recovery at the suit of an individual of exemplary damages for wanton, willful, or intentional misconduct is allowed is well within organic limitations; and we conceive no basis for the distinction between the power to punish in this way for negligence and such power in respect to wantonness and the like." *Richmond & Danville R.R. Co. v. Freeman*, 11 So. 800, 802 (Ala. (Continued)

The Alabama Supreme Court's decision in *Killough v. Jahandarfard*, 578 So.2d 1041 (Ala. 1991), is instructive. *Killough* rejected an Equal Protection challenge to the Alabama wrongful death statute predicated on that statute excluding wrongful death actions from the statutory cap on punitive damages awards. The *Killough* Court reasoned that the legislature was attempting "to preserve human life by making homicide expensive," that "exemption of wrongful death actions from caps on punitive damages awards bears a rational relationship to a legitimate state interest not prohibited by the Constitution," and that "[t]o leave with the jury the determination of what amount should be imposed as damages to punish the defendant who caused the loss and to deter others from similar conduct is a perfectly reasonable way to accomplish the legislative goal of deterring conduct that endangers life." 578 So.2d at 1044.[41] Just as the Alabama legislature had a perfectly reasonable, legitimate basis for distinguishing between tortious conduct resulting in death and tortious conduct not resulting in death for purposes of statutory caps on punitive damages, so too did it have a reasonable, legitimate basis for distinguishing between merely negligent conduct resulting in death and merely negligent conduct not resulting in death for purposes of exposure to punitive damages at all.

In light of the foregoing, defendants' Equal Protection challenge to the Alabama Wrongful Death Act fails as a matter of law. Compliance with state rules or regulations is never a guarantee of immunity from liability; to the contrary, under Alabama law, one may be liable for negligence whether or not one's conduct was "code compliant." The difference – and the

---

1892); *see also United States Cast Iron Pipe & Foundry Co. v. Sullivan*, 3 F.2d 794, 796 (5th Cir. 1925) ("It is clearly within legislative competency to give a civil right of action for the negligent or wrongful killing of a human being, and to make the wrongdoer liable for punitive or exemplary damages.").

[41]     *See also Alabama Power Co. v. Turner*, 575 So.2d 551, 556 (Ala. 1991) ("The protection of the lives of its citizens is certainly a legitimate state interest. By allowing punitive damages to be assessed against defendants in wrongful death actions in a manner different from the way punitive damages are assessed in other civil actions, the legislature … is attempting to preserve human life by making homicide expensive. … The exception of wrongful death actions from legislation imposing caps on the amount of punitive damages that can be awarded in civil actions bears a rational relationship to a legitimate state interest that is not prohibited by the Constitution. Therefore, that exception does not violate the guarantee of equal protection.") (citation and internal marks omitted).

relevant distinction here – is that negligent conduct cannot be punished with punitive damages if such conduct does not result in death, whereas under the Act negligent conduct is punished with punitive damages if it does result in death.  Under Alabama's statutory scheme, death opens the door to punitive damages.  Appellate courts have repeatedly recognized that a state legislature may properly choose to punish the same conduct more severely when it results in death versus when it does not; therefore, the resulting classification does no violence to constitutional guarantees of equal protection under the law.

### C.      Substantive Due Process.

Defendants' substantive due process challenge to the Act fails for much the same reason. The crux of defendants' position is that the Act "violates the Due Process Clause of the Fourteenth Amendment because it arbitrarily imposes punitive damages."  (Doc. 60, at 24.) Indeed, defendants complain that the Act is "deeply flawed" because the authorized punishment is predicated on "the resulting injuries (as opposed to the conduct at issue)."  (*Id.*)

"To prove that a statute violates its due process rights, the aggrieved party must demonstrate that the legislature has acted arbitrarily and irrationally. … However, if the government can show that the statute has a legitimate legislative purpose furthered by rational means, due process is satisfied." *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1057 (11th Cir. 2008) (citations and internal quotation marks omitted).  "Only in an exceptional circumstance will a statute not be rationally related to a legitimate government interest and be found unconstitutional under rational basis scrutiny." *Blue Martini Kendall, LLC v. Miami Dade County Florida*, 816 F.3d 1343, 1351 (11th Cir. 2016).  "So long as congressional legislation is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *Swisher*, 550 F.3d at 1058 (citation and internal quotation marks omitted).

Once again, the Alabama legislature had rational, legitimate reasons for subjecting negligent conduct to different and more severe punishment in circumstances resulting in death than in circumstances that do not, to-wit, the desire to protect human life; to prevent homicides by wrongful act, omission or negligence; and to impose liability, regardless of fault, upon those who are in some substantial measure in a position to prevent it.  Such grounds for developing a statutory scheme punishing negligence by punitive damages in cases of death – even though punitive damages would be unavailable as a matter of law had precisely the same conduct not

resulted in death – are in furtherance of a legitimate legislative purpose; therefore, the Act does not violate the Due Process Clause.

Two cases reinforce the point.  First, in *Boles v. Parris*, 952 So.2d 364 (Ala. 2006), the defendants challenged as violative of the Due Process Clause the feature of the Act that prohibits apportionment of punitive damages among multiple defendants in a wrongful death action.  In so doing, the *Boles* defendants asserted that their individual shares of the judgment entered against them were "disproportionate to their fault."  *Id.* at 368.  The Alabama Supreme Court gave this argument short shrift, reasoning that "nonapportionment of punitive damages among multiple defendants in wrongful death cases bears a rational relationship to a legitimate state interest – the prevention of homicide – and it thus does not violate constitutional guarantees."  *Id.* at 367 (citation omitted).  Similarly, in *Louis Pizitz Dry Goods Co. v. Yeldell*, 274 U.S. 112, 47 S.Ct. 509, 71 L.Ed.2d 952 (1927), an employer was held liable for punitive damages under the Alabama wrongful death statute when one of its employees negligently operated an elevator in its department store.  The employer balked that it was arbitrary, unjust and incompatible with notions of due process for the Alabama legislature to permit a jury "to assess punitive damages against the employer for the mere negligence of its employee."  274 U.S. at 114.  The Supreme Court disagreed, reasoning as follows: "We cannot say that it is beyond the power of a Legislature … to attempt to preserve human life by making homicide expensive.  It may impose an extraordinary liability such as the present, ***not only upon those at fault but upon those who, although not directly culpable, are able nevertheless***, in the management of their affairs, ***to guard substantially against the evil to be prevented***."  *Id.* at 116 (emphasis added).  On that basis, the *Louis Pizitz* Court opined that "imposition of liability without personal fault, having its foundation in a recognized public policy, is not repugnant to accepted notions of due process of law."  *Id.* at 115.

As shown by the foregoing, the Alabama Supreme Court in *Boles* found no due process defect in the Alabama Wrongful Death Act even though the statute's nonapportionment feature allows liability to be imposed on one of multiple defendants that is disproportionate to its fault.  And the U.S. Supreme Court in *Louis Pizitz* found no due process problem in the Act even though it allowed an employer to be held liable in punitive damages for the mere negligence of its employee, even though the employer itself was not directly culpable at all.  In both cases, the courts determined that the Alabama legislative choice bore a rational relationship to a legitimate

state interest, namely, the prevention of homicides by those with the ability to manage their affairs in such a manner to safeguard against same.  This reasoning defeats the functionally equivalent arguments of Sears and Schindler that the Act violates principles of substantive due process by allowing imposition of punitive damages for mere negligent conduct resulting in death even though punitive damages would have been prohibited had the victim survived.  Structuring the Act in this manner was a rational means of furthering a legitimate legislative purpose; therefore, the Alabama legislature did not run afoul of constitutional guarantees.[42]

## VIII.   Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.      Defendants' Motion to Strike Portions of Plaintiff's Evidentiary Submission (doc. 74) is **granted in part**, and **denied in part**.  The Motion to Strike is **granted** as to Paragraph 13 of the Kirksey Affidavit, and that paragraph is **stricken** for noncompliance with the personal knowledge requirement of Rule 56(c)(4), Fed.R.Civ.P.  In all other respects, the Motion to Strike is **denied**;

2.      Defendants' Motion for Oral Argument (doc. 77) is **denied**;

3.      Plaintiff's Motion for Limited Discovery under Rule 56(d) (doc. 80) is **denied**;

4.      Plaintiff's claims against "Fictitious Parties 1-10" are **dismissed**;

5.      Defendant Sears Roebuck & Co.'s Motion for Summary Judgment (doc. 56) is **denied**;

---

[42]      It bears noting one more time that defendants' effort to frame the debate in terms of "code-compliant" conduct is a nonstarter.  In their Reply, defendants repeat their lament that "the State of Alabama expressly approves conduct by issuing occupancy and use permits for the subject building and escalator on the one hand, while allowing a jury of Alabama citizens to punish Defendants for the identical code-complying conduct on the other hand under Alabama law."  (Doc. 72, at 20-21.)  As an initial matter, defendants' argument assumes facts not in evidence, inasmuch as the summary judgment record is decidedly sparse as to what permits and inspections the State of Alabama actually performed vis a vis the subject escalator at different points in time.  Recall that Kirksey has offered expert opinions that the escalator was not in fact code-compliant in key respects at the time of installation.  More fundamentally, however, defendants cannot use "code-compliance" as a cloak to immunize them from all liability.  As discussed *supra*, conduct may be negligent even if it is code-compliant.  And negligent conduct may be properly punished via punitive damages if it proximately causes death.  There is no Due Process problem here, and defendants' attempt to dress up their well-traveled, long-rejected constitutional arguments with the language of code-compliance does nothing to obscure that fundamental truth.

6.      Defendant Schindler Elevator Corporation's Motion for Summary Judgment (doc. 59) is **granted in part**, and **denied in part**.  The Motion is **granted** as to (i) plaintiff's failure-to-warn claim against Schindler as manufacturer/installer of the escalator, and (ii) plaintiff's negligent maintenance claim against Schindler. Those aspects of plaintiff's claim against defendant Schindler are **dismissed**.  In all other respects, Schindler's Motion for Summary Judgment is **denied**;

7.      Pursuant to 28 U.S.C. § 2403 and Rule 5.1 of the Federal Rules of Civil Procedure, the Court hereby **certifies** to the Alabama Attorney General that defendants have raised a constitutional challenge to the Alabama Wrongful Death Act.  If it elects to do so, the Alabama Attorney General may intervene in this action within **60 days** after the date of entry of this Order.  The Clerk of Court is directed to mail a copy of this Order to the State of Alabama, Office of the Attorney General, 501 Washington Avenue, Montgomery, AL 36104; and

8.      The parties are reminded that this action is set for Final Pretrial Conference before the undersigned on **July 27, 2016** at **2:00 p.m.**, with jury selection to follow on **August 2, 2016** at **8:45 a.m.**

DONE and ORDERED this 7th day of June, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

-42-