IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| TYRA KIRKSEY, as mother, next friend, and legal heir of JAKOBE KIRKSEY, a deceased minor, | ) CASE NO. 1:15-cv-000115-WS-N ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| SCHINDLER ELEVATOR CORPORATION; SEARS, ROEBUCK AND CO., Fictitious Parties 1-10, | ) ) ) ) |
| Defendants. | ) |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE AS UNRELIABLE THE TESTIMONY AND OPINIONS OF KATHLEEN RODOWICZ**

Defendants Schindler Elevator Corporation ("Schindler") and Sears, Roebuck and Co. ("Sears") (collectively "Defendants"), by counsel, submit this Response Brief in Support of Their Opposition to Plaintiff's Motion to Exclude as Unreliable the Testimony and Opinions of Kathleen A. Rodowicz.

## I.  INTRODUCTION

This case involves an 11-year-old child named Jakobe Kirksey ("Kirksey") who fell to his death from an escalator handrail. Defendants have designated Kathleen A. Rodowicz, Ph.D., P.E. ("Rodowicz") as an expert witness in this matter. She was retained to analyze the subject accident from a biomechanical perspective and to evaluate the position and kinematics of Kirksey preceding and during his fall.

Rodowicz is a biomechanical engineer. She has a Bachelor of Science and a Ph.D. in Mechanical Engineering from Drexel University. She has significant experience performing

biomechanical accident reconstructions, evaluating injury mechanisms, and injury potentials in a wide variety of situations. She has conducted significant research in the field of biomechanics and has published studies on occupant kinematics and injury mechanisms in motor vehicle accidents, head injury potential during sporting related impacts, and human balance retention and postural control strategies on moving surfaces during postural disturbances. Her research has been published in peer reviewed journals and presented at national and international conferences. She is extremely qualified to offer opinions regarding Kirksey's position and his kinematics proceeding and during his fall.

Rodowicz analyzed the surveillance video of Kirksey's fall. She has also inspected the subject escalator and accident site, taken measurements of the subject escalator and site, taken a three-dimensional scan of the subject escalator and accident site, and reviewed the escalator's schematics. She used this information in concert with the surveillance video to carefully construct a three-dimensional model that demonstrates how Kirksey interacted with the handrail before and during the fall. The three-dimensional model is accurate in all respects. It was created from the three-dimensional scan data and measurements she collected during her inspection as well as from the escalator schematics. Rodowicz then used an accepted and peer-reviewed technique called "camera-matching," which has been used for decades and admitted in court in several jurisdictions, to match the three-dimensional model with the surveillance video footage of the subject incident. A review of the still frames from the surveillance video in comparison to the three-dimensional model clearly show the precision of the three-dimensional model. It is an accurate depiction of the fall compiled using accepted and reliable data and processes. It is admissible to demonstrate Rodowicz's analysis and testimony regarding how Jakobe interacted with the railing and fell.

Rodowicz has also offered an opinion that a 42-inch guardrail (as proposed by Plaintiff) would not have prevented Kirksey's fall. These opinions are based on a frame-by-frame evaluation of the surveillance video of the fall, her inspection of the subject escalator and the accident site, and a detailed anthropometric analysis based on Kirksey's height and weight, as described in his medical records. Rodowicz used Kirksey's height and weight to determine his center of gravity in a seated position would have been above a 42-inch guardrail. She then analyzed his kinematics during the fall, as depicted in the surveillance video, and determined that his kinematics would have moved his center of gravity even further over a 42-inch guardrail. This opinion is supported, in part, by an anthropometry study from the National Aeronautics and Space Administration (NASA) which showed that upward body movements raise a person's center of gravity upwards, e.g. raising one's arms overhead would raise a person's center of gravity by approximately 2.5 inches. Rodowicz determined that Kirksey's center of gravity would have been over a 42-inch guardrail. Thus, she concluded that a 42-inch guardrail would not have prevented his fall. This opinion is well-supported and based on reliable scientific methodology.

Rodowicz further opines that Kirksey was not "pulled" onto the escalator handrail (as also proposed by Plaintiff). This opinion is also based on reliable methodology and processes. Rodowicz analyzed Kirksey's movements on the surveillance footage and found them to be continuous which is inconsistent with a person being unexpectedly pulled onto the handrail. A person being "pulled" onto a handrail would change his body position to maintain balance, which Kirksey did not do. Rodowicz also analyzed Kirksey's height in relation to the handrail height. She determined that Kirksey was not tall enough to back into the handrail with his buttocks. The handrail would have hit him above his buttocks meaning that he would not have

been able to transfer weight onto the handrail in a manner that would have allowed him to be carried by the handrail. Rodowicz confirmed her analysis through her three-dimensional model of the fall which showed that Kirksey lifted himself onto the handrail.

Rodowicz's opinions are founded on reliable data, studies, and methodology. They are helpful to the jury in understanding how Jakobe fell and whether "additional guarding" would have prevented the fall. Rodowicz's opinions are admissible under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Plaintiff's Motion to Exclude Dr. Rodowicz's Testimony should be denied in its entirety.

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence addresses the sufficiency and reliability of an expert's opinion. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The proponent of expert testimony must establish by a preponderance of the evidence that the Rule 702 requirements have been satisfied. *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004).

The criteria for evaluating the admissibility of expert opinion evidence under Rule 702 are stated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and have been summarized as follows:

> Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his

4

> conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562–63 (11th Cir.1998) (footnote omitted) (citing Fed.R.Evid. 702; *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786). *Daubert* sets several factors for use in assessing whether expert testimony is admissible. They include (1) whether a theory or technique applied by the expert can be or has been tested, (2) whether the theory has been subjected to peer review and publication, (3) in the case of a particular scientific technique, the Court should consider the known or potential rate of error, (4) and whether the theory or technique has gained general acceptance in the relevant community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. The Rule 702 inquiry is ultimately a flexible one. *Id.* at 594, 113 S.Ct. 2786.

Although "[r]ulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology," *McCorvey,* 298 F.3d at 1256, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. Indeed, as we said in *Maiz v. Virani*, "[a] district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" 253 F.3d at 666 (quoting *Allison v. McGhan* 184 F.3d 1300, 1311 (11th Cir.1999)). Quite the contrary, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the traditional means to attack expert opinions. *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798; *see also Ambrosini v. Labarraque,* 101 F.3d 129, 141 (D.C.Cir.1996) ("The district court[ ] err[ed] ... [by] misconce[iving] of the limited 'gatekeeper' role envisioned in *Daubert.* By attempting to evaluate the credibility of opposing experts and the

persuasiveness of competing scientific studies, the district court conflated the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder.").

### III. ARGUMENT

Rodowicz's opinions and three-dimensional modeling of the fall should not be excluded. They are founded on reliable scientific principles, her education, experience, and training, measurements that she personally recorded, and records that are regularly relied upon by biomechanical experts. Her opinions far exceed the *Daubert* admissibility requirements.

**1. Rodowicz is qualified to render opinions regarding her reconstruction of Jakobe's fall.**

Plaintiff argues that Rodowicz is not qualified to offer opinions on "whether Jakobe was intentionally[1] trying to sit on the handrail and whether guarding could have prevented the fall" because she does not have any experience with escalators. (Plaintiff's Brief, pp. 5-6). Plaintiff's arguments are misplaced as Rodowicz's analysis is not founded on her experience with escalators. Rodowicz is offering opinions regarding Kirksey's position and his kinematics proceeding and during his fall. She is extremely well-qualified to offer such opinions.

An expert may be qualified "by knowledge, skill, experience, training, or education." *Furmanite Am., Inc. v. T.D. Williamson, Inc.,* 506 F.Supp.2d 1126, 1129 (M.D.Fla.2007) (citing Fed.R.Evid. 702). Moreover, "[a]n expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id.* (citing *Maiz,* 253 F.3d at 665). Where an expert does have congruent experience, "[t]he Committee Note to the 2000 Amendments of Rule 702 ... explains that '[n]othing in this amendment is intended to suggest

---

[1] Rodowicz has not opined regarding Jakobe's "intentions." She has opined that his actions and interactions with the handrail up to and including the time that he lifted himself onto the moving handrail were volitional (i.e. that he was not involuntarily grabbed or "pulled" by the moving handrail.) (Rodowicz Affidavit, ¶14).

6

that experience alone ... may not provide a sufficient foundation for expert testimony.'" *Frazier,* 387 F.3d at 1261 (quoting Fed.R.Evid. 702 Advisory Committee's note (2000 amends.)).

Determining whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Jack v. Glaxo Wellcome, Inc.,* 239 F.Supp.2d 1308, 1314–16 (N.D.Ga.2002). In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998). This inquiry is "'not stringent,' and 'so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.,* 674 F.Supp.2d 1321, 1325 (S.D.Fla.2009) (citations omitted); *Johnson v. Big Lots Stores, Inc.,* 2008 WL 1930681, *14 (E.D.La. Apr. 29, 2008) (summarizing *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 507 n. 10 (5th Cir.1999), as "explaining that after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination").

Rodowicz is a biomechanical engineer.[2] (Rodowicz Affidavit, ¶4 attached as Exhibit A).[3] She has a Bachelor of Science and a Ph.D. in Mechanical Engineering from Drexel University. (*Id.*) She has taken classes regarding human physiology, medical sciences, mechanics of human joints and tissues, and cellular biomechanics. (*Id.*) She performed research in biomechanics as an intern after completing her Bachelor of Science degree and taught and trained students studying biomechanical engineering during graduate school. (*Id.* at ¶¶4-5). She

---

[2] Biomechanics "is the application of mechanical principles…to the solution of biological problems of living organisms." (Rodowicz Affidavit, ¶11).
[3] In lieu of calling Rodowicz to testify live before the Court, Defendants attach an affidavit of Rodowicz. Defendants are more than willing to call Rodowicz live to offer testimony in response to Plaintiff's Motion given the importance of the issues presented if necessary.

7

has also conducted significant research in the field of biomechanics, including studies in occupant kinematics and injury mechanisms in motor vehicle accidents and human balance retention and postural control strategies on moving surfaces. (*Id.* at ¶8). Her research has been published in peer reviewed journals and presented at national and international conferences. (*Id.*) Rodowicz's education and research alone renders he qualified to provide opinions relating to her biomechanical analysis of Kirksey's fall.

However, her qualifications do not end there. Rodowicz works as a biomechanical engineer. (*Id.* at ¶10). She regularly addresses issues involving the biomechanics of human injury, with expertise in the areas of human injury tolerance, kinematics, and rigid body dynamics. (*Id.*) She performs biomechanical accident reconstructions and analyzes traumatic injuries, just like she has done in this case. (*Id.*) She also has conducted and analyzed tests involving anthropomorphic test devices, human volunteers, and cadavers for purposes of evaluating human kinematics, balance retention, and injury potential. (*Id.*)

Rodowicz is well-qualified to offer opinions regarding Kirksey's interactions with the escalator handrail and whether "additional guarding" would have prevented the fall. She has significant experience performing biomechanical accident reconstructions and specifically accident kinematics and injury mechanisms. She has performed those same analyses in this case. She reviewed the surveillance footage of Kirksey's fall, inspected and measured the subject escalator, and reviewed various records related to the escalator, Kirksey, and the fall. She used this information to analyze how Kirksey interacted with the escalator handrail. She also analyzed Kirksey's center of gravity in relation to whether a 42-inch guardrail would have prevented the accident. These are basic biomechanical analyses that Rodowicz regularly performs. She is more than qualified to offer opinions regarding the same.

8

Despite Rodowicz's substantial experience in biomechanics and engineering, Plaintiff argues that Rodowicz should be excluded from testifying because she does not have experience involving escalators. This is a red-herring. Although Rodowicz has been involved in another escalator case, Rodowicz's expertise in this case is not tied to escalators. They are based on biomechanics. She has rendered biomechanical opinions regarding Kirksey's interactions with the escalator handrail and whether a 42-inch guardrail would have prevented the fall. Her expertise for these opinions lies in the areas of biomechanics and engineering where she has a wealth of experience as detailed above. Rodowicz's analysis of Kirksey's fall is not unique from a physics standpoint merely because he fell from an escalator. The analysis involves principles of physics, including an analysis of Kirksey's kinematics and center of gravity how these factors affected Kirksey before and during the fall. Rodowicz's testimony should not be excluded.

### 2. Rodowicz's three-dimensional model of Jakobe's fall should not be excluded.

Rodowicz created an accurate three-dimensional model of Jakobe's fall using reliable methodology. The model is a useful in explaining Rodowicz's testimony as it allows the fall to be viewed from various angles. The model will assist the jury in further understanding Kirksey's actions and Rodowicz's testimony regarding the same. It should not be excluded.

#### a. The three-dimensional model is an accurate demonstration of the fall and is helpful to explain Rodowicz's testimony.

As an initial matter, contrary to Plaintiff's contention, the three-dimensional model is not required to meet *Daubert* standards. Computer animations depicting accidents have been admitted for years as demonstrative evidence in courts throughout the United States. *See*, *e.g.*, *Byrd v. Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998) (district court properly admitted computer animation); *Swift Transp. Co. of Ariz., LLC v. Angulo*, No. 4:10CV01516, 2012 WL 28687, at *6 (E.D. Ark. Jan. 5, 2012) (computer animation was relevant, supported by testimony and

evidence, and "assisted the jury in understanding the evidence") *Musick v. Dorel Juvenile Group, Inc.*, No. 1:11CV00005, 2011 WL 5325534, at *1 (W.D. Va. Nov. 4, 2011) (permitting computer animation "to be used as demonstrative evidence to illustrate for the jury the opinion of ... plaintiff's expert witness"); *Datskow v. Teledyne Cont. Motors Aircraft Prods.*, 826 F. Supp. 677, 685-86 (W.D.N.Y. 1993) (computer animation admitted to illustrate expert's opinion); *see also Tillis Trucking Co. v. Moses*, 748 So.2d 874, 881-82 (Ala. 1999) (video animation properly admitted as demonstrative aid).

"The use of computer animations is allowed when it satisfies the usual foundational requirements for demonstrative evidence." *Friend v. Time Mfg. Co.*, No. 03-343, 2006 WL 2135807, at *7 (D. Ariz. July 28, 2006). Video animation "should be admitted into evidence" if it "is introduced to help the jury understand the witness's opinion as to what happened and is meant to be a visualization of the testimony." *Jones v. Kearfott Guidance & Navigation Corp.*, No. Civ. 93-64, 1998 WL 1184107, at *5 (D.N.J. Nov. 17, 1998). "A computer-generated video animation is admissible as demonstrative evidence when the proponent shows the animation is an authentic, relevant, fair, and accurate representation of the evidence to which it relates, and its probative value substantially outweighs the danger of unfair prejudice, confusing the issues, or misleading the jury." Jay Grenig & William Gleisner, 1 eDiscovery & Digital Evidence § 12:11 (Mar. 2016 Update).

Just a cursory review of still images from the surveillance camera compared to the same still images from the three-dimensional model demonstrates the detailed accuracy of the model. (See the side-by-side still images attached as Exhibit B). It is helpful to assist the jury in understanding Rodowicz's testimony because it allows the jury to view the fall from various angles. It is not confusing, misleading, or prejudicial to Plaintiff because Rodowicz will be

present to testify how the model was created. There is no risk that the jury will give undue weight to the model given that Plaintiff is free to cross-examine Rodowicz regarding any concerns that she may have regarding how the model was created. Accordingly, the model may be appropriately admitted as demonstrative evidence.

### b. The methods used by Rodowicz in creating the three-dimensional model meet the *Daubert* analysis and confirm the accuracy of the model.

Even though *Daubert* is not applicable to demonstrative computer animations such as Rodowicz's three-dimensional model, the unequivocal accuracy of the model is confirmed by analyzing Rodowicz's reliable and accepted methodology in creating the model under the *Daubert* analysis.

The *Daubert* Court identified four factors to guide district judges in assessing the reliability of an individual expert's methodology:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.

*United Fire & Cas. Co. v. Whirlpool Corp.,* 704 F.3d 1338, 1341 (11th Cir.2013) (per curiam) (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). These factors are not "a definitive checklist or test," *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796, and *Daubert* considerations are "applied in case-specific evidentiary circumstances," *Brown,* 415 F.3d at 1266. While the inquiry is "a flexible one," *the focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert,* 509 U.S. at 594–95, 113 S.Ct. at 2797 (emphasis added); *see McDowell v. Brown,* 392 F.3d 1283, 1298 (11th Cir.2004) (recognizing a trial judge

"should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate").

Rodowicz's methodology used in creating the three-dimensional model is reliable and accepted by her peers. Rodowicz created the three-dimensional model using Autodesk 3ds Max, which allows for the construction of accurate scale models based on real-world data. (Rodowicz Affidavit, ¶23). 3ds Max is commonly used to depict accidents and accident animations have been admitted in various court proceedings as set forth above. (*Id.* at ¶¶23-24).

Rodowicz collected measurements and data during an inspection of the subject escalator and accident site, she reviewed schematics of the escalator layout, and created a three-dimensional scan of the escalator and the accident site. (*Id.* at ¶23). She inputted this information into 3ds Max to create a detailed, scaled model of the accident. (Id.) Contrary to Plaintiff's arguments, during her inspection, Rodowicz even specifically documented the location of the surveillance camera that captured Kirksey's fall. (*Id.* at ¶¶25-26). That camera was located approximately 118 inches above the floor, approximately seven feet from the exit of the ascending escalator, and approximately seven feet from the base of the outboard fixed guardrail of the descending escalator. (*Id.* at ¶26). Rodowicz placed a camera in the computer model so that it matched the location of the camera at the actual accident site. (*Id.* at ¶¶25, 27). This produced a view of the three-dimensional model that matched the view of the surveillance camera that captured the fall.

Rodowicz next created a three-dimensional surrogate of Kirksey using his height and weight, as reported in his medical records. (*Id.* at ¶28). She then identified key frames in the surveillance video. (*Id.*) For each of the key frames, she placed a three-dimensional surrogate representing Kirksey in various positions and orientations until the view of the surrogate in the

12

three-dimensional model best matched the view of Kirksey in the surveillance video. (*Id.* at ¶30). This technique is referred to as camera-matching. (*Id.* at ¶¶24-30).

Camera-matching has been accepted in the scientific community. (*Id.* at ¶24). In the 1800's photogrammetry was used to compensate for perspective distortion and determine dimensions of objects from photographs. (*Id.*) Camera-matching has been used for decades and early techniques involved created a transparent miniature of a photograph and placing the miniature in the view screen of the camera. (*Id.*) The camera was then taken to the scene and the correct position was matched such that the image in the scene matched the image in the view screen. (*Id.*) This same technique can be recreated with computer modeling software where the camera and the computer can be adjusted to match the photograph. (*Id.*) Peer-reviewed research has relied on the use of "camera-matching" as a photogrammetric technique. (*Id.*) In fact, 3ds Max was used for the "camera-matching" in the peer reviewed study performed by Fenton et. al. in 2001. (*Id.*) "Camera-matching" has been accepted in various litigation venues and presented before juries. (*Id.*)

To test the accuracy of the video, Rodowicz altered the position of the three-dimensional surrogate and the model was compared to the surveillance video. (*Id.* at ¶30). Any movements of the surrogate by more than a few inches to scale resulted in discrepancies between the model and the surveillance video. (*Id.*) This confirmed the accuracy of the three-dimensional model.

Rodowicz's methodology in creating the three-dimensional model fully passes muster under *Daubert*. She created a three-dimensional model using data and dimensions that she personally obtained, a software program that creates accurate, scale models and is commonly used by her peers, and a peer-reviewed "camera-matching" technique commonly relied upon by

13

experts throughout the country. She then tested and confirmed the accuracy of the model. This practice is inherently reliable. The three-dimensional model should not be excluded.

### 3. Rodowicz's opinions regarding Kirksey's interactions with the escalator handrail should not be excluded.

Plaintiff also argues that Rodowicz's "determinations that Jakobe was intentionally attempting to sit on or "surf" the handrail and that a 42" guardrail would have had no effect on Jakobe's fall" are unsupported. (Plaintiff's Brief, p. 6). Plaintiff's argument again misses the mark. Rodowicz's opinions are founded on her frame-by-frame evaluation of the surveillance video of the fall, inspection of the subject escalator and the accident site, review of the escalator schematics, three-dimensional modeling of the fall, and a detailed anthropometric analysis based on Kirksey's height and weight, as described in his medical records. Rodowicz's testimony should not be excluded.

When a party offers expert testimony and the opposing party raises a *Daubert* challenge, the trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This requirement for proof of the reliability of the expert's method comes from Fed.R.Evid. 702, which authorizes the admission of expert opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 702 lays the foundation for the trial court's *Daubert* analysis. 509 U.S. at 590, 113 S.Ct. 2786.

*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury. *Id.* at 589 n.7, 597, 113 S.Ct. 2786. As a gatekeeper the

court must do "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593–94, 113 S.Ct. 2786. The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it. *Id.* at 590, 113 S.Ct. 2786. "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.*

      **i. Rodowicz's opinion that an extension of the 42-inch guardrail near the top of the escalator would not have prevented Kirksey's fall is based on reliable and sound methodology.**

Rodowicz's opinion that extending the 42-inch guardrail near the top of the escalator would not have prevented Kirksey's fall is founded on reliable methodology and principles. Rodowicz personally inspected the subject escalator and the store where the fall occurred. (Rodowicz Affidavit, ¶16). She took measurements of the escalator and accident site and performed a three-dimensional scan of the subject escalator and accident area. (*Id.*, ¶16, 26). She also reviewed schematics for the subject escalator and Kirksey's medical records. (*Id.* ¶16). Using this data and the biomechanical literature, Rodowicz performed a detailed anthropometric analysis using Kirksey's height and weight, as described in his medical records. (*Id.* ¶16). Rodowicz relied on a study titled *Anthropometry of Infants, Children, and Youths to age 18 for Product Safety Design* prepared by the Highway Safety Research Institute which contained a compilation of data taken from approximately 4,000 youths measuring different body dimensions.[4] (*Id.*, ¶17; Rodowicz Dep., pp. 47-48 attached as Exhibit C). She determined Kirksey's height and weight percentile with respect to the youths in the study. (*Id.*) Rodowicz

---

[4] This study was performed by the Highway Safety Research Institute and sponsored by the United States Consumer Products Safety Commission. (Rodowicz Affidavit, ¶17). It has been cited by over 200 scientific publications and is regularly used in biomechanical analyses. (Id.)

15

used that percentile to determine Kirksey's center of gravity which was also compiled in the same study. (*Id.*)

Rodowicz determined that Kirksey's center of gravity was approximately 8.5 inches above his buttocks while he was in a seated position. (Rodowicz Dep., p. 47). Her measurements from her inspection of the subject escalator revealed that the escalator handrail was approximately 35.25 inches above the floor. (Rodowicz Dep., p. 75). Thus, Kirksey's center of gravity was approximately 43.75 inches above the floor while seated on the escalator handrail. Rodowicz also analyzed the surveillance video as part of her analysis. (Rodowicz Affidavit, ¶¶16, 18). The video showed that Kirksey raised his hands and moved in the direct of the railing while he was seated on the escalator handrail. (*Id.* at ¶18). The National Aeronautics and Space Administration (NASA) published a reference document that demonstrated that a person's center of gravity moves upward as his limbs move upward, e.g. raising one's arms overhead increases the height of one's center of gravity by approximately 2.5 inches. (*Id.*).[5] Taking all of this into consideration, Rodowicz opined that extending the 42-inch guarding that existed near the top of the escalator would not have prevented Kirksey from falling because his center of gravity would have been over the guardrail and therefor he would have gone over the guardrail as he fell. (*Id.* at ¶¶16, 20). This opinion is well-founded and should not be excluded.

Rodowicz was also able to confirm this opinion using the three-dimensional model that she created using the surveillance video, her measurements of the escalator and the accident area obtained during her inspection, a three-dimensional scan of the accident area, schematics of the escalator, and Kirksey's medical records. (*Id.* at ¶¶20, 23). The model did not serve as the basis for this opinion. (*Id.*)

---

[5] The underlying study was titled Moments of Inertia and Centers of Gravity of the Living Human Body published by W.R. Santschi, J. Dubois, and C. Omoto in 1963. (Rodowicz Affidavit, n.7).

16

Despite Rodowicz's detailed analysis of Kirksey's fall, Plaintiff argues that Rodowicz did not calculate how Kirksey's center of gravity would have interacted with a 42-inch guardrail or any other safety device in a downward motion. (Plaintiff's Brief, pp. 9-10). Plaintiff bases this argument on the fact that Rodowicz did not analyze Kirksey's fall in relation to a hypothetical 42-inch guardrail that was placed 12 inches outside the escalator handrail. (*Id.*) Plaintiff's position is irrelevant as no such guarding has been proposed. Rodowicz analyzed how Kirksey would have interacted with the 42-inch guardrail that existed near the top of the escalator had it been extended along the escalator handrail as suggested Plaintiff's designated expert Traci Campbell. That handrail was approximately six (6) inches on the outside of the escalator handrail. Rodowicz did not analyze whether different hypothetical guarding, such as a 42-inch guardrail that is placed 12 inches on the outside of the escalator handrail, would have prevented Kirksey's fall. No such proposal has been made by Plaintiff or her designated experts. Contrary to Plaintiff's arguments, Rodowicz's opinions are not unreliable based on this issue.

### ii.     Rodowicz's opinion that Kirksey was not pulled onto the handrail is based on reliable methodology and principles.

Rodowicz also opined that Kirksey was not "pulled" onto the escalator handrail. This opinion too is based on reliable methodology. Rodowicz reviewed the surveillance video and analyzed how Kirksey was interacting with the escalator handrail before and during the incident. She also inspected the subject escalator and the accident scene, took measurements and three dimensional scan data of the escalator handrail and accident site, and obtained Kirksey's height and weight from his medical records. Rodowicz used this information combined with her wealth of knowledge regarding kinematics and biomechanics to determine that Kirksey was not "pulled" onto the escalator handrail.

17

Rodowicz began her analysis by analyzing Kirksey's movements as depicted on the surveillance video. (Rodowicz Affidavit, ¶14). She importantly, and along amongst designated experts, obtained coefficient of friction measurements for the subject escalator. (Rodowicz Dep., pp. 30-31). She determined that Kirksey's movements were continuous and inconsistent with being "pulled" onto the handrail. (*Id.*) A person being suddenly and unexpectedly "pulled" by the handrail would respond by changing his body position to maintain his balance. (*Id.* at ¶15). The surveillance video did not show Kirksey engaging in such actions. (*Id.*) Rodowicz confirmed this through the "camera-matched" model which, as set forth above, is a peer reviewed and accepted technique that has been used for decades that allowed Rodowicz to view the fall from several angles. (*Id.* at ¶14).

Rodowicz, however, did not stop there. She continued to analyze Kirksey's interaction with the handrail to test the conclusions she formed based on her review of the surveillance video. She analyzed the height of the handrail in relation to Kirksey's height. (*Id.* at ¶15). She determined that had Kirksey was not sufficiently tall to transfer his weight onto the handrail had he simply backed into it. (*Id.*) Simply put, the handrail would have hit Kirksey above his buttocks in a location where he would not transfer his weight and be carried or "pulled" by the handrail. (*Id.*) This additional analysis confirmed the conclusions that Rodowicz formed by analyzing the surveillance video.

Rodowicz's opinions are based on reliable methodology that she has properly applied in this case using her extensive background in kinematics and biomechanics. Her opinions should not be excluded.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Exclude as Unreliable the Testimony and Opinions of Kathleen Rodowicz should be denied.

Respectfully submitted,

FROST BROWN TODD LLC

/s/ Kevin C. Schiferl
Kevin C. Schiferl (Pro Hac Vice)
Blake N. Shelby (Pro Hac Vice)
201 North Illinois Street, Suite 1900
P.O. Box 4961
Indianapolis, IN 46244-0961
Phone: 317.237.3800
Fax: 317.237.3900
kschiferl@fbtlaw.com
bshelby@fbtlaw.com

*And*

/s/ John C.S. Pierce
John C.S. Pierce (PIE009)
SIROTE & PERMUTT PC
1 St. Louis Centre, Suite 1000
Mobile, AL 36602
Phone: 251.432.1671
Fax: 251.434.0196
jpierce@sirote.com

*Attorneys for Defendants Schindler Elevator Corporation and Sears, Roebuck and Co.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this July 27, 2016, a copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system on all counsel of record:

***Attorneys for Plaintiff***
Mark B. Wilson
P.O. Box 69
Chelsea, AL 35043
Phone: 205.792.9070
Email: markwilson@hotmail.com

Gregory A. Brockwell
LEITMAN, SIEGAL & PAYNE, P.C.
420 20th Street North, Suite 2000
Birmingham, AL 35203
Phone: 205.251.5900
Fax: 205.986.5071
Email: gbrockwell@lsppc.com


                                            */s/ Kevin C. Schiferl*

0000HSO.0623261  4822-3194-9109v1