# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

TYRA KIRKSEY,                          )
                                       )
    Plaintiff,                       )
                                       )
v.                                     )    CIVIL ACTION 15-0115-WS-N
                                       )
SCHINDLER ELEVATOR                     )
CORPORATION, *et al.*,                 )
                                       )
    Defendants.                      )

## ORDER

This matter comes before the Court on Defendants' Joint Motion to Exclude Proffered Opinion Testimony of J. Barton Weeks, David Cooper, and Traci Campbell (doc. 89), as well as Defendants' Joint Motion to Exclude Joseph Stabler (doc. 92). Both Motions have been exhaustively briefed and are now ripe for disposition.[1]

## I.  Background.

This wrongful death action arises from an incident at the Sears retail store at Bel Air Mall in Mobile, Alabama, on June 14, 2014. An 11-year old boy named Jakobe Kirksey fell more than 20 feet to his death over the side of a moving escalator handrail on the second floor of the

---

[1]    The Court takes the Motions under submission without a hearing. The decision of whether to conduct a *Daubert* hearing is discretionary. *See, e.g., Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 n.10 (11th Cir. 2007) (in *Daubert* context, "although they are often helpful, hearings are not prerequisite to such determinations under the Federal Rules or established law"); *United States v. Rodriguez*, 591 Fed.Appx. 897, 899 (11th Cir. Jan. 21, 2015) ("it is clear that a district court need not conduct a *Daubert* hearing where one would be unnecessary"); *Madura v. BAC Home Loans Servicing, LP*, 593 Fed.Appx. 834, 847 (11th Cir. Nov. 10, 2014) ("Although *Daubert* hearings 'are often helpful,' they are not a prerequisite to determine the admissibility of expert testimony under the Federal Rules of Evidence or established law.") (citation omitted). Given the vast array of briefs and exhibits the parties have submitted in support of their respective positions on the admissibility of these witnesses' testimony, a hearing would be neither necessary nor helpful to understanding the nature and bases of these witnesses' opinions or the grounds for defendants' objections. At any rate, no party has requested a *Daubert* hearing as to witnesses Weeks, Cooper, Campbell and Stabler.

store.  Jakobe's mother, Tyra Kirksey, brought a wrongful death lawsuit against Sears, Roebuck & Co. (the owner/operator of the premises) and Schindler Elevator Corporation (the escalator manufacturer).  Central to plaintiff's claims is her contention that the spot where Jakobe fell was an unguarded floor opening that should have had a guardrail or some other form of fall protection.

On that basis, plaintiff purports to assert a wrongful death claim against Schindler pursuant to Alabama Code § 6-5-391 on theories of "common law negligence, common law wantonness, and also product liability under the Alabama Extended Manufacturer Liability Doctrine ('AEMLD') related to the sale, design, manufacture, and installation of the subject escalator in 1997."  (Doc. 103, at 2.)  Plaintiff also purports to assert a § 6-5-391 claim against Sears on the theory that "Sears is guilty of common law negligence and/or common law wantonness relating to the safety of its store."  (*Id.* at 3.)  Defendants have raised affirmative defenses of contributory negligence, "open and obvious," and product misuse.  (*Id.* at 4-6.)[2]

At trial, plaintiff intends to offer the expert testimony of J. Barton Weeks, David Cooper, Traci Campbell and Joseph Stabler pursuant to Rule 702 of the Federal Rules of Evidence. Defendants now seek to exclude all or part of each such witness's testimony on the grounds that Weeks, Cooper and Campbell "do not possess the requisite qualifications to render their proffered opinions and they filed to use reliable methodology and [*sic*] formulating their opinions;" and that Stabler "is not qualified to render an opinion" and "failed to use reliable methodology."  (Doc. 89, at 1; doc. 92, at 1.)  Both Motions to Exclude have been extensively briefed; indeed, the parties have collectively offered more than 110 pages of briefing and approximately 850 pages of exhibits in support of their respective positions as to these threshold admissibility questions.

## II.  Governing Legal Principles.

The Federal Rules of Evidence, as construed by the Supreme Court in the landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d

---

[2]    In the Joint Pretrial Document, defendants also identify their "Affirmative Defense that the Alabama Wrongful Death Act Violates United States Constitution."  (Doc. 103, at 5.)  On summary judgment, however, the Court found that defendants' constitutional objection fails as a matter of law.  (*See* doc. 85, at 34-41.)  As such, this "affirmative defense" is no longer part of the case and will not be presented to the jury at trial.

469 (1993), "require[] expert scientific evidence to be both reliable and relevant pursuant to Rule 702," such that it "appropriately assists the trier of fact." *United States v. Henderson*, 409 F.3d 1293, 1302 (11th Cir. 2005). In that regard, "[t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). This gatekeeping function is guided by the well-established principle that "[t]he proponent of the expert testimony carries a substantial burden under Rule 702" to show admissibility of that testimony by a preponderance of the evidence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also Boca Raton Community Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("The offering party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder …, by a preponderance of the evidence.").

As a general proposition, "[i]n determining the admissibility of expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007). "While there is inevitably some overlap among the basic requirements – qualification, reliability, and helpfulness – they remain distinct concepts and the courts must take care not to conflate them." *Rosenfeld v. Oceana Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (citation omitted).

In examining the reliability prong, *Daubert* teaches that the following factors should be considered: "(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community." *Tampa Bay Water v. HDR Engineering, Inc.*, 731 F.3d 1171, 1184 (11th Cir. 2013) (citations omitted). That said, "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). For that reason, courts have stressed that the

*Daubert* inquiry is "a flexible one," that the *Daubert* factors are mere guidelines for applying Rule 702, and that "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the particular circumstances involved. *Id.* at 1267-68. In performing a *Daubert* analysis, the court's focus must be "solely on principles and methodology, not on the conclusions that they generate;" indeed, it matters not whether the proposed expert testimony is scientifically correct, as long as it is shown to be reliable. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Even in the aftermath of *Daubert*, it remains true that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Rosenfeld*, 654 F.3d at 1193 (citations omitted). "[I]n most cases, objections to the inadequacies of a[n opinion] are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Id.* (citations omitted). Thus, disagreements as to the manner in which an expert performs modeling or analysis may best "be aired out in front of the jury and tested by the crucible of cross-examination," without implicating the *Daubert* gatekeeping function. *Tampa Bay Water*, 731 F.3d at 1185. Importantly, "[o]nce an expert opinion has satisfied *Daubert*, a court may not exclude the opinion simply because it believes that the opinion is not – in its view – particularly strong or persuasive." *Seamon v. Remington Arms Co.*, 813 F.3d 983, 990 (11th Cir. 2016).

It bears noting that *Daubert* principles do not bar an expert's opinion as unreliable merely because it is grounded in personal knowledge or experience. *See, e.g., United States v. Jennings*, 599 F.3d 1241, 1248 (11th Cir. 2010) ("A district court may decide that non-scientific expert testimony is reliable based upon personal knowledge or experience.") (citation omitted); *Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001) ("there is no question that an expert may still properly base his testimony on professional study or personal experience") (citation and internal quotation marks omitted). "The experiential nature of [an expert]'s expertise does not render his opinions *per se* unreliable, equate to lack of methodology, or warrant automatic exclusion of his testimony." *Continental Motors, Inc. v. Jewell Aircraft, Inc.*, 2013 WL 5530842, *7 (S.D. Ala. Oct. 4, 2013). That said, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Augustin*, 661 F.3d 1105, 1125 (11th Cir. 2011).

The foregoing principles inform the undersigned's evaluation of defendants' objections to the admissibility of opinions articulated by plaintiff's proffered experts.[3]

## III. Challenge to Proposed Expert David A. Cooper.

### A. Qualifications and Opinions.

The Joint Pretrial Document identifies one of plaintiff's experts as David A. Cooper, a chartered engineer in the building services sector with 33 years of experience, including 20 at the senior management level. (Doc. 103, Exh. 4.) Cooper's academic qualifications include a Bachelor's degree in engineering, a Master's degree in lift engineering and a Master's degree in research. (*Id.*) He has published numerous works concerning escalators and elevators, including

---

[3]     A recurring theme in defendants' objections to plaintiff's experts is that, even if such testimony were admitted, plaintiff could not satisfy the legal elements of her claims under Alabama law. (*See, e.g.,* doc. 90, at 5-6, 11, 13, 22; doc. 115, at 1-3, 6, 8, 10.) In particular, defendants argue that, under Alabama law, Kirksey cannot prevail unless she proves at trial that (i) there was a reasonable, safer, alternative design for the escalator that would have eliminated or reduced Jakobe's injuries; and (ii) the utility of such alternative design outweighed the utility of the design actually used. Defendants lambaste plaintiff's expert opinions as not meeting this standard. The trouble with this line of reasoning is that it is fundamentally a "sufficiency of proof" argument, which may have been well suited for a summary judgment motion but has no place in a *Daubert* motion. The Court declines to construe defendants' Motions to Exclude as renewed summary judgment motions. After all, the deadline for filing Rule 56 motions in this case expired more than six months ago. (Doc. 31, ¶ 12.) Each defendant filed an elaborate summary judgment motion, and both motions were heavily litigated and (mostly) denied via a 42-page Order (doc. 85) entered on June 7, 2016. If defendants had wished to argue that plaintiff's expert opinions – in concert with the rest of plaintiff's evidence – were insufficient as a matter of law to make out viable claims, then they could and should have done so then. Not now. A *Daubert* motion is not a backdoor means of achieving a second bite at the summary judgment apple. To be sure, defendants couch their arguments that plaintiff's experts' opinions fail to satisfy her burden of proof for her substantive claims under Alabama law in terms of the "helpfulness" prong of the Rule 702 analysis. It is true, of course, that one prerequisite for admissibility is that the proffered expert testimony "assists the trier of fact … to understand the evidence or to determine a fact in issue." *Seamon*, 813 F.3d at 988 (citation omitted). But the helpfulness prong "goes primarily to relevance" and applies the "basic standard of relevance," which is "liberal." *Id.* (citations omitted). Plaintiff's experts' opinions are plainly relevant to the issues joined here. It is not necessary that each expert's opinion, taken in isolation and without regard for plaintiff's other evidence, support her case in its entirety in order to be admissible; rather, it suffices if the opinion is "relevant to the task at hand" and "logically advances a material aspect" of plaintiff's case. *Boca Raton Community Hosp.*, 582 F.3d at 1232 (citations omitted). The subject expert testimony in this case meets that modest threshold. Accordingly, this Court will not entertain summary judgment arguments disguised as *Daubert* objections at this time.

co-authorship of a book entitled *Elevator & Escalator Accident Investigation & Litigation.* (*Id.*) Cooper has worked in the lift and escalator industry since 1980, including early-career experience working on escalators as a service engineer and (for more than 20 years) employment as a consultant. (Doc. 90, Exh. A at 2.) His dissertation for his Master's degree in lift engineering was "an investigation into escalator accidents in retail environments," and his thesis for his other advanced degree was "an investigation into falls from or over the sides of escalators." (*Id.*) All told, Cooper has conducted more than 100 investigations into escalator accidents and has authored numerous papers about the subject. (*Id.*) Cooper has sat on the British Standards MHE/4 committee for lifts and escalators since 1990, and is an Associate Lecturer at the University of Northampton specializing in lift and escalator technology. (*Id.*) He has presented his research on escalator falls at industry events around the world and has published that research in trade journals worldwide. (*Id.*) Finally, Cooper has substantial experience as an expert witness in cases involving escalators, including investigations into falls over the sides of escalators. (*Id.* at 45.)[4]

In the Joint Pretrial Document, plaintiff summarized the opinions that she expects Cooper to offer at trial as including the relevance of the subject escalator's design to his research on escalator falls, "ways to design around issues causing falls, how these could and should have been incorporated in the escalator's design, and the existence of such designs in the industry." (Doc. 103, Exh. 4, at 5.) Plaintiff will also have Cooper "present information regarding his extensive research, and the industry knowledge, of the risks of falls from escalators." (*Id.*) Leaving aside this rather nebulous description, Cooper's report includes among his salient opinions the following: (i) "to a reasonable degree of certainty, the escalator presented a dangerous condition to patrons;" (ii) "design (i.e. the long drop to the side of the escalator) was the main contributory factor to this accident;" (iii) "the escalator presented a dangerous condition due to the layout of the incident escalator in an open atrium and due to a number of dimensions of the escalator;" (iv) the risk of injury was exacerbated "by the layout [inasmuch] as the height of the fall is increased by the architectural layout of the area;" (v) "low handrails are a factor in

---

[4] Given these and other pertinent credentials outlined in Cooper's CV, it might not be hyperbolic for plaintiff to posit that "[n]o one on earth knows more about falls from escalators" than Cooper does. (Doc. 107, at 16.)

this accident;" (vi) "the incident was entirely foreseeable and preventable;" (vii) "there are a number of ways of preventing falls" over the side of an escalator, such as "to enclose the escalator or to guard it to or above the statutory height;" (viii) "[t]here are a number of solutions that escalator owners have used to minimise or eliminate the risk of falling over the handrail," some of which are documented in Cooper's report; and (ix) "some method of prevention was available and should have been installed as it was foreseeable that it could happen." (Doc. 90, Exh. A, at 27-38.)

### B.    *Analysis.*

Defendants' objections to the admissibility of Cooper's proffered opinions are threefold. First, defendants maintain that Cooper "is not qualified to render an opinion on escalator design." (Doc. 90, at 5.)  Second, defendants assert that his opinions are inadmissible because he "does not explain what renders the design of the subject escalator unsafe," but simply offers his *ipse dixit* that it is so.  (*Id.* at 7-9.)  Third, defendants object that Cooper provides no specifics about his proposal for a 42-inch guardrail, and that "Cooper's mere observation that a 42-inch guardrail should have been put into place to *possibly* prevent the fall does not constitute reliable methodology."  (*Id.* at 9-13.)  Each challenge will be addressed in turn.

With regard to qualifications, the issue is whether Cooper "is qualified to testify competently regarding the matters he intends to address," through such means as "scientific training, education, and experience."  *Seamon*, 813 F.3d at 988 (citations omitted).  Defendants posit that "Cooper has no experience – none – that qualifies him to render an opinion on the design of the subject escalator."  (Doc. 90, at 6.)  This position cannot be reconciled with the record facts concerning this witness's qualifications.  After all, Cooper is a building services engineer who has studied escalators and escalator falls for his entire career.  He has spent more than three decades working in and around the escalator industry, has conducted extensive research into escalator falls, has investigated more than 100 escalator accidents, has written numerous papers about escalator accidents, and has been a member of the British Standards panel for lifts and escalators for a quarter century.[5]  The Court finds that these and numerous

---

[5]    Given these and other record facts concerning Cooper's qualifications, the Court is hard-pressed to understand the record basis for defendants' characterization of Cooper's experience as consisting of a mere "tabulation of 'other incidents'" on escalators.  (Doc. 115, at 4 (footnote omitted).)  Cooper's education, expertise and experience render him far more than a (Continued)

other forms of demonstrated experience and expertise render Cooper eminently well-suited to offer opinions as to the subject escalator's design, whether that design was unreasonably dangerous, how that design may have contributed to Jakobe Kirksey's fall, and whether other design alternatives might have prevented or reduced the risk of a fall.[6]

---

mere passive "tabulator" who has tallied up "the frequency of falls from escalators and the nature of those falls." (*Id.*)

[6] Defendants' point is, apparently, that unless Cooper has personally designed escalators, he is unqualified to opine about escalator design. (Doc. 90, at 6-7.) Defendants offer no case law to support such a stringent construction of Rule 702's qualifications requirement. Research reveals a wealth of well-reasoned authorities to the contrary. *See, e.g., Lara v. Delta International Machinery Corp.*, --- F. Supp.3d ----, 2016 WL 1254023 (E.D.N.Y. Mar. 31, 2016) (overruling objection that expert was not qualified to testify about defective design in table saw because he had never designed one, where the totality of his experience, education and training rendered him qualified and witness's lack of design experience goes to weight, not admissibility); *Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp.3d 729, 740 (W.D.N.Y. 2015) ("It is not necessary that Mr. Coniglio be a mechanical engineer or have design experience to opine on questions relating to the safety of the unguarded Conveyor."); *Great Northern Ins. Co. v. BMW of North America LLC*, 84 F. Supp.3d 630, 640-41 (S.D. Ohio 2015) ("[U]nder the facts of this case, Clarke need not have specialized knowledge of the exact component at issue, the stiffener plate, in order to make conclusions that assist the trier of fact. Clarke's experience in the automotive industry and his observations of the vehicle and exemplar vehicles provide a sufficient foundation for him to opine on the vehicle defect and an alternative design."); *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp.3d 223, 239-40 (E.D.N.Y. 2014) (rejecting argument that plaintiff's expert "is not qualified to render an expert opinion in this case because … he has no education or experience in designing table saws," where expert was a registered safety engineer who had inspected the subject table saw and reviewed numerous documents regarding safeguarding such saws); *Bryant v. BGHA, Inc.*, 9 F. Supp.3d 1374, 1391 (M.D. Ga. 2014) (concluding that mechanical engineer who had investigated over 100 falls from ladders and published papers on ladder safety was qualified to provide expert opinions that ladder stand was defectively designed, even though witness lacked experience in designing commercial ladder stands); *Romero v. ITW Food Equipment Group, LLC*, 987 F. Supp.2d 93, 102-03 (D.D.C. 2013) ("Although Defendant objects that Kane has no specialized expertise in designing commercial kitchen equipment, … Defendant does not explain why such specialized expertise is required in order to competently opine upon the safety of a basic mechanical device"); *In re Yamaha Motor Corp. Rhino ATV Products Liability Litigation*, 816 F. Supp.2d 442, 451-52 (W.D. Ky. 2011) (rejecting challenge to plaintiff's expert, an engineer with 40 years of experience in automotive industry, that his "testimony should be excluded because he has no experience designing or evaluating off-road vehicles and because he cannot reach a conclusion about specific changes that Yamaha should have made to the design of the Rhino"). Cooper's lack of experience in designing escalators goes to the weight, not the admissibility, of the opinions he offers in this case.

As for defendants' objection that Cooper fails to provide "any clear explanation as to what rendered the escalator 'unreasonably dangerous'" (doc. 90, at 9), the record shows otherwise. Specifically, Cooper's report delineates his opinions that "[t]he handrail was a high friction type which would had an effect on the victim being lifted by the handrail," "[t]he handrail was low and would also have had an effect on the lifting of the victim," "[t]he handrail does not constitute a guard," and "[t]he building fabric guard was insufficient to assist in preventing the accident." (Doc. 90, Exh. A, at 25.)[7] Cooper's report goes on to amplify his determinations regarding the inadequacy of the handrail, such as his opinions that "the fall hazard protection is insufficient" because of the height of the handrail, and "the floor opening in this case was unguarded." (*Id.* at 26.) And Cooper identifies as contributory factors the "long drop to the side of the escalator" and "the layout of the incident escalator in an open atrium." (*Id.* at 27.) Such a discussion, taken in the aggregate and grounded in Cooper's extensive experience studying and investigating escalator falls, certainly rises above the level of conclusory, unexplained *ipse dixit* (*i.e.*, "the escalator is dangerous because I say so"). Defendants' criticism that Cooper's opinions are unreliable because he neglected to offer a "clear explanation as to what rendered the escalator 'unreasonably dangerous'" is unavailing.

Finally, defendants protest that Cooper should not be allowed to testify as to the availability of an alternative 42-inch guardrail, inasmuch as he "does not offer any engineering dimensions" about such a device, does not provide "any details about how this proposed guard should be constructed or installed," "performed no testing" as to such an alternative guard, and "does not even know if the particular 'method' he has proposed would have prevented the accident." (Doc. 90, at 10-12.)

In his report, Cooper asserted that "[t]he International Building Code (various dates) requires fall hazard protection to be a minimum of 42" in height," but that in this case "[t]he

---

[7] Cooper relates these opinions to specific observations concerning the subject escalator. For example, he notes in his report "[t]he low handrail height compared to a hip height of a human," and indicates that "the lower the handrail the greater the risk of a fall over the side." (*Id.* at 23.) Additionally, Cooper states, "the fixed guard does not extend far enough beyond the newel to prevent a fall over the side. The fixed guard stops too short and should have extended the full length of the escalator. Even if the fixed guard had only extended the length of the floor plate (stopping where the escalator goes into downward transition begins) it would, in my opinion, have prevented the accident." (*Id.* at 24.)

handrail height is known to be less and the fall hazard protection is insufficient." (Doc. 90, Exh. A, at 26.) To correct this dangerous condition, Cooper opined, "there are a number of ways of preventing falls. In my opinion the simplest method of preventing falls over the side are to enclose the escalator or to guard it above the statutory height." (*Id.* at 29.) Cooper's report goes on to identify various means of enclosing or guarding escalators from falls, such as the safety curtain fall protection method and the additional handrail fall protection method. (*Id.* at 30-37.) Cooper concluded by summarizing his opinion that "some method of prevention was available and should have been installed as it was foreseeable that it could happen." (*Id.* at 38.)[8] All of these opinions appear well within the realm of Cooper's expertise, and defendants have not objected to them as far as they go.

The portion of Cooper's testimony to which defendants do object is his opinions concerning the guardrail. Cooper's opinion, quite simply, is that the building code required the escalator to have a guard of a minimum 42" in height, but that the escalator lacked such a device, and that a compliant guard should have been installed. In his own words, Cooper said, "I have referred to this 42-inch guard which should have been, in my opinion, at the top of the escalator and run all the way outside the escalator because the building code requires a 42-inch anti-fall guard." (Doc. 90, Exh. C, at 116.) Cooper never designed such a guard. He did not test such a guard. He did not offer specifications for materials, construction, or installation of such a guard. He merely testified that the International Building Code required 42" fall protection and that the escalator should have – but did not – have such a device. There is no *Daubert* reliability problem here. To be sure, defendants are correct that Cooper neither designed nor tested a 42" guard for the Sears escalator, nor even offered opinions as to what materials should be used, how it should be installed, or whether such guarding would have prevented Jakobe's fall. Such omissions may impair Kirksey's ability to prove up all the legal elements of an AEMLD theory of liability at trial. They may create fertile ground for cross-examination or closing argument. But they do not present a *Daubert* problem. The specific opinions offered by Cooper to which

<hr />

[8]     Cooper reiterated this assessment in his deposition, testifying that "[i]t is my opinion to a reasonable degree of certainty that some method of prevention was available and should have been installed." (Doc. 90, Exh. C, at 181.)

objection has been made satisfy the qualification, reliability and helpfulness criteria of Rule 702; therefore, plaintiff will be able to elicit those opinions from him at trial.[9]

## IV.    Challenge to Proposed Expert J. Barton Weeks.

### A.    *Qualifications and Opinions.*

Another expert witness identified by Kirksey is J. Barton Weeks, a registered professional engineer with 26 years of experience in structural and civil engineering, as well as industrial, residential and commercial construction.  (Doc. 107, Exh. C, at 1.)  Weeks holds both a Bachelor of Science degree and a Master of Science degree in civil engineering.  (*Id.*)  As relevant experience, Weeks has engineered and constructed dozens of complex remodeling projects and residential homes, many of them in Alabama.  (*Id.*)  His experience includes performing home inspections, structural inspections, building code analysis, failure analysis and special construction inspections; and he has served as principal design engineer, construction manager and business consultant on everything from residential projects to large industrial structures.  (*Id.*)

According to the Joint Pretrial Document, plaintiff expects to elicit opinions from Weeks at trial "regarding the building codes applicable to the Sears escalator area, the escalator's compliance with those codes, and that the floor openings of the escalator installation required guarding."  (Doc. 103, Exh. 7 at 5.)  In his expert report, Weeks offers the following opinions, among others: (i) the City of Mobile adopted the 1994 Standard Building Code via ordinance on May 30, 1995, and did not create any exceptions or revisions to that Code relating to escalator safety or guarding requirements; (ii) "[t]he escalator installation failed to provide the Code

---

[9]        Defendants' *Daubert* Motion appears to be fueled in large part by a disconnect between defendants' objections to Cooper's opinions and the actual substance of those opinions. For example, defendants complain that Cooper's methodology does not allow him "to opine that the utility of the alternative design outweighs the utility of the challenged design."  (Doc. 90, at 12.)  But nowhere in the cited portions of Cooper's expert report or deposition does he purport to offer such an opinion.  Likewise, defendants blast Cooper's methodology as being inadequate to allow him to "testify that his alternative design would have even prevented the subject accident." (*Id.* at 13.)  Again, it does not appear that Cooper ever offered such an opinion in this case.  Of course, a *Daubert* challenge must be directed at a putative expert's actual opinions being offered in a case, rather than engaging in hypotheticals as to whether *Daubert* principles would have permitted that expert to offer additional/different opinions above and beyond those identified in his report or deposition testimony.

prescribed minimum requirements for providing a safe guardrail system for the escalator and landings;" (iii) both the 1994 Standard Building Code and every other building code known to Weeks include "mandatory requirements for guarding (42 inches high) of open sides of floor openings," and have "required handrails and guardrails to prevent fall hazards;" and (iv) in Weeks' opinion, "it is clear that a building code compliant guardrail system was absent from the location of the fall." (Doc. 90, Exh. E, at 2-3.)

### B.    Analysis.

Defendants seek exclusion of Weeks' proffered opinions on two grounds. First, defendants challenge his qualifications by asserting that Weeks "does not possess any expertise in the application of the Alabama Building Code to escalators." (Doc. 90, at 13.) Defendants' position is that, notwithstanding his experience as a structural engineer, Weeks is not qualified to offer expert opinions here because he is not a certified escalator inspector, has never testified in an escalator case, has never designed escalator guardrails, and has not worked on projects involving escalators for many years. (Id. at 14-15.) Simply put, defendants object that Weeks' general experience in the engineering field does not translate into qualifications that enable him to testify competently about building codes and escalators.

The trouble with this objection is that defendants read the "qualification" prong of Rule 702 too stringently. "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand. … [S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." Waite v. All Acquisition Corp., --- F. Supp.3d ----, 2016 WL 4257516, *2 (S.D. Fla. July 11, 2016) (citations omitted).[10] Always, the critical question for qualifications is whether the putative expert has such knowledge, skill, experience, training or education that his opinion will

---

[10]      See also Kipperman v. Onex Corp., 411 B.R. 805, 843 (N.D. Ga. 2009) ("an expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case") (citations omitted); Hendrix v. Evenflo Co., 255 F.R.D. 568, 578 (N.D. Fla. 2009) ("as to qualification, the standard for admissibility is not stringent," and "so long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony"); Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp.2d 1293, 1304 (N.D. Ga. 2008) ("an expert with the education or background to permit him to analyze a given set of circumstances … can through reading, calculations, and reasoning from known scientific principles make himself very much an expert in [regard to] the particular product even though he has not had actual experience with the product") (citations and internal quotation marks omitted).

aid the trier of fact in understanding the evidence. The record shows that Weeks has spent decades as a structural engineer working with and applying building codes to particular industrial, commercial and residential applications in Alabama and elsewhere. Although those projects may not have focused on escalators, Weeks' experience supports a conclusion that his opinions identifying and applying the relevant building code(s) to the Sears escalator in Bel Air Mall in Mobile, Alabama are sufficiently grounded in his specialized knowledge and expertise to satisfy the liberal standard for admissibility under the "qualifications" prong of Rule 702. Stated differently, upon examining Weeks' credentials in light of the subject matter of his proposed testimony, the Court concludes that he is qualified to offer the opinions set forth in his expert report.

Second, defendants take aim at the admissibility of Weeks' opinions by framing them as "speculative opinions relating to what the Building Code should say as opposed to what it actually requires." (Doc. 90, at 13.) In so doing, defendants seize on an isolated passage from Weeks' deposition in which he testified that guardrail requirements for escalators "have not been codified in the building code .... We know it's a problem we need to address, we just need to get it in the building code. … I would request a building code change." (Doc. 90, Exh. D, at 24.) Defendants focus on this testimony to assert that Weeks' testimony must be excluded as "mere speculation" and statements of "subjective belief" regarding desired changes to the building code. (Doc. 90, at 16.)

Where defendants' objection breaks down is that plaintiff does not actually intend to call Weeks to testify about potential revisions to building codes. Weeks is not being called to offer his opinions on what he thinks the building code ought to say in a perfect world, or to pontificate about a hypothetical building code that exists only in his imagination. To the contrary, Weeks' report identifies among his opinions that the 1994 Standard Building Code governed the specifications of the subject escalator, that the Code "had mandatory requirements for guarding (42 inches high) of open sides of floor openings" and "required handrails and guardrails to prevent fall hazards," and that "a building code compliant guardrail system was absent from the location of the fall." (Doc. 90, Exh. E, at 2-3.) In other words, the gravamen of the opinions to which Weeks will testify at trial is that the Sears escalator did not comply with the applicable

building code.[11]  Plaintiff is not calling him to testify about what revisions he might make to the building code; rather, Weeks will be offering opinions that the escalator did not comply with the Code as it existed at the time.  There is nothing speculative about such opinions, and no attendant reliability problem.

## V.     Challenge to Proposed Expert Traci Campbell.

### A.     *Qualifications and Opinions.*

A third expert witness identified by plaintiff is Traci Campbell, an experienced industrial engineer.  According to the record, Campbell holds a Bachelor of Science degree in industrial engineering, and has spent more than 20 years working in the fields of industrial engineering and forensic engineering consulting.  (Doc. 107, Exh. D at 1.)  Her specialties include industrial accident reconstruction; slip, trip and fall analysis; product failure analysis; and workplace safety

---

[11]      Weeks' deposition testimony was unambiguous on this point, to-wit:

"Q:     And the area where he fell from the second floor, is it your opinion that it was unguarded, as that term is used in your industry?
A:     Yes.
Q:     And do you have an opinion as to whether or not the building code that was in effect required or did not require the area where Jakobe fell to be guarded?
A:     It clearly – the 1994 standard building code clearly addresses floor openings, and that opening would fall under that classification.
Q:     So is it your opinion that a guard was required by the building code for the area where Jakobe fell?
A:     Yes."

(Doc. 90, Exh. D, at 123.)  It appears that Weeks' opinions on this point are derived from the section of the building code addressing floor openings, rather than that addressing escalators. Defendants may disagree with that approach.  If so, they are certainly free to cross-examine him about it.  But it is inaccurate to characterize Weeks' opinions as bald speculation concerning how he would modify the building code if given the chance.  In their reply, defendants insist that it is "pure conjecture" for Weeks to opine that the spot where Jakobe fell was an unguarded floor opening within the meaning of the building code.  (Doc. 115, at 15.)  But defendants do not say why.  Within the parameters of his expertise, Weeks may testify about what the applicable building code provisions are, what they mean, and how they apply to the Sears escalator in this case.  If defendants dispute that the subject location meets the building code's definition of an "unguarded floor opening," then that is a matter for cross-examination, not exclusion. Defendants have identified nothing in Weeks' expert report or deposition testimony that would support a determination that it was "pure conjecture" for him to opine that the spot of Jakobe's fall meets the definition of an unguarded floor opening under the applicable building code.  As presented, defendants' objection goes to the weight, not the admissibility, of Weeks' opinions under Rule 702.

issues.  (*Id.*)  She has received education and training in the field of kinematics, which refers to "the motion that an object … takes during an accident sequence and that is contingent upon the forces that are acting upon that body."  (Doc. 107, Exh. E, at 17.)  She has given presentations and written publications in the areas of accident reconstruction and slip and fall.  (Doc. 107, Exh. D, at 7.)  And she has consulted as an expert witness in nearly 20 cases, predominantly in Florida and Alabama.  (*Id.*)

According to the Joint Pretrial Document, plaintiff intends to call Campbell to testify at trial about "her kinematic analysis of Jakobe Kirksey's fall, based upon surveillance video footage and detailed measurements of the Sears escalator and how additional guarding would have prevented Jakobe Kirksey's fall."  (Doc. 103, Exh. 6, at 9.)  She is also expected to offer opinions concerning "how failure to properly account for risk in the escalator installation played a role in the accident," and to rebut defense expert opinions on the subjects of "center of gravity analysis of Jakobe's fall and the benefit of the presence of additional guarding."  (*Id.*)

In support of her opinions in this case, Campbell has prepared two expert reports.  (Doc. 107, Exhs. F & S.)  Her first report includes the following conclusions, among others: (i) if the silver guardrail at the top of the Sears escalator had extended for the full length of the flat part of the escalator, Jakobe would have had the benefit of its support and protection for an additional 3.13 seconds, and such additional time could have enabled him "to exercise a different course of action" before his fall; (ii) defendants failed to exercise sound engineering practices through a Failure Modes and Effects Analysis, because the hazard of sitting on and falling over the exposed edge of the escalator handrail "was not identified and properly designed out, guarded against, or warned against;" (iii) defendants failed to apply the accepted practice of Safety Hierarchy to "identify the known and foreseeable hazards of riding the moving handrail and falling over the exposed edge;" and (iv) "[t]here were technically and economically feasible alternative designs for the escalator that would have eliminated or reduced the exposure to the hazard," such as "additional guards on the end caps of the escalator," "taller guard rails along side the escalator and solid walls on the exposed edges."  (Doc. 107, Exh. F, at 8.)

Meanwhile, in Campbell's second, rebuttal report, she offered additional opinions intended to rebut those of defendants' expert Kathleen Allen Rodowicz, Ph.D., P.E.  Campbell's rebuttal opinions were largely in the areas of coefficient of friction and center of gravity, and included the following: (i) there was a high degree of friction between the moving handrail and

Jakobe's shorts; (ii) that high coefficient of friction caused Jakobe's shorts to stick to or grip the moving handrail, which was "an assisting factor that worked to Jakobe Kirksey's detriment;" (iii) based on analysis of Jakobe's center of gravity, "as long as the fixed guardrail is present, Jakobe Kirksey's body and center of gravity will be supported by the guardrail and he will not rotate over the fixed guardrail;" (iv) had that guardrail been extended by 62 inches, Jakobe's body would have been supported and would not have gone into the rotating and falling motion as long as it was supported by the fixed guardrail, allowing him additional time to select a different course of action before tumbling over the side; and (v) "the extension of the fixed guard rail could have prevented Jakobe Kirksey's fall." (Doc. 107, Exh. S.)

### B. *Analysis.*

In a now-familiar pattern, defendants' Motion to Exclude interposes objections both to Campbell's qualifications and to the reliability of her opinions.

#### 1. *Objections to Qualifications.*

As to the former set of objections, defendants maintain that Campbell is not qualified to offer opinions on the subject of escalator design, inasmuch as she has never worked at or consulted with an escalator company, never designed components for products that have reached the public, and never taken coursework specifically dealing with escalators. (Doc. 90, at 17.) Campbell's "design" opinions on which defendants focus are, apparently, that alternative designs for the escalator could have eliminated or reduced the hazard; and that such alternatives included installation of additional guards at the end caps, taller guardrails alongside the escalator, solid walls on the exposed edges, or extension of the silver guardrail for the full length of the flat part at the top of the escalator.

Again, Campbell is an experienced industrial engineer with an extensive background in the areas of industrial accident reconstruction; slip, trip and fall analysis; and workplace safety issues, among other things. Such expertise may not be narrowly tailored to match the exact point of dispute (*i.e.*, escalator design) in this case, but neither Rule 702 nor *Daubert* requires it to be so. Rather, the law is well established that "as to qualification, the standard for admissibility is not stringent," and "so long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009); *see also Waite*, 2016 WL 4257516, at *2 ("An expert is not necessarily unqualified simply because [her] experience does not precisely match the matter at

hand."). The most compelling reasoning in favor of Campbell's suitability to testify as to matters of escalator design in this case may be found in her own deposition testimony, to-wit:

> "[W]hat I can tell you is that you don't have to be an escalator expert in order to know how to guard machines and that's what I am an expert in. And that when you look at the fact that this is an escalator, it could be a set of stairs, it could be a slide, it could be anything where a person is coming into contact with a piece of machinery. My job as an industrial engineer is to be able to look at that interaction and design ways to make it safer. And that is the expertise that's needed in this case and that's why I'm able to talk about alternative designs without being a structural expert, without being an escalator expert."

(Doc. 90, Exh. F, at 139-40.)

For the reasons stated, the Court concludes that plaintiff has satisfied the qualification prong of the Rule 702 analysis as to proffered expert Traci Campbell. Given her expertise as an industrial engineer who examines interactions between people and machines and designs ways to make those interactions safer, Campbell is qualified to offer expert opinions here as to alternative designs for the Sears escalator that might have made interactions between people and that machine safer, notwithstanding her lack of specialized escalator experience. Defendants' objections to her paucity of particularized escalator experience go to the credibility, weight and persuasiveness of her proffered opinions, not their admissibility.

There is, however, a small subset of Campbell's expert opinions as to which the qualification element of Rule 702 is not satisfied. As one of numerous opinions set forth in her expert report, Campbell wrote, "Sears failed in their responsibly [*sic*] to provide a safe place of business which was free from recognized hazards that were likely to cause death or serious physical harm to its business invitees." (Doc. 107, Exh. F, at 7.) Defendants correctly observe that this opinion amounts to a commentary on a retailer's standard of care and whether Sears breached that standard of care. Defendants also correctly note that nothing in Campbell's CV or expert report establishes any qualifications she might have to offer those particular opinions. In response, plaintiff makes no attempt to rebut defendants' objections on this point. On this showing, the Court concludes that Campbell is not qualified to testify competently as to a retailer's standard of care and whether Sears satisfied that standard as to the subject escalator; therefore, expert opinion #3 in Campbell's report dated October 30, 2015 will be excluded from trial pursuant to the "qualification" prong of Rule 702.

## 2.    *Objections to Opinions in Campbell's Primary Report.*

Next, defendants raise reliability objections to Campbell's design opinions.  In that regard, defendants first take aim at Campbell's opinion that Sears and Schindler "failed to exercise sound engineering practices through the use of Failure Modes and Effects analysis" because they failed to identify, design out, guard against, or warn against the hazard of falling over the edge of a moving escalator handrail.  (Doc. 107, Exh. F, at 8.)  Defendants criticize Campbell for not using the Failure Modes and Effects methodology properly because she did not examine architectural design drawings, does not know specifics as to how the "design team" placed this escalator, and points to no particular available guarding solutions.  (Doc. 90, at 19-20.)  Defendants characterize Campbell's testimony as being nothing more than that the escalator must have been defectively designed because Jakobe fell.  (*Id.* at 20-21.)

Defendants' objections do not strip this expert's opinion of *Daubert* reliability.  In her report, Campbell explained that Failure Modes and Effects Analysis "is a step by step approach for identifying all possible failures in a design," pursuant to which "[f]ailures are prioritized according to how serious their consequences are, how frequently they occur and how easily they can be detected."  (Doc. 107, Exh. F, at 7.)  Campbell's opinion is that Failure Modes and Effects Analysis is a "sound engineering practice" that defendants failed to follow because if they had, then the hazard of falling over the exposed edge of the escalator would have been identified and "[t]he severity of the consequences from exposure to this known hazard should have prompted specific action."  (*Id.*)  Thus, Campbell appears to be opining that the potential escalator design failure of someone falling over the edge of the moving handrail should have received high priority for correction given the severity of its consequences; however, we know it was not so prioritized because defendants did nothing to design out or guard against that potential design failure.[12]  This reads like a straightforward application of the very methodology Campbell espouses.  Although defendants object that Campbell failed to look at design drawings or to learn how this escalator was placed, they do not explain why the principles of Failure Modes and

---

[12]      Campbell alluded to this conclusion in her deposition testimony about risk tolerance, where she opined that "in this case, I don't believe that that tolerable risk level had been met, that I believe there was more that could have been done considering what the consequences are of accidents that do happen.  Even though as we talked about that they do happen with infrequency."  (Doc. 90, Exh F, at 138-39.)

Effects Analysis required her to take into account such facts or data, or why the facts and data she did examine (including her on-site inspection of the escalator) were insufficient to enable her to perform the Failure Modes and Effects Analysis in a reliable manner as to this specific hazard. Nor does it appear to be a fair characterization of Campbell's expert opinions for defendants to say she is "unable to point to anything except the fact that the incident occurred to suggest that the design was unsafe." (Doc. 90, at 20.)[13]

Also under the reliability heading, defendants are sharply critical of Campbell's opinions about reasonable alternative designs. Specifically, they object that while Campbell opined that there were technically and economically feasible alternative designs for the escalator that would have reduced exposure to the hazard, "Campbell wholly failed to actually present any of those designs." (Doc. 90, at 21.) It is certainly correct that this witness did not design a guard for the escalator. Upon repeated interrogation in her deposition, Campbell acknowledged that she "had

---

[13]     Defendants identify no passage in Campbell's expert report where she opines that the escalator must have been defectively designed because Jakobe fell. Their argument appears to rest almost entirely on the following two short excerpts from her deposition:

"Q:     So the fact that Jakobe Kirksey fell leads you to believe and opine that there was irresponsible behavior, correct?
A:      At this point, yes, because there were no guards to prevent him from falling."

                    *                    *                    *

"Q:     Are you telling the ladies and gentlemen and judge in this case that [analysis of tolerable risk by defendants] did not happen?
A:      I'm not saying that didn't happen. What I'm saying is the end result did not meet with a solution that would keep Jakobe Kirksey from dying when he fell from this second story escalator."

(Doc. 90, Exh. F, at 133, 140-41.) Taking these snippets of testimony out of context does a disservice to, and does not fairly summarize, Campbell's opinions. Reading those deposition excerpts in context, along with the expert report, the Court discerns very clearly that Campbell's opinion is that the absence of fall protection on an open-sided escalator was a known foreseeable hazard, that defendants did nothing to correct or protect against that hazard, and that whatever tolerable risk analysis defendants did must have been inadequate because it did not result in implementation of any of a number of relatively-easy, readily-available solutions to guard against a known risk of catastrophic injury or death. That opinion is a far cry from defendants' attempt to distort Campbell's words into an opinion that she "points to the mere fact that the incident occurred to prove her conclusion" (doc. 115, at 10), or that the escalator must have had a defect because Jakobe fell. Rule 702 principles are applied to an expert's opinion as actually stated, not as the objecting party might wish it to be.

not gone through the process of actually doing the design of those alternatives" and further testified, "I don't know how many more ways to tell you that I did not sit down and do an actual design for this case." (Doc. 90, Exh. F, at 73-74.)[14] But that is not the relevant inquiry under *Daubert* and Rule 702 principles. Movants cite no authority – and the Court is aware of none – holding that the Federal Rules of Evidence mandate exclusion of an expert's opinion that alternative designs exist unless that expert has personally undertaken to prepare such designs for the product or device at issue. The undersigned understands (but does not decide, in the context of this evidentiary motion, the legal validity of) defendants' position that, without such specifics as to form of the alternative design, plaintiff's claims fail under Alabama law. Again, however, this matter is before the Court on an evidentiary challenge, not a summary judgment motion. The pertinent question for admissibility purposes is not whether plaintiff's case might be rendered legally deficient by shortcomings in her expert's testimony, but whether there are sufficient indicia of reliability for the opinions she did offer to go to the jury. The Court answers that question in the affirmative.

Campbell's testimony is pellucidly clear as to what her alternative design opinions are, and what they are not. She explained in her deposition that her opinion about technically feasible design alternatives was "based off of my experience and my knowledge of guarding with regard to what is possible with materials such as plexiglass or other materials that could be used for guarding, their applicability for this situation and knowing that those types of materials are readily available. They have been around for years and years, used in these types of situations for guarding." (Doc. 90, Exh. F, at 73.) In addition to plexiglass, Campbell explained, "[t]here are a number of different kinds of guards that could have been used in this case … to eliminate the fall hazard," such as "having escalators that are installed side-by-side" or "having escalators that run along side solid walls." (*Id.* at 76.) Campbell testified that "these are, again, concepts and ideas that have been around in engineering and in practical application for a very long time."

---

[14]    Notwithstanding the clarity of Campbell's testimony as to this point, defense counsel continued questioning her about whether she had actually designed an alternative guarding system for this escalator, prompting her to testify, "As we've already beat to death, I have not put those drawings down, but it can be done." (*Id.* at 86.) Notwithstanding defendants' barrage of questions about whether she had actually designed an alternative guarding system for the Sears escalator, Campbell was emphatic that "the fact that I haven't done that degree of analysis does not negate the fact that it still can technically be done." (*Id.* at 87.)

(*Id.* at 83.) Campbell elaborated that she was discussing "alternative designs that are readily available, well-known in applications everywhere," and she knew from her "education and training and knowledge as an engineer that these things exist. They are readily available and are technically feasible." (*Id.* at 135.) Simply put, she testified, "[t]he materials are readily available and the concepts for the design are readily available," and "the ideas and concepts for what you would use to do those kinds of designs are out there readily available and are economically feasible." (*Id.* at 137, 153.) The Court finds no *Daubert* reliability problem with these opinions, which appear firmly grounded in Campbell's professional experience and knowledge as an engineer, and therefore do not suffer from a lack of reliable methodology for Rule 702 purposes. That Campbell did not design specific alternative designs in this case is a topic for cross-examination, not a basis for wholesale exclusion of her opinions.[15]

### 3. Objections to Opinions in Campbell's Rebuttal Report.

As noted, Campbell also submitted a rebuttal expert report to address the opinions offered by defense expert witness Kathleen Allen Rodowicz, Ph.D., P.E. Defendants object to two of Campbell's rebuttal opinions, to-wit: Her opinion that a high coefficient of friction between the escalator handrail and Jakobe's shorts was an "assisting factor" in the accident, and her opinion that "extension of the guard rail could have prevented Jakobe Kirksey's fall." (Doc. 107, Exh. S, ¶¶ 7, 23.) Defendants maintain that neither opinion is supported by reliable methodology.

With regard to the coefficient of friction, defendants focus on Campbell's opinions that, because of the high coefficient of friction, Jakobe's "shorts tended to 'stick' or grip the moving handrail as opposed to the moving handrail sliding along his shorts," and that the interaction between handrail and shorts was thus "an assisting factor that worked to [his] detriment." (*Id.*,

---

[15] The parties' protracted sparring (both in their *Daubert* briefs and in the expert deposition itself) over Campbell's alternative design opinions appears disproportionate. After all, in her expert report, she opines (with specific support from her own kinematic analysis in this case) that "[i]f the subject silver guard rail at Sears had been extended to full length of the top flat portion of the escalator," it would have provided more fall protection that might have prevented Jakobe's accident by giving him an additional three-plus seconds to make another decision (*i.e.*, climb off the handrail) before falling. (Doc. 107, Exh. F, at 8.) That simple modification – extending the silver guardrail for an additional 62 inches to encompass the entire flat part of the top of the escalator – sounds very much like a specific alternative design. Any objection (which has not been voiced, in any event) that such a design concept would have been technically or economically unfeasible would appear of dubious merit.

¶¶ 7-8.)  Defendants maintain that, given Campbell's admission that she conducted neither research nor testing, "it is nonsensical to conclude that Campbell relied on generally accepted scientific principles to reach her conclusion that frictional lifting … contributed to the accident." (Doc. 90, at 26.)

From careful review of Campbell's rebuttal report and rebuttal deposition, the Court is satisfied that the *Daubert* reliability threshold for admissibility is satisfied.  Here is why: Defendants' expert, Dr. Rodowicz, calculated the coefficient of friction between the Sears escalator handrail and the fabric of Jakobe's shorts at between 0.65 and 0.96.[16]  Campbell, as an experienced industrial engineer, used her education and training to interpret those values.  In particular, she explained that coefficients of friction are measured on a scale of between 0 and 1, with 0.5 being considered by the scientific community to be the tipping point for whether a material is slip resistant or not.  (Doc. 90, Exh. H, at 29-30; doc. 107, Exh. S, ¶ 1.) Values above 0.5 are considered slip resistant, whereas values below 0.5 are not.  (*Id.*)[17]  Based on the measured values reported by Dr. Rodowicz, Campbell applied these general principles of coefficients of friction to opine that "the type of material that Jakobe Kirksey would have been wearing at the time of the accident fell into the category of a high friction material that would

---

[16]  In her report, Dr. Rodowicz explained that she had conducted testing "to determine the static coefficient of friction between the escalator handrail and fabric from four different types of men's pants. … The static coefficient of friction for the materials tested ranged from approximately 0.65 to 0.96."  (Doc. 107, Exh. AA, at 5.)  Dr. Rodowicz did not have the actual shorts that Jakobe was wearing at the time of the accident, so she tested four types of fabrics from menswear (casual dress pants, jeans, cargo shorts, and corduroy pants) to get a range of values in which the fabric of Jakobe's shorts might be expected to lie.

[17]  Defendants complain that these standards apply only to walking surfaces and that Campbell's opinion is rendered unreliable because "handrails … are certainly not walking surfaces."  (Doc. 115, at 11.)  This criticism overlooks Campbell's testimony that it does not matter whether the surface tested is a walking surface, a handrail or anything else "[b]ecause coefficient of friction is a scientific principle that doesn't change depending on your application. The scale is zero to one regardless of what surface that you're going to be measuring on, and the values, the greater that you get to one, the more friction there is between the two surfaces that you are determining the coefficient between."  (Doc. 90, at 32.)  In light of Campbell's expert opinion about the universality of the scale for and the interpretation of coefficients of friction, defendants' criticism about walking surfaces versus handrails does not negate the reliability of her testimony.

tend to stick to the handrails as opposed to sliding on the handrails." (Doc. 90, Exh. H, at 35.)[18] This is a simple statement of opinion, whereby an industrial engineer uses her expertise to explain to the jury how to interpret the coefficient of friction values measured by the defense expert, to-wit: that the higher coefficients of friction mean that Jakobe's shorts would have tended to stick to or grip the escalator's handrail rather than sliding off. Without question, Campbell's opinion testimony on that straightforward interpretive point satisfies all *Daubert* reliability criteria, notwithstanding her lack of independent testing.[19]

Nor does that conclusion change with regard to Campbell's follow-up opinion. Taking the interpretation of the coefficients of friction one step further and viewing it in tandem with her kinematic analysis of Jakobe's fall, Campbell opined that "[t]he interaction between the shorts and the moving handrail was an assisting factor that worked to Jakobe Kirksey's detriment." (Doc. 107, Exh. S, ¶ 8.) She did not testify that the "sticking" of clothing to handrail pulled him on the handrail all by itself; to the contrary, she expressly disclaimed any such opinion.[20] She did not opine that Kirksey never would have ended up on the handrail were it not for the gripping interaction between his shorts and the moving rail. Nor did she testify that Kirksey was

---

[18]     In her testimony, Campbell made clear that she was not offering any opinions as to whether the Sears escalator handrail was unreasonably slippery or somehow out of step with industry norms as to slip resistance. (*Id.* ("I wasn't being critical in terms of saying it was too slip resistant or not.").) There is no suggestion anywhere in Campbell's testimony or plaintiff's briefing that the coefficients of friction yielded by the handrail on the Sears escalator amounted to a design defect. And Campbell confirmed that she was offering no recommendations for what a coefficient of friction on an escalator handrail should or should not be. (*Id.* at 45-46.)

[19]     Despite the extensive briefing on the subject in defendants' Motion to Exclude, Campbell took pains in her deposition to emphasize that her opinion is a straightforward application of the coefficients of friction found by Dr. Rodowicz. As Campbell put it, "there's a very simple point that was to be made with the coefficient of friction discussion that we've been having, that did not require any testing." (Doc. 90, Exh. H, at 43.) Later, she reiterated the point that "[a]gain, this is simply a statement of the fact that his shorts are going to tend to stick to the handrail as it is moving and not slide off of the handrail." (*Id.* at 49.)

[20]     The relevant deposition exchange is as follows:

"Q:     Are you suggesting to the jury in this case that Jakobe Kirksey was lifted onto the handrail without any application of force by himself?
"A:     No, I'm not."

(Doc. 90, Exh, H, at 38-39.)

involuntarily pulled onto the handrail.  (Doc. 90, Exh. H, at 37 ("It's going to be assistive whether it was voluntary or involuntary."), 39 ("I don't know if it was voluntary or not.").) Rather, Campbell went no further than to opine that, "as Jakobe was interacting with the moving handrail, that his shorts were going to tend to stick to the handrail as opposed to sliding on the handrail, therefore being an assistive device to him in the accident sequence." (*Id.* at 35-36.)[21] She can reliably offer that narrowly circumscribed, limited opinion about the tendency of the moving handrail to pull Jakobe – which again is rooted in her interpretation of the coefficients of friction and her kinematic analysis – without performing the testing or quantifying calculations on which defendants insist.  Campbell is careful not to offer any opinions as to whether this was a major factor or a minor factor in the accident. The Court is confident that defense counsel will be able to identify and illuminate for the jury's benefit the clear limitations in the simple, narrow opinions Campbell does offer on this point.[22]

Defendants also challenge Campbell's rebuttal opinion that "extension of the fixed guardrail could have prevented Jakobe Kirksey's fall" on the grounds that she performed no testing of the structural strength of the silver guardrail.  (Doc. 90, at 26-27.)  As noted, a cornerstone of Campbell's expert opinions in this case is that "the extension of the fixed guard

---

[21]     Elsewhere, Campbell reframed this opinion in similarly limited terms as follows: "It is simply a matter of the fact that when he is coming into contact with the handrail, that his shorts, as well as his body, are going to tend to move along with the handrail because of the coefficient of friction, as one of the factors."  (Doc. 90, Exh. H, at 46.)

[22]     Defendants' *Daubert* challenge on this point is disconnected from the exceedingly narrow opinion that Campbell actually offered.  If she had testified that the interaction between Jakobe's shorts and the rail caused him to be involuntarily lifted onto the handrail, that he never would have ended up on the handrail but for the interaction between clothing and moving machinery, that the "stickiness" overpowered his will or rendered him helpless to stay off the handrail, or that the slip-resistance of the handrail constituted a design defect, then defendants' objections about no testing or no quantification might well resonate for Rule 702 admissibility purposes.  But that is not what Campbell said.  Instead, her very logical opinion is that (i) Dr. Rodowicz found a high coefficient of friction, (ii) that high coefficient of friction means that these surfaces were slip-resistant, (iii) Jakobe's shorts would have a tendency to stick to or grip the slip-resistant handrail rather than sliding off it, and (iv) all other things being equal, this gripping interaction between shorts and moving handrail would be an "assistive device" or "one of the factors" in the accident sequence.  Contrary to defendants' Motion to Exclude, the admissibility of such an opinion is not rendered "nonsensical" under *Daubert* by her failure to conduct her own testing or quantify the amount of force needed.

rail could have prevented Jakobe Kirksey's fall." (Doc. 107, Exh. S, ¶ 23.) That opinion is supported by multiple underlying facts, opinions and methodologies, including among others the following: (i) Campbell's engineering training, education and experience; (ii) her field inspection and measurements at the Sears escalator; (iii) her frame-by-frame examination and kinematic analysis of surveillance video of the accident; (iv) her calculations about the moving handrail's speed, the amount of time that Jakobe was on the handrail before falling, and the amount of additional time he could have remained on the handrail had the silver guardrail been extended for the entirety of the top flat part of the escalator; (v) her calculations of Jakobe's center of gravity and where such center of gravity would have interacted with and contacted the fixed guardrail; (vi) her conclusion that Jakobe's center of gravity would have been below the top of the fixed guardrail, such that the guardrail would have supported his body and center of gravity for as long as the guardrail was in place; and (vii) her assessment that if Jakobe had had a little more time before the guardrail ended, he might have taken action (*i.e.*, climbed off the handrail) before the fall protection ended, rather than falling over the side of the escalator.

Defendants' position is that this opinion is unreliable and inadmissible in the absence of any testing or analysis of the structural strength of the guardrail. (Doc. 90, at 26-27.) Evidently, then, defendants contend that Campbell's opinion is speculative without some basis for concluding that the fixed guardrail would have been structurally strong enough to support Jakobe's body. That may be a fine tack for cross-examining Campbell at trial; however, it does not constitute a ground for excluding her opinions altogether as unreliable under a *Daubert* analysis. Campbell visually inspected the guardrail. Her assumption that it would have been structurally sound and strong enough to support the weight of an 11-year old boy leaning into it from an adjacent handrail (as opposed to, say, crashing into it in an all-out sprint) is not so unrealistic or speculative as to deprive of it of reliability.[23] In short, Campbell relied on

---

[23] Campbell even allowed for the possibility that the guardrail might not have been strong enough to support Jakobe, as she testified, "I'm not 100 percent sure that it would have prevented his fall," and indicated that her lack of quantification of the structural strength of the guardrail was "certainly one of" the reasons she was not certain that extending the guardrail would have prevented the fall. (Doc. 90, Exh. H, at 77.) This is simply not a situation in which an expert witness has made an unvarnished guess about something she never saw. Nor did she testify with false, misleading certainty about something she never tested. Campbell was entitled to rest her opinion on an assumption that the guardrail would not have been so flimsy as to (Continued)

multifaceted, detailed methodology in evaluating whether extending the guardrail might have prevented Jakobe's fall. Along with that methodology, she made certain facially reasonable assumptions, and acknowledged uncertainty in her final opinion arising from such assumptions. That she did not specifically test those assumptions does not render her conclusion inadmissible under Rule 702.

## VI. Challenge to Proposed Expert Joseph L. Stabler.

### A. Qualifications and Opinions.

A fourth expert designated by plaintiff is Joseph Stabler, who has "over 40 years of progressive hands-on experience in the elevator and escalator industry." (Doc. 93, Exh. A, at 3.) Among the roles that Stabler has performed in the industry include owner/manager of an elevator company, sales engineer, elevator constructor, field engineer, consultant and Certified Elevator Inspector involved in design, construction, inspection and testing of 6,000 conveyance systems. (Id.)[24] He is a member of the American Society of Mechanical Engineers ("ASME"), and sits on its Escalator and Moving Walk Committee. (Id.) Stabler also consults with architects, contractors, elevator manufacturers and others concerning building codes, elevator/escalator codes, industry customs, practices and standards, and life safety codes. (Id.)

Plaintiff first disclosed Stabler as a rebuttal expert. According to the Joint Pretrial Document, Kirksey intends to call him at trial to testify in three broad areas. First, Stabler will "testify on the applicable escalator and building codes to the Sears escalator, the compliance of the escalator with such codes, and the knowledge of the industry and Defendants regarding the risk of falls from escalators." (Doc. 103, Exh. 5, at 7.) Second, Stabler will testify in rebuttal of defense witnesses as to existing research regarding escalator falls and ways of guarding against them. (Id.) Third, Stabler will "testify in rebuttal as to previously-existing solutions to fall

---

collapse or bend out of position when an 11-year old boy leaned against it while sitting on the moving escalator handrail 6.5 inches away.

[24]    These qualifications come with caveats. In his deposition, Stabler acknowledged that he has never designed an escalator, any components for an escalator, or any type of fall protection for an escalator. (Doc. 93, Exh. B, at 179-80.) Stabler also testified that he does not hold a license to perform escalator inspections in Alabama. (Id. at 178.)

prevention, industry code group work on the subject of falls, ASME activities and minutes, and Schindler's involvement with the code group." (*Id.*)

**B.      Analysis.**

As they have done with respect to each of Kirksey's other expert witnesses, defendants move to exclude Stabler's opinions pursuant to Rule 702 on both qualification and reliability grounds.  Specifically, defendants maintain that Stabler is not qualified to render opinions as to escalator design, that his opinions that the escalator was unsafe are unreliable, that he does not offer a "methodologically-sound reasonable alternative design," and that his opinions as to who bears responsibility for escalator code compliance are inadmissible.  Unique to their motion to exclude Stabler's opinions is defendants' assertion that if this witness is allowed to testify at trial, he should be limited to testifying in a rebuttal capacity.  Each of these issues will be addressed in turn.

**1.      Objections to Stabler's Qualifications.**

Defendants fail to specify precisely which of Stabler's opinions they contend he is unqualified to render.  Instead, they refer generically to his opinions "that the subject escalator was dangerous or should have been equipped with fall protection." (Doc. 93, at 5.)  The Court's understanding, however, is that Stabler has offered opinions in this case as to whether the Sears escalator complied with applicable building codes and safety standards.  These sorts of opinions fit comfortably within the parameters of Stabler's expertise, particularly given his extensive background in working with, consulting on, and sitting on committees that consider and evaluate safety standards and codes for escalators.  As framed, defendants' objection that Stabler is not qualified under Rule 702 to offer these opinions because he lacks personal experience designing escalators is not persuasive, and proceeds in derogation of the low threshold imposed by the qualification prong of the Rule 702 admissibility standard.

**2.      Reliability Objections to Stabler's Opinions Concerning Unsafe Escalator and Alternative Design.**

In terms of reliability, defendants take issue with Stabler's opinions that the "code violations he believes were present in the escalator rendered the escalator unsafe and caused the subject accident." (Doc. 93, at 5.)  Defendants maintain that these opinions are mere *ipse dixit* because Stabler does not understand the facts of the accident and performed no testing.  The specific testimony to which defendants' objection is directed includes Stabler's opinions that the 6.5-inch gap between the moving handrail and the silver guardrail was noncompliant with the

1994 Standard Building Code, that the Code required guardrails forming a protective barrier of not less than 42 inches high as to unenclosed floor openings, that the Sears escalator was therefore in violation of the Code at the time of Jakobe's fall, and that "the escalator should have been out of service if it didn't comply with the escalator code … at the time." (Doc. 93, Exh. B, at 77.) The Court perceives no reliability problems with these opinions that would preclude their admissibility. It is an appropriate, permissible methodology for Stabler to apply his knowledge and expertise of the 1994 Standard Building Code and other industry standards/requirements to known facts concerning the configuration and layout of the Sears escalator to evaluate its compliance with those standards.

There are also no *Daubert* reliability issues attaching to Stabler's follow-up testimony that, given his opinion that the Sears escalator was not in compliance at the time of Jakobe's fall, it should not have been in service. This conclusion is not undermined by defendants' protestation that Stabler offered these opinions "despite not even stepping foot in Mobile." (Doc. 93, at 5.) Rule 702 does not require that an expert personally examine the subject escalator, or forbid him from using photographs, known measurements by other witnesses, and the like in assessing whether that escalator was or was not code-compliant.[25]

---

[25] An important clarification / distinction must be made. Defendants' Motion characterizes Stabler's opinions as being that the code violations "caused the subject accident" and amounted to "dangerous conditions [that] caused Jakobe Kirksey's fall." (Doc. 93, at 5, 10.) Defendants balk that Stabler cannot reliably so conclude because he "has no understanding of how the incident took place." (Doc. 93, at 5, 7.) Defendants' straw man inaccurately describes Stabler's opinions. Defendants do not cite – and the undersigned has not found – any place in Stabler's expert report or deposition where he offers opinions as to how Jakobe fell from the escalator, or what role the observed code violations played in his fall. Stabler does not testify, for example, that the 6.5-inch gap between moving handrail and silver guardrail contributed to Jakobe losing his balance and falling. Had he done so, there would have been obvious *Daubert* reliability problems with those opinions, given Stabler's lack of knowledge of the particular circumstances of Jakobe's fall. But Stabler did not so opine; rather, he simply identified what he believed to be code violations and indicated that, as a result of such violations, the escalator should not have been in service. When asked whether the 6.5-inch gap contributed to Jakobe's fall, Stabler testified that he did not know. (Doc. 93, Exh. B at 79.) Thus, Defendants' Motion to Exclude distorts Stabler's opinions into something they are not. He does not purport to be offering causation testimony, or explaining the interaction between the code violations he observed and Jakobe's fall. Instead, he does nothing more than testify that certain reported conditions on the escalator amounted to code violations, and that the escalator should have been (Continued)

In their reply brief, defendants advance a new argument that Stabler's proffered testimony about code violations pertaining to the 6.5-inch gap and other defects not directly linked to Jakobe's fall should be excluded because it is "irrelevant and unhelpful to the jury." (Doc. 118, at 4.) As an initial matter, this argument is improper because it was not fairly presented in defendants' principal brief, despite having been available at that time.[26] Setting aside the procedural defect, defendants' "unhelpfulness" argument for excluding this aspect of Stabler's opinions is unavailing. Recall that Stabler is being called as a rebuttal expert. His opinions concerning the Sears escalator's code violations are rebuttal opinions. As documented in Stabler's report, his opinions about code violations rebut the opinions of defense expert Davis L. Turner that the Sears escalator was code compliant. (Doc. 93, Exh. A, § 3.1.) If defendants put on expert testimony that the Sears escalator complied with all applicable code requirements (even as to escalator features that did not proximately cause Jakobe's fall), then it is neither irrelevant nor unhelpful for plaintiff to put on expert testimony in rebuttal of those opinions.

As a further reliability argument, defendants object to Stabler's "alternative design" opinions. Once again, defendants' Motion to Exclude suffers from a lack of clarity as to precisely what opinions defendants find objectionable. At best, defendants cite Sections 2.6 through 2.8 of Stabler's report; however, those sections do not even purport to state expert opinions, but are instead presented under the heading "Background of escalator industry knowledge and research regarding falls over the side of escalators." (Doc. 93, Exh. A, § 2.0.) Sections 2.6 and 2.7 document the efforts of a competitor escalator manufacturer, ThyssenKrupp Rulletrapper, to describe safety curtains that have been successfully applied to escalators in Norway for more than 40 years. (*Id.*, §§ 2.6-2.7.) In Section 2.8, Stabler writes that because defendant Schindler does business in Norway, it "reasonably knew or should have known about

---

out of service because of those violations. Those opinions – as far they go – do not fairly implicate any *Daubert* reliability concerns that might call for exclusion.

[26]     *See, e.g., Herring v. Secretary, Dep't of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotes omitted*); Brown v. CitiMortgage, Inc.*, 817 F. Supp.2d 1328, 1332 (S.D. Ala. 2011) (explaining that "it is improper for a litigant to present new arguments in a reply brief" and that "[n]ew arguments presented in reply briefs are generally not considered by federal courts").

the aforementioned requirements and safer alternative designs." (*Id.*, § 2.8.) Notwithstanding defendants' objections, Stabler may testify about what others in the industry have done to implement fall protection solutions, particularly if (as the Court understands) he is doing so in rebuttal of defense expert testimony that either (i) no safer designs for escalators existed at the relevant times, or (ii) Schindler was unaware of available fall protection designs at the relevant times.[27]

### 3. Objections to Stabler's Opinions as to Responsibility for Code Compliance.

Defendants also take issue with Stabler's opinions expressed in his deposition concerning the obligation of the escalator installer to ensure compliance with code requirements. At the outset, the Court notes that Stabler's expert report does not appear to identify any such opinions, nor does this particular opinion appear in plaintiff's summary of his opinions in the Joint Pretrial Document. And given Stabler's status as a rebuttal expert, it is not clear how he would offer an opinion as to whose responsibility it was for the Sears escalator to be code-compliant, unless of

---

[27]     Several other observations bear noting on this point. First, to the extent that defendants reiterate their argument (also advanced against multiple other plaintiff's experts) that Stabler's opinions about alternative designs are inadequate to prove Kirksey's case under Alabama law, that objection is not properly presented in an evidentiary motion but should instead have been raised on summary judgment. Second, defendants' objection to Stabler's use of the word "safer" in describing the other designs found in industry literature is unpersuasive. Stabler may testify, based on his own expertise as well as his knowledge and review of such literature concerning the safety history of such alternative designs, that those designs are "safer" than that of the Sears escalator. Third, defendants correctly note that Stabler testified that he was not aware of any manufacturer of escalators in the United States incorporating fall protection into its designs in 1997. (Doc. 93, Exh. B, at 185.) But he also testified that that there was no reason why fall protection designs available and used in other countries in the 1990s could not have been incorporated into United States escalator designs at that time. As Stabler put it, "An escalator is an escalator in that regard. … [I]f it's a design they would use in Germany or Europe or anywhere else, they could use it anywhere." (*Id.* at 149.) While defendants criticize Stabler's testimony on this point as cavalier and "overly simplistic," (doc. 118, at 5), it is permissible for this witness to offer an expert opinion based on his more than four decades of experience in the escalator industry that what was achievable in escalator design in Norway in the 1970s would have also been achievable for the Sears escalator in Mobile, Alabama in the mid-1990s. Stabler's testimony about what escalator manufacturers were doing in other countries will thus not be excluded on the ground that such designs were not available in the United States. All of these concerns may be brought out on cross-examination; however, they do not render Stabler's core opinion (*i.e.*, that other safer designs were available and being used in the escalator industry and that Schindler knew or should have known it) so unreliable as to be inadmissible.

course a defense expert had opined on that specific topic. To be sure, in a page and a half of his 204-page deposition transcript, Stabler fielded general questions posed by defense counsel about "[i]n those installations, you have been involved in … who is, per your understanding, involved with assuring compliance with building codes?" (Doc. 93, Exh. B, at 40.)[28] That Stabler answered those questions does not imply that plaintiff intends to elicit such opinions from him at trial. As such, this objection is perplexing because it is far from clear that Stabler even intends to offer that opinion on direct examination at trial.

Notwithstanding the foregoing, insofar as defendants are interposing a *Daubert* reliability challenge to this particular snippet of Stabler's testimony, that objection is unpersuasive. Defendants protest that "Stabler may not purport to offer legal conclusions to a jury" regarding responsibility for code compliance. (Doc. 93, at 14.) However, that is not what Stabler did. Defense counsel asked the witness for his opinion, based on his own personal experience and involvement in escalator installations, as to who was involved in assuring compliance with building codes. Stabler's responses to those questions were rooted in his decades of experience in the escalator industry, how things are "[t]ypically" done and what responsibilities he has had in those kinds of transactions. Stabler is plainly qualified to offer such experiential opinions, and his first-hand observations from personal experience supply the requisite reliability to satisfy Rule 702. As framed, then, this objection is overruled.

### 4. Miscellaneous Objections to Use of Stabler's Testimony.

As a final grab-bag category of objections, defendants submit that Stabler should not be permitted to testify in plaintiff's case-in-chief. Everyone agrees that Kirksey designated Stabler as a rebuttal expert. His expert report is dated March 11, 2016, which also appears to be the date on which Kirksey first disclosed him to defendants. (Doc. 93, Exh. A; doc. 64.) It was also the

---

[28] In responding to defendants' objections to Stabler's answers, plaintiff argues that Stabler "is testifying on his opinion based on facts contained in the Sears/Schindler national maintenance contract." (Doc. 107, at 35.) The context and content of this testimony unambiguously reveals otherwise. Stabler's deposition testimony on the obligation of an escalator installer to ensure code compliance was neither linked to the Sears escalator nor guided by applicable maintenance contract documents between Sears and Schindler; rather, Stabler couched his testimony in terms of what is "[t]ypically" done and what happens "when we do an acceptance" of an escalator. (Doc. 93, Exh. B, at 40-41.) The Court therefore cannot accept plaintiff's characterization that Stabler was merely reciting what he had read in Sears/Schindler contractual documents.

court-ordered deadline for disclosure of rebuttal expert witnesses. (*See* doc. 49, ¶ 8; doc. 50.)
The underlying Rule 16(b) Scheduling Order fixed a deadline for plaintiff's expert disclosures of
November 2, 2015, "except that expert testimony ***intended solely to contradict or rebut*** shall be
disclosed within the time permitted under Rule 26(a)(2)(D)(ii)." (Doc. 31, ¶ 7 (emphasis
added).) Plaintiff did not disclose Stabler prior to the November 2 deadline; therefore, his
involvement in this case is "solely to contradict or rebut." In light of this procedural history, it
would be inappropriate – and violative of the express terms in the Scheduling Order – to allow
Kirksey to utilize Stabler's expert testimony at trial in any capacity other than "solely to
contradict or rebut." Plaintiff designated him as an expert for the limited, narrow purpose of
contradicting or rebutting defense expert testimony. Obviously, Stabler cannot perform such a
rebuttal role in plaintiff's case-in-chief, as defendants' experts will not yet have testified and
there will be nothing in the record to rebut. For these reasons, defendants' objection to Stabler
offering expert opinions in plaintiff's case-in-chief is sustained.[29]

    Finally, defendants lodge an objection to Stabler's testimony pursuant to Rule 403,
Fed.R.Evid., on the grounds that it is unreasonably cumulative and duplicative. On the record
presently before the Court, it does not appear that Stabler's rebuttal opinions will be cumulative.
Of course, the Rule 403 determination hinges on the testimony that actually is admitted at trial.

---

[29]      Plaintiff's counterarguments are not compelling. In particular, plaintiff invokes
the Court's discretion under Rule 611, Fed.R.Evid., as to the mode and order of examination of
witnesses and presentation of evidence. The undersigned declines to exercise that Rule 611
discretion to allow a witness disclosed by plaintiff as a rebuttal expert to testify to such expert
opinions in plaintiff's case-in-chief, before the jury has heard any of defense experts' opinions
that he is purportedly rebutting. The Court disagrees with plaintiff's assessment that it would be
"terribly inefficient" to make Stabler wait until the end of trial to testify and that Stabler's
rebuttal testimony "would fit most seamlessly into Plaintiff's case in chief." (Doc. 107, at 40.)
Again, he was disclosed exclusively as a rebuttal expert witness. By their very nature, rebuttal
witnesses appear and testify at the end of trial. And how could Stabler fit seamlessly into
plaintiff's case-in-chief when he is offering rebuttal opinions to defense experts who will not
have testified yet? Plaintiff also indicates that Stabler may be needed to testify as a fact witness
"to authenticate the A17.1 minutes," and says it would "make no sense" to require Stabler to fly
in from Missouri to give that authentication testimony, then fly back to Alabama sometime later
to give his rebuttal opinions. (*Id.*) (Contrary to defendants' characterization, such authentication
testimony would not render Stabler a "case-in-chief expert," but would rather be presented in his
capacity as a fact witness. (Doc. 118, at 9.).) There may be any number of viable, acceptable
workarounds to the practical dilemma identified by Kirksey; however, allowing Stabler to
present expert rebuttal opinions in plaintiff's case-in-chief is not one of them.

Without hearing the specifics of Stabler's trial testimony in the context of the testimony given by other witnesses (and knowing whether Kirksey will re-call any other expert witnesses to testify in a rebuttal capacity and, if so, what they will say), it is not possible to evaluate defendants' contentions that Stabler's testimony will be unreasonably cumulative and duplicative. As such, that objection is premature.

## VII. Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.  Defendants' Joint Motion to Exclude Proffered Opinion Testimony of J. Barton Weeks, David Cooper, and Traci Campbell (doc. 89) is **granted in part, and denied in part**. The Motion is **granted** insofar as plaintiffs' expert Traci Campbell would offer opinions about a retailer's standard of care and whether Sears satisfied that standard here. Thus, Campbell may not testify at trial as to opinion #3 enumerated in her expert report dated October 30, 2015. In all other respects, the Motion is **denied**; and

2.  Defendants' Joint Motion to Exclude Joseph Stabler (doc. 92) is **granted in part, and denied in part**. The Motion is **granted** insofar as defendants seek a ruling that plaintiff may not call Stabler to offer expert opinions in her case-in-chief, but may only call him in rebuttal of opinions offered by defense experts. This ruling does not bar Stabler from testifying as a fact witness in plaintiff's case-in-chief to authenticate exhibits. In all other respects, the Motion is **denied**.

DONE and ORDERED this 20th day of September, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE