# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| TYRA KIRKSEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 15-0115-WS-N |
| | ) |
| SCHINDLER ELEVATOR | ) |
| CORPORATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## ORDER

This matter comes before the Court on plaintiff's Motion to Exclude as Unreliable the Testimony and Opinions of Kathleen A. Rodowicz (doc. 99), Motion to Exclude as Unreliable Lay Testimony and Opinions of Surveillance Video and Portions of Police Report (doc. 100), and Motion to Exclude as Unreliable Testimony and Opinions of Defendants' Expert Davis Turner (doc. 101). The Motions have been briefed and are ripe for disposition.[1]

**I.    Background.**

This wrongful death action arises from an incident at the Sears retail store at Bel Air Mall in Mobile, Alabama, on June 14, 2014. An 11-year old boy named Jakobe Kirksey fell more than 20 feet to his death over the side of a moving escalator handrail on the second floor of the store. Jakobe's mother, Tyra Kirksey, brought a wrongful death lawsuit against Sears, Roebuck & Co. (the owner/operator of the premises) and Schindler Elevator Corporation (the escalator manufacturer). Central to plaintiff's claims is her contention that the spot where Jakobe fell was an unguarded floor opening that should have had a guardrail or some other form of fall protection.

---

[1] Defendants submitted responses in opposition to each of these Motions. (*See* docs. 108, 109, 110.) Although the applicable briefing schedule (doc. 102) allowed for plaintiff to file reply briefs on or before August 3, 2016, plaintiff elected not to do so. As such, all three Motions are taken under submission on the strength of the principal briefs and accompanying exhibits.

On that basis, plaintiff purports to assert a wrongful death claim against Schindler pursuant to Alabama Code § 6-5-391 on theories of "common law negligence, common law wantonness, and also product liability under the Alabama Extended Manufacturer Liability Doctrine ('AEMLD') related to the sale, design, manufacture, and installation of the subject escalator in 1997." (Doc. 103, at 2.) Plaintiff also purports to assert a § 6-5-391 claim against Sears on the theory that "Sears is guilty of common law negligence and/or common law wantonness relating to the safety of its store." (*Id.* at 3.) Defendants have raised affirmative defenses of contributory negligence, "open and obvious," and product misuse. (*Id.* at 4-6.)[2]

At trial, defendants intend to offer the expert testimony of Kathleen Rodowicz, Ph.D., and Davis Turner pursuant to Rule 702 of the Federal Rules of Evidence, as well as certain lay opinions from representatives of the Mobile Police Department and Alabama Department of Labor pursuant to Rule 701 of the Federal Rules of Evidence. Via a series of three motions, plaintiff seeks exclusion of such opinions and testimony.

## II. Governing Legal Principles.

The Federal Rules of Evidence, as construed by the Supreme Court in the landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "require[] expert scientific evidence to be both reliable and relevant pursuant to Rule 702," such that it "appropriately assists the trier of fact." *United States v. Henderson*, 409 F.3d 1293, 1302 (11th Cir. 2005). In that regard, "[t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). This gatekeeping function is guided by the well-established principle that "[t]he proponent of the expert testimony carries a substantial burden under Rule 702" to show admissibility of that testimony by a preponderance of the evidence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also Boca Raton Community Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("The offering

---

[2] In the Joint Pretrial Document, defendants also identify their "Affirmative Defense that the Alabama Wrongful Death Act Violates United States Constitution." (Doc. 103, at 5.) On summary judgment, however, the Court found that defendants' constitutional objection fails as a matter of law. (*See* doc. 85, at 34-41.) As such, this "affirmative defense" is no longer part of the case and will not be presented to the jury at trial.

party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder …, by a preponderance of the evidence.").

As a general proposition, "[i]n determining the admissibility of expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007). "While there is inevitably some overlap among the basic requirements – qualification, reliability, and helpfulness – they remain distinct concepts and the courts must take care not to conflate them." *Rosenfeld v. Oceana Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (citation omitted).

In examining the reliability prong, *Daubert* teaches that the following factors should be considered: "(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community." *Tampa Bay Water v. HDR Engineering, Inc.*, 731 F.3d 1171, 1184 (11th Cir. 2013) (citations omitted). That said, "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). For that reason, courts have stressed that the *Daubert* inquiry is "a flexible one," that the *Daubert* factors are mere guidelines for applying Rule 702, and that "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the particular circumstances involved. *Id.* at 1267-68. In performing a *Daubert* analysis, the court's focus must be "solely on principles and methodology, not on the conclusions that they generate;" indeed, it matters not whether the proposed expert testimony is scientifically correct, as long as it is shown to be reliable. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Even in the aftermath of *Daubert*, it remains true that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Rosenfeld*, 654 F.3d at 1193 (citations omitted). "[I]n most cases,

objections to the inadequacies of a[n opinion] are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Id.* (citations omitted). Thus, disagreements as to the manner in which an expert performs modeling or analysis may best "be aired out in front of the jury and tested by the crucible of cross-examination," without implicating the *Daubert* gatekeeping function. *Tampa Bay Water*, 731 F.3d at 1185. Importantly, "[o]nce an expert opinion has satisfied *Daubert*, a court may not exclude the opinion simply because it believes that the opinion is not – in its view – particularly strong or persuasive." *Seamon v. Remington Arms Co.*, 813 F.3d 983, 990 (11th Cir. 2016).

It bears noting that *Daubert* principles do not bar an expert's opinion as unreliable merely because it is grounded in personal knowledge or experience. *See, e.g., United States v. Jennings*, 599 F.3d 1241, 1248 (11th Cir. 2010) ("A district court may decide that non-scientific expert testimony is reliable based upon personal knowledge or experience.") (citation omitted); *Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001) ("there is no question that an expert may still properly base his testimony on professional study or personal experience") (citation and internal quotation marks omitted). "The experiential nature of [an expert]'s expertise does not render his opinions *per se* unreliable, equate to lack of methodology, or warrant automatic exclusion of his testimony." *Continental Motors, Inc. v. Jewell Aircraft, Inc.*, 2013 WL 5530842, *7 (S.D. Ala. Oct. 4, 2013). That said, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Augustin*, 661 F.3d 1105, 1125 (11th Cir. 2011).

The foregoing principles inform the undersigned's evaluation of plaintiff's objections to the admissibility of opinions articulated by defendants' proffered experts.

**III. Challenge to Proposed Expert Kathleen Rodowicz.**

Among the expert witnesses designated by defendants is Kathleen Rodowicz, Ph.D., P.E. Defendants indicate in the Joint Pretrial Document that this witness will testify concerning "her biomechanical analysis of the subject event, including her critique of Plaintiff's … expert's opinion as to alleged prevention of the subject event through 'guarding.'" (Doc. 103, Exh. 9, at 6.) Dr. Rodowicz's expert report sets forth specific opinions, including her conclusions that Jakobe lifted himself up onto the handrail and that extending the silver guardrail along the top

flat part of the escalator would not have prevented him from falling. (Doc. 99, Exh. C, at 10.)[3] In her Motion to Exclude, plaintiff asserts that Dr. Rodowicz's opinions are "grossly unreliable and highly prejudicial" because the witness neither was qualified to render certain of her opinions nor utilized a reliable methodology to formulate such opinions. (Doc. 99, at 2.) Each category of objection will be addressed in turn.

### *A. Plaintiff's Objections to Qualifications.*

According to her CV, Dr. Rodowicz holds both a Bachelor of Science degree and a Ph.D. in mechanical engineering. Her work focuses on "the biomechanics of injuries, with expertise in the areas of human injury tolerance, injury mechanics, and occupant kinematics." (Doc. 99, Exh. B, at 1.) In this capacity, she "performs biomechanical accident reconstructions and evaluates injury mechanisms and injury potential in motor vehicle, sporting, industrial, and slip-and-fall accidents," and also analyzes from a biomechanical standpoint the design of consumer and industrial products. (*Id.*) "Dr. Rodowicz's interdisciplinary research has focused on problems that lie along the interface of engineering and medical technologies." (*Id.*) She has published and presented research findings at professional conferences and has held an academic appointment at Drexel University.

In an objection strikingly reminiscent of defendants' criticisms leveled at certain of plaintiff's experts, Kirksey insists that Dr. Rodowicz cannot satisfy the qualification prong of the Rule 702 admissibility test because she "has not received any training or education specific to escalators," has focused her work on automobile accidents and sports injuries, "has no involvement with any escalator industry group or organization," and "is not sufficiently qualified or experienced with falls from heights." (Doc. 99, at 6.)[4] Just as defendants did in their

---

[3] One point of clarification is necessary at the outset. In her Motion to Exclude, Kirksey complains that Dr. Rodowicz has offered an opinion "that Jakobe intentionally placed himself in danger." (Doc. 99, at 6.) Nowhere in this witness's report or deposition does the Court find any opinions or conclusions about Jakobe's intent. Moreover, Dr. Rodowicz has expressly disclaimed any opinions concerning Jakobe's intentions. (Doc. 108, Exh. A, ¶ 14 ("I have never opined on Kirksey's intentions, only that … he was not involuntarily grabbed or 'pulled' by the moving handrail.").) Framing this proposed testimony as a conclusion about what Jakobe's intentions were is thus inaccurate.

[4] Plaintiff's objection echoes defendants' objections lodged against plaintiff's own experts. For example, in interposing admissibility objections to the opinions of plaintiff's expert Traci Campbell, defendants protested that Campbell "has never worked at any elevator or (Continued)

corresponding objections interposed against plaintiff's experts, plaintiff reads the "qualification" requirement of Rule 702 too stringently. "An expert is not necessarily unqualified simply because [her] experience does not precisely match the matter at hand. ... [S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *Waite v. All Acquisition Corp.*, --- F. Supp.3d ----, 2016 WL 4257516, *2 (S.D. Fla. July 11, 2016) (citations omitted).[5] Always, the critical question for qualification is whether the putative expert has such knowledge, skill, experience, training or education that her opinion will aid the finder of fact in understanding the evidence.

The record shows that Dr. Rodowicz has education, training and experience as a biomechanical engineer, and that her areas of expertise include human injury tolerance, occupant kinematics, rigid body dynamics, biomechanical accident reconstruction and analysis of traumatic injuries. Her expert opinions in this case apply these biomechanical and engineering principles to the circumstances of Jakobe's fall. There is no indication, and no reason to believe, that Dr. Rodowicz is unqualified to apply such principles to the facts of the case without expertise specific to escalators, membership in an escalator industry group, or experience studying falls from heights. Simply put, as an expert in biomechanical analyses of accidents and human injuries, Dr. Rodowicz is qualified to offer opinions on topics such as how Jakobe came to be seated on the moving handrail of the escalator and whether additional protective guarding

---

escalator company, has not consulted with any elevator or escalator companies, and has never served on any committees specifically dealing with escalator issues." (Doc. 90, at 17.) Thus, in contemporaneously filed *Daubert* briefs, each of Kirksey and the defendants argues both sides of precisely the same evidentiary question, their positions shifting depending on whether the expert witness was retained by that party or the other party.

[5] *See also Kipperman v. Onex Corp.*, 411 B.R. 805, 843 (N.D. Ga. 2009) ("an expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case") (citations omitted); *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) ("as to qualification, the standard for admissibility is not stringent," and "so long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony"); *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp.2d 1293, 1304 (N.D. Ga. 2008) ("an expert with the education or background to permit him to analyze a given set of circumstances … can through reading, calculations, and reasoning from known scientific principles make himself very much an expert in [regard to] the particular product even though he has not had actual experience with the product") (citations and internal quotation marks omitted).

would have prevented his fall. Given the low threshold created by the qualification prong of Rule 702 and Dr. Rodowicz's clear expertise in the field of biomechanical engineering, she can reliably apply that expertise to the facts and circumstances of Jakobe's fall, despite not being an escalator expert. The same reasoning and result held true for plaintiff's expert Traci Campbell. Accordingly, any criticism by plaintiff that Dr. Rodowicz lacks experience specific to the escalator industry goes to the persuasiveness, weight and credibility of her opinions, not their admissibility.

### B. *Plaintiff's Objections to Opinions.*

Next, plaintiff objects to the admissibility of Dr. Rodowicz's expert testimony under the reliability prong of Rule 702. To recap, this witness summarized her opinions as follows: (i) Jakobe positioned himself, lifted himself, and transferred his weight onto the moving handrail; (ii) Jakobe would not have fallen over the side of the escalator if he had not positioned, lifted and transferred his weight in that manner; (iii) Jakobe "was not pulled by the handrail by simply backing into the railing;" and (iv) "[g]iven Jakobe Kirksey's position on the moving handrail, even if the guardrail had been extended, he still would have fallen over the railing." (Doc. 99, Exh. C, at 10.)

Kirksey argues that *Daubert* principles demand exclusion of these opinions because Dr. Rodowicz failed to use a reliable methodology in formulating them. In particular, plaintiff characterizes Dr. Rodowicz's methodology as being that she "simply reviewed the video" of the accident, "jump[ed] to these conclusions," and "used a 3D animation program … to illustrate her preconceived opinions" under the guise of simulation or analysis. (Doc. 99, at 6.) Plaintiff's position is that Dr. Rodowicz "simply 'eyeballed' the video and created an animation to match." (*Id.* at 8.) Defendants counter that the 3D animation model prepared by Dr. Rodowicz is mere "demonstrative evidence" to "explain[] Rodowicz's testimony" and is therefore "not required to meet *Daubert* standards." (Doc. 108, at 9.)

Review of the parties' briefs, as well as Dr. Rodowicz's report and affidavit, suggests a measure of confusion on both sides as to what her methodologies actually were. Contrary to defendants' argument, the 3D animation model is not a mere demonstrative exhibit, but is rather

-7-

part and parcel of the witness's analysis.[6]  But contrary to plaintiff's argument, the 3D animation model was not simply whipped up by Dr. Rodowicz out of thin air under pretense of scientific method to illustrate speculative conclusions she had already reached.  According to the record, Dr. Rodowicz's methodology included the following elements:  She engaged in a frame-by-frame analysis of the surveillance video of the accident, conducted a site inspection and took measurements of the Sears escalator, performed a detailed anthropometric and biomechanical analysis, calculated Jakobe's center of gravity using biomechanical literature and Jakobe's medical records, assessed the position of Jakobe's center of gravity relative to the fixed guardrail from a seated position on the moving handrail, and created a 3D model of the accident using a camera-matching technique to help understand Jakobe's interaction with the escalator before and during the fall.  (Doc. 99, Exh. C, at 4-7; doc. 108, Exh. A, ¶¶ 16-30.)  This methodology extends well beyond "simply 'eyeballing' the video" as plaintiff asserts in her Motion to Exclude.

Two specific criticisms advanced by Kirksey against Dr. Rodowicz's methodology are likewise unavailing.  First, Kirksey objects that the "camera matching" technique is not described in sufficient detail in the expert report to explain how Dr. Rodowicz did it.  (Doc. 99, at 7-8.)  Of course, plaintiff's counsel could have explored this topic with the witness in painstaking detail at her deposition.  More fundamentally, Dr. Rodowicz has explained that she used data collected during her site inspection to ensure that "the location of the camera within the 3D model matched the location of the surveillance camera," such that the view in the 3D model

---

[6]  As Dr. Rodowicz herself explained, "The 3D model … is a tool I used, based on the physical data, to better understand Kirksey's interactions with the subject escalator and his environment prior to and during his fall. … [I]t is not uncommon to utilize a 3D modeling software program … to analyze geometric relationships." (Doc. 108, Exh. A, ¶ 29.)  Similarly, in her report, Dr. Rodowicz indicated that "the 3D model was camera matched to specific frames within the surveillance video to evaluate the kinematics of Jakobe prior to and during his fall from the subject escalator.  Using the 3D model in conjunction with the surveillance video, it was determined that Jakobe lifted himself onto the handrail …." (Doc. 99, Exh. C, at 6-7.)  The report is peppered with statements that certain findings were made by reference to the surveillance video and the 3D model, or that other findings were consistent with the 3D model.  In light of Dr. Rodowicz's own explanation of her methodology, defendants' efforts to characterize the 3D animation as just a demonstrative exhibit to explain her testimony are inaccurate.  The modeling process is subject to *Daubert* standards because it was plainly part of the witness's methodology and analysis, as opposed to being a mere demonstrative aid to illustrate her findings to a jury.

would match that in the video. (Doc. 108, Exh. A, ¶¶ 25-27, 30.) To the extent that plaintiff quarrels with the accuracy of particular dimensions of that matching (such as camera angle or distance), such criticisms and questions may be appropriately raised in cross-examination and go only to the weight or credibility of the evidence, not its admissibility.[7] Second, plaintiff challenges Dr. Rodowicz's opinions concerning Jakobe's center of gravity by stating that she "failed to perform any reliable calculations or analyses" on that topic. (Doc. 99, at 9.) In fact, defendants have shown that Dr. Rodowicz utilized a specific, reliable methodology in computing Jakobe's center of gravity in a seated position, based on biomechanical literature and Jakobe's own anthropometry as detailed in his medical records. (Doc. 108, Exh. A, ¶¶ 16-17; doc. 108, Exh. C, at 47-48.)[8] Insofar as plaintiff objects that Dr. Rodowicz failed to consider "how Jakobe's center of gravity would have interacted with a guardrail" (doc. 99, at 9), the witness has explained in clear terms how she did consider that interaction.[9] Plaintiff's disagreement with Dr. Rodowicz's conclusions is appropriately channeled through cross-examination, not exclusion.

---

[7] Plaintiff's threshold objection that "camera matching" lacks acceptance in the relevant scientific community has been effectively rebutted by defendants' showing that this technique has been used in photogrammetry for decades, as documented by peer-reviewed literature and technical papers. (Doc. 108, Exh. A, ¶ 24.)

[8] It also bears noting that plaintiff's own industrial engineering / accident reconstruction expert, Traci Campbell, endorsed and accepted Dr. Rodowicz's estimates of Jakobe's center of gravity without dissent. When asked about Dr. Rodowicz's center of gravity calculations in her rebuttal deposition, Campbell testified, "I'm giving credit for those numbers. …. I looked at … what those numbers would translate to in terms of his body position, and agreed that those were in the same areas that I would have said that they were as well, or that I would have calculated that they were. So, yes, I did not have any issue with those." (Doc. 90, Exh. 8, at 56.) In light of plaintiff's expert's endorsement, plaintiff's *Daubert* challenge directed at those calculations is difficult to fathom.

[9] In particular, Dr. Rodowicz calculated Jakobe's seated center of gravity, measured the height of the escalator handrail and fixed guardrail that plaintiff argues should have been extended along the entire flat part of the escalator, and determined that "his CG was above the top of the fixed guardrail." (Doc. 108, Exh. A, ¶ 17.) Moreover, Dr. Rodowicz took into account that surveillance video showed Jakobe lifting his arms, thereby raising his center of gravity by approximately 2.5 inches and reinforcing her conclusion that his center of gravity would have been above the height of any such extended guardrail, such that the guarding would not have prevented his fall. (*Id.*, ¶ 18.) Plaintiff faults Dr. Rodowicz for failing "to attempt a calculation of a moving center [of] gravity" (doc. 99, at 10); however, Dr. Rodowicz explains her opinion that such calculations are unnecessary because Jakobe's movements would have further
(Continued)

Finally, plaintiff asserts as an alternative ground for her Motion to Exclude that Dr. Rodowicz's testimony should be excluded pursuant to Rule 403, Fed.R.Evid. That rule allows for exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.* The Eleventh Circuit has recognized that Rule 403 is "an extraordinary remedy which the district court should invoke sparingly, and the balance … should be struck in favor of admissibility." *United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003) (citations and internal marks omitted). Here, the risk of unfair prejudice, confusion or misleading the jury is low. The Court has already determined that Dr. Rodowicz's challenged opinions are supported by reliable methodology. The limitations in the 3D model she used may be clearly exposed via cross-examination and other witnesses. And plaintiff's expressed fears of unfair prejudice or confusion flowing from testimony "that Jakobe intentionally placed himself on the escalator handrail" (doc. 99, at 11) are unfounded because Dr. Rodowicz will not offer any such opinions. The extraordinary remedy of Rule 403 exclusion is not appropriate here.

**IV. Challenge to Lay Opinions of Surveillance Video.**

Not surprisingly, in the immediate aftermath of Jakobe's fall, state and local authorities were called to the Sears store at Bel Air Mall to investigate the accident. Among the individuals who reported to the scene were Mobile Police Department Sergeant Jeremy Franks, Mobile Police Department Detective Lance Deleston, and Alabama Department of Labor Deputy

---

raised his center of gravity above and over that guardrail. (Doc. 108, Exh. A, ¶ 21.) The Court cannot say that such an opinion is so speculative or lacking in *Daubert* reliability indicia that it must be barred from the jury's consideration. Also, Dr. Rodowicz is sharply critical of the moving center of gravity calculations performed by plaintiff's expert Campbell. (*Id.*, ¶ 2.) In sum, the disagreement between the parties' expert witnesses as to where Jakobe's center of gravity would have been in relation to an extended guardrail is a classic "battle-of-experts" subject to be resolved at trial, rather than via exclusion of one side's evidence. As for plaintiff's complaint that Dr. Rodowicz's "opinions ignore what protection would have been provided by any guarding taller than the 42-inch minimum height" (doc. 99, at 2 n.1), that criticism goes not to *Daubert* factors at all but merely points out limitations in defendants' expert opinions as to particular, hypothetical protective measures. That Dr. Rodowicz may not have opined about the efficacy of guarding taller than 42 inches does not reasonably imply that she should be barred from testifying about the efficacy of 42-inch guarding.

Inspector Marvin J. Byrum. In the course of their investigations, Sgt. Franks, Det. Deleston and Inspector Byrum each had occasion to review surveillance video of the accident. That same video will be shown to the jury at trial.

In both written reports and deposition testimony, these witnesses stated their perceptions about what the surveillance video depicted. In an Alabama Uniform Incident / Offense Report, Sgt. Franks wrote that the video "shows the juvenile lean against the top of his handrail. Then, it appears he tried to set [*sic*] up on the top of the rail that was in motion when he falls over …." (Doc. 100, Exh. A, at 2.) Similarly, in his written narrative of the incident, Det. Deleston described the video as follows: "The video showed the juvenile attempting to sit on the railing of the escalator and while doing so, he fell over the rail of the escalator." (*Id.* at 6.) And Inspector Byrum's written account of the incident was that Jakobe "sat on the escalator rail and immediately lost his balance causing him to fall." (Doc. 100, Exh. B.) These witnesses testified similarly in their depositions.[10]

Defendants plan to introduce into evidence at trial these witnesses' impressions of the surveillance video. Plaintiff now moves to exclude such evidence as inadmissible lay opinion testimony. Everyone, including the witnesses themselves, agrees that Sgt. Franks, Det. Deleston and Inspector Byrum are not experts in the areas of accident reconstruction, biomechanics, kinematics, human kinesiology or escalator accidents.[11] Nonetheless, defendants maintain that that this testimony is admissible under Rule 701 of the Federal Rules of Evidence.

By rule, a lay witness may testify in the form of an opinion only if such opinion is both "rationally based on the witness's perception" and "helpful to clearly understanding the witness's

---

[10]  Det. Deleston testified, "From what I saw in the video was Jakobe Kirksey was trying to sit down, … [a]nd when he went to sit down, when he went to go sit down on top of the wall, he went back – reached back to put his hand back on the wall, and then that's when he went down." (Doc. 109, Exh. A, at 25.) Inspector Byrum testified that "[i]t was a video of the victim getting up on the handrail, and as soon as he cleared the barrier, he lost his balance and fell." (Doc. 109, Exh. B, at 67.)

[11]  Most notably, when asked in his deposition if he was testifying as an expert in reconstructing the accident from video, Det. Deleston responded, "I'm not an expert at all." (Doc. 100, Exh. D, at 49.) And both Sgt. Franks and Inspector Byrum acknowledged that they do not hold themselves out as experts in accident reconstruction, nor do they have expertise relating to escalator accidents. (Doc. 100, Exh. C, at 33; doc. 100, Exh. E, at 94.)

testimony or to determining a fact in issue." Rule 701(a)-(b), Fed.R.Evid.; *see also United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011).[12] The investigating officers and inspector each viewed the surveillance video with his own eyes; therefore, each witness's testimony about what the video showed would plainly have a rational basis in his own perception, so as to satisfy Rule 701(a). However, the "helpful" requirement of Rule 701(b) is another story.

As noted, the surveillance video will be in evidence at trial. It will be published to the jury. Jurors will view it themselves, probably numerous times. The problem, as plaintiff frames it, is that "[t]he witnesses, with nothing other than lay qualifications, simply reviewed the video and concluded that Jakobe intentionally placed himself on [the] escalator handrail." (Doc. 100, at 5.) Of course, members of the jury can review the video at trial and draw their own conclusions about what it depicts. In other words, the lay opinions offered by Sgt. Franks, Det. Deleston and Inspector Byrum as to their perceptions of Jakobe's actions in the video would not be helpful to the jury because the jury will be perfectly capable of watching the video and reaching an independent conclusion based on the evidence presented. The Court finds that these witnesses' opinions about what they observed in the surveillance video would not assist the jury in understanding the witnesses' testimony or determining a fact in issue; therefore, such lay opinions are inadmissible pursuant to Rule 701(b).

Defendants' arguments to the contrary do not alter this conclusion. Defendants cite *United States v. Pierce*, 136 F.3d 770 (11th Cir. 1998), for the proposition that "[o]ther courts have approved witness opinions based on a video or photograph under Rule 701." (Doc. 109, at 5.) But *Pierce* actually highlights the reasons why the subject lay opinions are inadmissible here. In *Pierce*, the Eleventh Circuit considered the admissibility of lay opinion testimony identifying the defendant as the person depicted in a bank surveillance photograph. The defendant argued that "the lay opinion identification testimony was not helpful because the witnesses were no better equipped than the jury to compare Pierce's appearance at trial with the appearance of the

---

[12] Rule 701 further provides that such lay opinions are admissible only if they are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701(c), Fed.R.Evid.; *see also Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1222 (11th Cir. 2003) (explaining that subsection (c) was added to Rule 701 in order to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing") (citation omitted). Subsection (c) is not in dispute here, and need not be addressed.

individual depicted in the surveillance photograph." *Pierce*, 136 F.3d at 773. The *Pierce* court found the objection to be meritless, explaining that "lay opinion identification testimony may be helpful to the jury where, as here, there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *Id.* at 774 (citations and internal quotation marks omitted). The critical point is that the Rule 701(b) "helpfulness" requirement is satisfied as to lay opinions of video or photographic evidence only where the witness is better able to observe, understand or interpret the contents of that video or photograph than the jury is.[13]

Here, there is simply no reason to believe that Sgt. Franks, Det. Deleston, or Inspector Byrum had any comparative advantage in their viewing of the surveillance video that would allow them to perceive details that a jury might miss, to understand or absorb its contents more effectively than a jury could do, or to interpret the images on that video more skillfully than a jury might be able. For aught the record shows, these witnesses are no better equipped to view

---

[13] This principle is well-settled in federal appellate jurisprudence. *See, e.g., United States v. Houston*, 813 F.3d 282, 291-92 (6th Cir. 2016) ("Federal Rule of Evidence 701 permits a lay witness to identify a defendant in a photograph when the witness is more likely than the jury to identify the individual," on the grounds that "someone who is personally familiar with an individual is presumptively better able to identify the individual in a photograph than a juror"); *United States v. Sanchez*, 789 F.3d 827, 837 (8th Cir. 2015) ("Under Federal Rule of Evidence 701, a witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.") (citations and internal marks omitted); *United States v. Garcia-Ortiz*, 528 F.3d 74, 79-80 (1st Cir. 2008) (district court erred in allowing government witness to testify that defendant looked like man in photograph, where witness "was no more familiar with the defendant than the jury," witness "improperly testified about a non-technical subject which was not beyond the purview of the jury," and "[t]he jury was perfectly capable of drawing its own independent conclusion based on the evidence presented"); *United States v. Begay*, 42 F.3d 486, 502-03 (9th Cir. 1994) (officer's narrative of enhanced video shown to jury depicting a "tremendous array of events all occurring simultaneously" satisfied Rule 701 "helpfulness" requirement because that officer had spent over 100 hours viewing the video and his testimony "concerning which persons were engaged in what conduct at any given moment could help the jury discern correctly and efficiently the events depicted in the videotape"); *United States v. Muhammad*, 512 Fed.Appx. 154, 161 (3rd Cir. Jan. 31, 2013) (witness's description of still images from surveillance video was helpful "in allowing the jury to understand the security footage in terms of the angles in which the security cameras were oriented in the bank, what features of the bank were depicted, and identifying a bank employee").

and analyze the surveillance video than the jury will be.[14] Accordingly, their lay opinions about what the video shows are not helpful to a jury, and are inadmissible under Rule 701.

In a last-ditch effort to ward off exclusion, defendants invoke the "helpful to clearly understanding the witness's testimony" prong of Rule 701(b). Defendants explain that these witnesses' observations of the surveillance video "are fundamental to their testimony regarding the investigations of the accident," and that the jury may be confused or may reject or misunderstand their investigative conclusions (*i.e.*, "that the fall was not caused by foul play and that the escalator was operating normally") if these witnesses "cannot testify as to how they reached their ultimate conclusion of their authorized investigations." (Doc. 109, at 2, 4.) Defendants' fear is misplaced. These witnesses are, of course, free to testify about what they did in investigating Jakobe's fall and how they reached their conclusions. They can testify that they went to the Sears security office and viewed the surveillance video, and that they relied on the video in reaching their conclusions of no foul play and normal escalator operation. They can testify that their investigations, including the video, revealed no evidence of foul play and no evidence of abnormal operation of the escalator. They simply cannot tell the jury what they perceived the video as showing Jakobe do or not do. Under the circumstances, having these witnesses describe their specific perceptions about what the surveillance video depicts with respect to Jakobe's conduct would not be helpful to a clear understanding of their investigative conclusions concerning lack of foul play or escalator malfunction.

For all of these reasons, plaintiff's Motion to Exclude (doc. 100) is **granted** as to any testimony or written opinions by Sgt. Franks, Det. Deleston or Inspector Byrum about the conduct of Jakobe Kirksey as depicted on the surveillance video.

## V. Challenge to Proposed Expert Davis Turner.

Finally, plaintiff moves to exclude eight enumerated opinions offered by defense expert Davis L. Turner. (Doc. 101, ¶ 2(a)-(h).) The record reflects that Turner is an electrical engineer by training who runs an elevator consulting firm providing litigation support, consulting and expert services in the elevator/escalator industry; and that he is heavily involved in the

---

[14] In his deposition, Sgt. Franks agreed that "anyone who sees the video can reach their own conclusion about what happened." (Doc. 100, Exh. C, at 33.) Det. Deleston made a similar acknowledgment. (Doc. 100, Exh. D, at 49.)

development of safety codes for escalators and elevators. (Doc. 101, Exh. A, § 1.0; doc. 110, Exh. A, ¶ 5.) In the Joint Pretrial Document, defendants state that Turner will offer expert testimony at trial concerning "the escalator codes applicable to the subject escalator, its compliance with the same, and that additional guarding was not necessary for the subject escalator." (Doc. 103, Exh. 8, at 10.) However, in his expert report, Turner sets forth opinions on various other topics as well. Plaintiff's Motion to Exclude seeks exclusion of a subset of eight opinions identified in Turner's report, on the grounds that such opinions "go wildly beyond any arguable area of expertise that he may have" and that he "has done nothing more than 'spitball' some opinions." (Doc. 101, ¶¶ 2, 4.) The Court will consider each of the eight challenged opinions in turn.

First, Kirksey objects to Turner's opinions that Jakobe was "unattended" at the time of his fall from the Sears escalator and that Jakobe engaged in a series of "intentional movements" to mount the moving handrail. (Doc. 101, Exh. A, §§ 4.3-4.3.5, 6.5.) With respect to Jakobe being "unattended," Turner indicates that he "based this opinion on the surveillance video as well as on the facts in this case." (Doc. 110, Exh. A, ¶ 7.) Defendants have identified no particular expertise that Turner has in the areas of interpretation of surveillance video or assessment of whether a child is attended or unattended. These are not expert opinions at all, but are instead slanted statements of fact. Such testimony would not be helpful to the jury within the meaning of Rule 702 because nothing in Turner's qualifications gives him any special insights or skill in determining whether Jakobe was unattended at the time of his fall. As for whether Jakobe engaged in "intentional movements," again this opinion falls squarely outside Turner's documented expertise. Turner admits that he is neither a kinematics expert nor an accident reconstruction expert. (Doc. 101, Exh. B, at 132.) He has no special ken to opine as to how Jakobe came to be seated on the escalator handrail; thus, his opinions about his own interpretation of the video reflecting "intentional movements" by Jakobe are not helpful to the jury because they are well beyond the scope of his expertise. The Motion to Exclude is **granted** as to these opinions.

Second, Kirksey objects to Turner's opinion that "the centerline of [Jakobe's] buttocks is approximately 29.5 inches (half his total height) vertically above the escalator floor plate on which he is standing." (Doc. 101, Exh. A, § 4.3.5.) When asked in his deposition about the source of this opinion, Turner testified that it was "[b]ased just on some knowledge that I've

-15-

gained through the years that your midpoint of your body is approximately hip height." (Doc. 101, Exh. B, at 124.) In an affidavit filed in response to the Motion to Exclude, Turner attempts to shore up this opinion by stating that it is actually based on anthropometric data he encountered while working on the ASME A17.7 Committee for the Performance Based Safety Code. (Doc. 110, Exh. A, ¶ 10.a.) The problem, however, is that nowhere in the record does Turner display any expertise in the analysis, interpretation or application of anthropometric data. The fact that he may have seen some numbers while working on an escalator safety committee does not qualify him to render expert opinions applying such data to Jakobe's physiology, particularly in the absence of demonstrated medical, biomechanical, or kinematic expertise.[15] Simply stated, defendants have not shown that opinions about the centerline of Jakobe's buttocks lie within the realm of this witness's expertise; therefore, Turner will not be allowed to offer such opinions to the jury.

Third, plaintiff takes aim at Turner's opinions concerning the Sears escalator's compliance with building code requirements. In his report, Turner wrote that "[t]he subject escalator complied with applicable building code requirements at the time of the incident on June 14, 2014." (Doc. 101, Exh. A, § 5.2.) Turner went on to specify why, in his opinion, the building code's requirement for guarding of open sided walking surfaces does not apply to escalators. (*Id.*, §§ 6.6-6.7.) It appears that plaintiff's objection on this point stems from Turner's deposition testimony that he had never served on a building code committee, had never held himself out "as an expert on a Building Code" and had never "been hired to offer any expert opinions relating to the Building Code." (Doc. 101, Exh. B, at 116.) But in the very same deposition excerpt, Turner testified that he had been an admitted as an expert witness on a building code issue "as it relates to elevators and escalators." (*Id.*) The point is simple. Turner is not an expert on building codes generally; however, his CV demonstrates expertise in

---

[15] It is far from clear from the record that Turner even reviewed that data. After all, he testified that his opinion on the centerline of Jakobe's buttocks was "not based on anthropometric data that I might have reviewed but I didn't review. It's just my knowledge." (Doc. 101, Exh. B, at 124.) In light of this admission, defendants' attempt to bolster this opinion after the fact by referencing the witness's work on the ASME A17.7 Committee falls short.

application of building codes to escalators and elevators.[16] In light of that expertise, and in the absence of any further elaboration of the precise nature of plaintiff's objection, the Court will allow Turner to testify as to whether the Sears escalator did or did not comply with the applicable building code. Such opinions appear to satisfy *Daubert* reliability criteria and the other prerequisites for admissibility under Rule 702.

Fourth, plaintiff objects to Turner's opinion that "[t]he escalator was well maintained." (Doc. 101, Exh. A, § 6.1.) Turner never inspected the Sears escalator, even though he acknowledged that it is his "preference" to do so and that he has inspected the scene in all other cases in which he has testified. (Doc. 101, Exh. B, at 123-24.) The obvious question is how this witness can reliably opine that the escalator was "well maintained" if he never saw it. Defendants argue that Turner can properly give such an opinion "[b]ecause maintenance was not a contributing factor to Master Kirksey's accident and those maintenance items identified after the incident were the subject of routine care and maintenance." (Doc. 110, at 8.) The logic of this contention is opaque. That a person fell off an escalator for reasons unrelated to maintenance says nothing about whether the escalator was well maintained or not. And the fact that deficiencies identified on the escalator "were the subject of routine care and maintenance" does not reasonably yield a conclusion that the escalator was well maintained; to the contrary, it suggests that such "routine care and maintenance" had not been done, else those deficiencies would not have been observed. Based on the information before the Court, it does not appear

---

[16] Turner's CV documents his 20 years of experience providing "a broad range of elevator and escalator related services to the elevator industry, building managers, risk managers, architects, engineers, building designers, owners and the legal profession." (Doc. 101, Exh. A, Att. 2, at 3.) Such services include "Preconstruction project planning and budgeting," "Elevator and escalator system design integrated into the building structure," "Technical support with emphasis on … Codes and standards … [and] Design." (*Id.*) The compliance *vel non* of a particular escalator design with the governing building code would fit neatly within these documented specialties. Given the witness's experience in these areas, coupled with his involvement in developing safety codes for escalators, the Court finds that Turner meets the low hurdle of being qualified to render opinions on the application of the building code to the Sears escalator, notwithstanding his disclaimer of expertise in building codes generally. He may rely on his knowledge and experience to form opinions as to the Sears escalator's compliance with the building code, and such opinions will be helpful to jurors who lack such knowledge and experience for themselves. The Court is confident that plaintiff's counsel will engage in any appropriate cross-examination of the witness as to the limits of his knowledge of and familiarity with building codes.

that Turner may reliably offer an expert opinion that the Sears escalator was well maintained. The Motion to Exclude will be granted as to that specific opinion.

Fifth, plaintiff takes issue with Turner's opinion that "[i]f a guardrail is required it is the responsibility of the building designer/architect to specify such and for a subcontractor other than the escalator installer to provide the guardrail." (Doc. 101, Exh. A, § 6.3.) The basis of Kirksey's objection is unclear. After all, Turner has decades of experience as a consultant to the elevator/escalator industry, including substantial work with architects, building managers, building designers, engineers and owners. He has consulted in areas of escalator system design, preconstruction project planning, technical/product planning, and technical support with respect to codes and standards, product safety, and design. Based on this wealth of real-world experience, Turner may offer expert opinions at trial as to which actor or actors, in his experience, bear responsibility for providing guardrails for escalators.[17] The Court reached an analogous conclusion in overruling defendants' objection to plaintiff's expert Joseph Stabler's experience-based opinion that escalator installers are responsible for ensuring compliance with code requirements. Similar reasoning and result attach here. Turner may reliably testify based on his own experience doing system design for escalators that the responsibility for specifying guardrails would rest with the design architect, not with the escalator installer.

Sixth, Turner's report sets forth a gratuitous opinion that "[t]he probability of Master Kirksey falling over the side of the escalator would have been greatly reduced had he had appropriate adult supervision." (Doc. 101, Exh. A, § 6.4.) Plaintiff objects. For the same reasons that Turner is not qualified to offer expert opinions that Jakobe was "unattended" at the time of his fall, he is not qualified to offer expert opinions as to whether there was "appropriate adult supervision" of Jakobe at that moment. This witness has not been shown to possess any special training, education or experience that would render him any more skilled than the average juror to ascertain from the surveillance video and other evidence in this case whether Jakobe was receiving "appropriate adult supervision" when the accident took place. The Motion to Exclude will be granted as to this opinion.

---

[17] Turner has made clear that this opinion is grounded in his experience, as opposed to his reading of contract documents or his interpretation of legal requirements. (Doc. 110, Exh. A, ¶12(b).)

Seventh, plaintiff objects to Turner's rebuttal opinion that, with respect to falls over the side of escalators, "[t]he statistical probability of such an incident occurring in comparison to the number of passenger rides is so small as to be 'indistinguishable' from zero and would be considered to be mitigated under assessment methodologies." (Doc. 101, Exh. A, § 7.1.) Plaintiff's expert David Cooper has documented the frequency of escalator falls worldwide and has presented that data in the context of his opinion that the Sears escalator was unreasonably dangerous. Furthermore, plaintiff's expert Traci Campbell has been sharply critical of defendants for not utilizing proper risk management analysis (in the form of methodologies such as Failure Modes and Effects Analysis or Safety Hierarchy) to identify and design against the risk of escalator falls. Turner offers a contrasting view based on "an iterative process of evaluating the severity of injury with the probability of occurrence and applying mitigating measures to reduce the probability of occurrence." (Doc. 110, Exh. A, ¶ 15(a).) Indeed, it appears that Turner is using the same methodologies and analytical tools that Campbell did, based on the same data that Cooper generated, to reach a different conclusion. Given Turner's extensive experience in escalator consulting, escalator design, and development of escalator safety codes, the Court is satisfied that the reliability criteria of *Daubert*, and all other prongs of Rule 702, are met with regard to this opinion.

Eighth, Kirksey seeks exclusion of Turner's rebuttal opinion that "guardrails at the sides of the escalator … could not be attached to the existing escalator truss due to weight limitations." (Doc. 101, Exh. A, § 7.4.) Once again, plaintiff neglects to articulate clearly the basis for her *Daubert* objection to this testimony. In support of his opinion, Turner cites to specific requirements in the building code for strength of guardrails. (*Id.*) Turner also indicates that he reviewed the Schindler layout for this particular escalator, and particularly the manufacturer's note that "[m]aterial such as cladding carried by the truss cannot exceed ten pounds per square foot." (Doc. 110, Exh. A, ¶ 14(b).) Based on his review of the building code and the Schindler layout, and his knowledge and experience with respect to escalator design, Turner could reliably opine that adding guardrails to the Sears escalator would not have been feasible in the absence of "significant modification and reinforcement of the truss." (*Id.*) Plaintiff is, of course, free to cross-examine Turner on this point, and to delve into the specifics of particular types of guardrails at particular locations on the escalator. But the Court has no reservations at this time,

on this showing and with these arguments, in finding that Turner's testimony on this point comports with threshold *Daubert* requirements and is otherwise allowable under Rule 702.

Without explanatory verbiage or analysis, plaintiff also seeks exclusion of all of Turner's opinions pursuant to Rule 403, Fed.R.Evid. On this showing, the Court finds that those of Turner's opinions that pass Rule 702 admissibility thresholds are not properly excluded via the extraordinary remedy of Rule 403. The Turner opinions that satisfy the qualification, reliability and helpfulness prongs of Rule 702 do not pose a significant danger of unfair prejudice, confusion of issues or misleading the jury that might outweigh their probative value. Thus, plaintiff's cursory Rule 403 objection is overruled.

## VI.  Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1. Plaintiff's Motion to Exclude as Unreliable the Testimony and Opinions of Kathleen A. Rodowicz (doc. 99) is **denied**;

2. Plaintiff's Motion to Exclude as Unreliable Lay Testimony and Opinions of Surveillance Video and Portions of Police Report (doc. 100) is **granted**. Lay opinions by Sgt. Franks, Det. Deleston or Inspector Byrum about their impressions of surveillance video relating to the conduct and/or actions of Jakobe Kirksey are **excluded**; and

3. Plaintiff's Motion to Exclude as Unreliable Testimony and Opinions of Defendants' Expert Davis Turner (doc. 101) is **granted in part**, and **denied in part**. Turner's opinions are **excluded**, and the Motion is **granted**, as to the topics of whether Jakobe was "unattended," whether Jakobe engaged in "intentional movements" leading to the accident, the position of the centerline of Jakobe's buttocks, whether the escalator was "well maintained," and whether there was "appropriate adult supervision" of Jakobe prior to his fall. In all other respects, the Motion to Exclude is **denied**.

DONE and ORDERED this 20th day of September, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE