# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **TYRA KIRKSEY,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION 15-0115-WS-N** |
| | ) |
| **SCHINDLER ELEVATOR** | ) |
| **CORPORATION, *et al.*,** | ) |
| | ) |
|     **Defendants.** | ) |

## ORDER

This matter comes before the Court on Defendants' 25-part Motion in Limine (doc. 128). The Motion has been subject to extensive briefing, and is now ripe for disposition.[1] Each sub-issue identified in the Motion in Limine will be addressed sequentially.

### I.    Motion to Exclude "Other Falls" Evidence.

As the first component of their Motion in Limine, defendants request that evidence of prior escalator falls be excluded "unless Plaintiff carries her burden of demonstrating that the prior incidents are substantially similar to the instant case and that all of the other requirements for admissibility, including Rule 403, are satisfied." (Doc. 128, at 2.)  A hotly contested issue in this case is whether (and when) defendants knew about the allegedly defective condition of the escalator in the Sears store in Mobile, Alabama, the danger of falls over the side of the escalator's handrail and into the open atrium, and the availability of alternative guarding solutions.  On this point, plaintiff, Tyra Kirksey, intends to present evidence of previous falls

---

[1]    Both sides have exceeded, without prior leave of court, the page limitations on briefing established by Civil L.R. 7(e), inasmuch as plaintiff's principal brief is 40 pages long and defendants' reply weighs in at 34 pages.  Additionally, plaintiff attached more than 150 pages of exhibits to her principal brief without furnishing a courtesy copy to the Court, as required by Civil L.R. 7(g) and Paragraph 14(c) of the Rule 16(b) Scheduling Order (doc. 31). Nonetheless, the Court in its discretion will consider and resolve the Motion in Limine in its present form.

from escalators at other Sears stores and escalators maintained by Schindler in order to show that defendants were on notice of "an inherent issue with relying solely on handrails for protection against falls from escalators installed in atrium settings." (Doc. 133, at 4.) Defendants oppose the introduction of such evidence.

Both sides agree that admissibility of "other falls" evidence is evaluated using the "substantial similarity" doctrine. (Doc. 128, at 2; doc. 133, at 4.) It is well settled that "[t]his evidentiary doctrine applies when one party seeks to admit prior accidents or occurrences involving the opposing party, in order to show, for example notice, magnitude of the danger involved, the party's ability to correct a known defect, the lack of safety for intended uses, strength of a product, the standard of care, and causation." *Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1396 (11th Cir. 1997) (citation, footnote, and internal marks omitted). The two prongs of the "substantial similarity" doctrine have been summarized as follows:

> "Because of the potential prejudicial impact of prior accidents, courts have developed limitations governing their admissibility. First, conditions substantially similar to the occurrence in question must have caused the prior accident. … Second, the prior accident must not have occurred too remote in time. … Determining the remoteness of evidence is within the trial judge's discretion."

*Jones v. Otis Elevator Co.*, 861 F.2d 655, 661-62 (11th Cir. 1988) (citations omitted). Thus, "before evidence of prior accidents or occurrences is admitted into evidence, the proponent of such evidence must show that conditions substantially similar to the occurrence cause[d] the prior accidents." *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1287 (11th Cir. 2015) (citation omitted). In addition to the substantial similarity and remoteness inquiries, "[t]he admission of such evidence is also subject to the reasonable discretion of the trial court … as to whether the prejudice or confusion of issues which may probably result from such admission is disproportionate to the value of the evidence." *Heath*, 126 F.3d at 1396 n.13 (citation omitted).

To be clear, "substantial similarity" does not require that the prior occurrence be an identical match to the accident that forms the basis of the plaintiff's claims; to the contrary, the inquiry is flexible and context-specific. *See, e.g., Sorrels*, 796 F.3d at 1287 ("The 'substantial similarity' doctrine does not require identical circumstances, and allows for some play in the joints depending on the scenario presented and the desired use of the evidence."); *Borden, Inc. v. Florida East Coast Ry. Co.*, 772 F.2d 750, 755 (11th Cir. 1985) ("The conditions surrounding the two incidents were similar enough to allow the jury to draw a reasonable inference concerning FEC's ability to foresee this type of vandalism and its results. … Although the results of the two

incidents were dissimilar, this difference is insubstantial in considering the issue of the foreseeability of this type of vandalism."). Thus, the evidentiary question at the heart of Kirksey's attempt to introduce evidence of other escalator falls is not whether those "other falls" were identical in all respects to the one that resulted in the death of 11-year old Jakobe Kirksey at the Sears escalator at Bel Air Mall in Mobile, Alabama on June 14, 2014; rather, the key inquiry is whether those "other falls" were similar to Jakobe's in the ways that matter, given the evidentiary purposes for which plaintiff is offering that evidence (namely, to show that defendants were on notice of the inadequacy of handrails to protect against falls from escalators in atrium settings, and the foreseeability that catastrophic injuries might result).

Defendants' Motion in Limine identifies the following "other falls" from escalators at Sears stores prior to June 14, 2014: (i) a 2005 incident in Hawaii in which a small child fell over the side of an escalator; (ii) a 2008 incident in California in which a man with Lou Gehrig's disease lost his balance and slipped at the top of the escalator; (iii) a 2013 incident in Chicago in which a teenage girl leaning over an escalator handrail fell to the level below; (iv) a 2011 incident in Massachusetts in which a four-year old boy tried to ride the escalator from the outside of the handrail but was unable to hold his weight; and (v) escalator falls from Schindler-maintained equipment (evidently not at Sears stores) in Indiana, Atlantic City and Philadelphia. (Doc. 128, at 3.)

With respect to each of these "other falls," defendants posit that "strike one against substantial similarity" is that "none of the prior incidents occurred at the Sears store in Mobile." (*Id.*) Insofar as defendants would suggest that the different geographic location of the "other falls" evidence suffices to flunk the "substantial similarity" test, the Court cannot agree. Many factors play into the "substantial similarity" analysis, and escalator falls in other locations could place defendants on notice of allegedly defective conditions, risks of falls, and the need for additional guarding at the Mobile store just as easily as falls at the Mobile store could. Thus, the whereabouts of the "other falls" evidence identified by plaintiff is neither dispositive nor even particularly significant in the "substantial similarity" inquiry here.

Next, defendants propose a laundry list of criteria that they say must be aligned before the "other falls" evidence may be deemed "substantially similar" to Jakobe's fall, so as to be admissible under the Federal Rules of Evidence. In particular, defendants cite considerations of escalator "configuration, setting, safety measures, and alleged defect," as well as "accident

victims' personal characteristics and their pre-fall behavior." (Doc. 128, at 4.)  The Court declines to adopt such an arbitrary, mandatory checklist of factors, given the purposes for which Kirksey seeks to admit such evidence (namely, to show that defendants were on notice of escalator defect, the danger of catastrophic falls over the side of escalators, and the need for additional guarding beyond the handrail).  Rather, the Court concurs with plaintiff's assessment that the appropriate criteria for purposes of the substantial similarity test in this case are whether the prior incidents occurred "on an escalator, in an[] atrium or open-sided installation without guarding, and the fall of a victim over the side of the escalator handrail." (Doc. 133, at 5.) Defendants have advanced no meaningful argument or showing to explain why the other factors they propose are germane to the "substantial similarity" inquiry given the particular purposes for which plaintiff seeks to introduce such evidence here.[2]

Nor have defendants – who are, after all, movants in the Motion in Limine – come forward with specific facts or evidence as to most of the proposed "other falls" that might permit a finding as to "substantial similarity" *vel non* at this time.  If, after conducting extensive and wide-ranging discovery and preparing their case for trial, defendants possess some reason to believe that a particular "other fall" incident designated by Kirksey flunks the substantial similarity test, then it is incumbent on them to explain why in their Motion in Limine; otherwise, the Motion serves no meaningful purpose in resolving any evidentiary dispute that may exist.

---

[2]     For example, defendants posit that "other falls" evidence could not satisfy the substantially similar test unless those other incidents took place on escalators "configured in a crisscrossing pattern." (Doc. 128, at 4.)  But defendants offer no explanation – and, frankly, it makes little sense – for their assertion that a customer falling over the side of escalator handrail at another Sears store in an atrium or open-sided setting could not have placed Sears on notice of the danger of customer falls over the side of escalator handrails in the atrium setting at its Mobile store unless the other store utilized crisscrossing escalators.  This detail is simply not significant to the "substantial similarity" inquiry here.  Likewise, contrary to defendants' conclusory assertion, the age or personal characteristics of the other victims would not necessarily deprive Sears of notice of the risks of falls at the Mobile store if those victims were dissimilar in age and other characteristics to Jakobe Kirksey.  Irrespective of whether the "other fall" involved an elderly person, an intoxicated person, a teenager, or a child playing on the handrail, a finder of fact in this case could reasonably, properly conclude that such an occurrence placed Sears on notice of the need to do more to protect customers at its Mobile store from falling over the side of the escalator handrails.

Instead, their Motion in Limine trades predominantly in unhelpful generalities questioning what "Plaintiff can prove outside the presence of the jury." (Doc. 128, at 7.)

That said, defendants do make a compelling argument for exclusion of evidence of one particular "other fall," to-wit: the 2011 incident at a Sears escalator in Massachusetts. The facts of that fall, as represented by defendants, involved "a four-year-old who purposefully grabbed the **outside** of the handrail and rode down on the outside [of] the escalator well." (Doc. 128, at 4.) Plaintiff concedes that the decedent in the Massachusetts incident "did not fall **over** an escalator handrail," but instead "fell through the gap between the escalator handrail and the building fabric." (Doc. 133, at 8.) Nothing about that incident could have placed Sears on notice of the dangers of people falling over escalator handrails in open-atrium or open-sided settings because, again, the victim did not fall over an escalator handrail at all; therefore, the 2011 Massachusetts incident is not substantially similar to the accident that resulted in Jakobe Kirksey's death in June 2014.[3] Evidence of that "other fall" is properly **excluded** at trial.

Defendants also seek exclusion of the "other falls" evidence of the incident in Hawaii in 2005 in which a small child fell over the escalator handrail. Defendants contend that this

---

[3]     In arguing for admissibility, plaintiff does not attempt to show that the Massachusetts fall passes muster under the "substantial similarity" test governing admissibility of "other falls" evidence. Instead, plaintiff theorizes that the Massachusetts fall evidence is relevant because it demonstrates "Schindler's ability to react and respond to falls by inspecting escalators and executing remedial measures," inasmuch as Schindler "sent out a 'product letter' to a wide variety of divisions and employees" after the Massachusetts fall and launched "an immediate nationwide campaign to identify and remedy any similar problems." (Doc. 133, at 8.) Plaintiff contends that such facts are relevant here because "Schindler should long ago have undertaken such a remedial campaign involving the risk of falls over escalator handrails." (*Id.*) However, no such failure-to-remediate claim is asserted against Schindler in this action. This evidence is inadmissible insofar as plaintiff seeks to use it in furtherance of a cause of action that has not been joined for trial. The same goes for plaintiff's arguments that the Massachusetts evidence should be admissible because the Mobile store suffered from the same defect (*i.e.*, excessive gap between handrail and building fabric), Schindler never corrected it at the Mobile store following the Massachusetts incident, and this was a "code violation" that should have resulted in the escalator being taken out of service. The fundamental shortcomings in plaintiff's position are that this purported defect is not alleged to have proximately caused Jakobe Kirksey's fall, and there are no claims asserted against Schindler for failing to correct a defect at the Mobile escalator between 2011 and 2014. As such, the Massachusetts evidence is neither relevant nor admissible on plaintiff's alternate theories, setting aside the "substantial similarity" mechanism.

evidence is too remote in time because it "is more than a decade old and should be excluded on that ground." (Doc. 128, at 4.) Under the particular circumstances of this case, however, the undersigned concludes that the 2005 Hawaii incident is not too remote in time for purposes of the "substantial similarity" doctrine. After all, plaintiff's evidence is that the 2005 Hawaii incident was one of a series of falls over the side of escalator handrails at Sears stores over a ten-year period preceding Jakobe's fall. The 2005 Hawaii incident is probative of Sears' knowledge of the particular danger that resulted in Jakobe's death some nine years before it happened. Given the types of claims and specific hazard involved here, the 2005 Hawaii "other fall" evidence will not be excluded on remoteness grounds.

Separate and apart from the "substantially similar" doctrine, defendants advance two additional arguments in support of their Motion in Limine seeking exclusion of "other falls" evidence. First, defendants express alarm that allowing Kirksey to introduce evidence of escalator falls in other states "raises a grave risk that the jury, if it finds Sears and/or Schindler liable, will punish them for out-of-state conduct," in violation of due process. (Doc. 128, at 5.) This concern is grossly overstated. Kirksey has asserted no claims against defendants for punitive damages for accidents that occurred in states other than Alabama. The jury in this case will be asked only to determine whether defendants are liable for the June 2014 escalator accident at the Sears store in Mobile, Alabama that resulted in Jakobe Kirksey's death. Evidence of events that occurred in other states may be admitted for the limited purpose of establishing Sears' knowledge that its open-sided escalator in Mobile, Alabama was a hazardous condition and that the existing handrail was inadequate to prevent invitees from being seriously injured or killed by falling over the side. Any fear by defendants that the jury may misinterpret this evidence as providing a factual predicate to heap punishment on defendants for alleged misdeeds at other times and places in other states may be effectively allayed via limiting instruction that defendants are welcome to propose at an appropriate time.[4]

---

[4] In their reply, defendants balk that a limiting instruction is inadequate to protect them "because out-of-state designs and configurations are subject to different codes, standards, and regulations," and the Sears escalators in those other states may have been "created to comply with different codes and standards in different states." (Doc. 136, at 9.) This argument is a red herring that misstates both the issues joined for trial and the narrow purpose for which "other falls" evidence is being admitted. The jury in this case will not be asked to decide whether Sears and Schindler were culpable as to the escalators in Hawaii, California, Chicago or anywhere else. (Continued)

Second, defendants pose the query of how "other falls" evidence is relevant as to Schindler.  After all, Kirksey's "other falls" evidence with respect to both Schindler escalators in Sears stores and Schindler-maintained escalators located elsewhere appears confined to the time frame of 2005 to 2014.  As stated in the Joint Pretrial Document, Kirksey's sole claims against Schindler are for "common law negligence, common law wantonness, and also product liability under the [AEMLD] related to the sale, design, manufacture, and installation of the subject escalator in 1997."  (Doc. 139, at 2.)  Yet plaintiff would introduce evidence of "other falls" from 2005 to 2014 against Schindler to show "Defendants' knowledge of the danger, and … Defendants' failure, in spite of the foreseeability and their knowledge, to correct the danger." (Doc. 133, at 9.)  Such evidence is inadmissible for that purpose.  What Schindler knew after 1997 is irrelevant to Kirksey's claims against it.  What Schindler did or did not do after 1997 "to correct the danger" is irrelevant to Kirksey's claims against it.  Again, plaintiff is suing Schindler solely for its alleged acts and omissions "related to the sale, design, manufacture, and installation of the subject escalator ***in 1997***."  (Doc. 139, at 2 (emphasis added).)  Plaintiff will not be allowed to muddy the waters by arguing to the jury about what Schindler knew after 1997 or what she thinks Schindler should have done to mitigate the risk after 1997 because no such claim remains in this case today.  Thus, the proffered "other falls" evidence is inadmissible to show Schindler's knowledge of the danger or failure to take corrective action.  It is, however, admissible against Schindler to show the existence of a danger, given defendants' litigation position that the Mobile, Alabama escalator was not defective at all.

---

Whether those escalators complied with – or were designed especially to conform to – regulatory provisions in other states is irrelevant.  Again, the primary purpose for which "other falls" evidence is admissible in this case is to show that Sears was on notice years before the fact that the Mobile, Alabama escalator was unreasonably dangerous because of the open-atrium design and the inadequacy of the handrail to prevent people from falling over the side.  Whether Sears was at fault – or should be punished – for escalator falls in places like California is simply not at issue in this case.  Kirksey's introduction of "other falls" evidence for the limited purpose of establishing notice to Sears does not alter that conclusion.  To the extent that defendants worry that the jury may misuse the "other falls" evidence to decide that Sears should be punished here for wrongdoing in California and elsewhere, defendants are free to propose a suitable limiting instruction calculated to clear up any such hypothetical (and unlikely) misunderstanding.

In sum, defendants' Motion in Limine to Exclude "Other Falls" Evidence is **granted in part,** and **denied in part**.  The Motion is **granted** insofar as plaintiff seeks to introduce evidence of the 2011 Massachusetts incident that resulted in the death of a four-year old boy.  The Motion is further **granted** insofar as plaintiff seeks to introduce "other falls" evidence to show Schindler's knowledge of or failure to correct a defect in the subject escalator.  In all other respects, the Motion is **denied** as to the "other falls" issue.

## II.   Motion to Exclude Evidence Concerning Foreign Escalator Standards or Designs.

Next, defendants' Motion in Limine seeks exclusion of "evidence concerning foreign escalator or elevator standards" that Kirksey may use "to show that foreign nations require particular design elements."  (Doc. 128, at 7.)  Defendants argue at length that evidence of foreign legal standards and regulations would be irrelevant and confusing to a jury, because the escalator from which Jakobe fell was subject to Alabama law and regulations, not those of Norway or some other sovereign.  In response, Kirksey expressly states that she "is not attempting to introduce foreign law or standards."  (Doc. 133, at 10.)  Because defendants seek an order excluding evidence that plaintiff has disclaimed any intent to present, this aspect of the Motion in Limine is **denied** as unnecessary.[5]

What plaintiff does plan to introduce at trial is evidence of "foreign designs and the timeframe of their appearance" in order to show that "alternative, feasible designs were available and existed at the time of installation of Sears' escalator in Mobile."  (Doc. 133, at 10.)  Such evidence is highly relevant, given that a significant factual dispute in this case concerns whether alternative, feasible escalator designs existed at relevant times.[6]  Evidence of foreign designs has been ruled admissible by federal courts in products cases on the issue of feasibility.  *See, e.g., Kramer v. Ford Motor Company*, 2016 WL 827746, *9 (D. Minn. Feb. 29, 2016) ("Here, Mr.

---

[5]     In their reply brief, defendants contend that the Motion in Limine should be granted on this issue "[b]ecause Plaintiff agrees that foreign standards and regulations are not relevant to this case."  (Doc. 136, at 9.)  However, that is not a fair characterization of plaintiff's response.  Kirksey has not stipulated that foreign standards and regulations are irrelevant; rather, she has simply represented that she does not intend to introduce any such evidence.

[6]     For example, the Joint Pretrial Document recites as a disputed fact pertaining to Kirksey's wrongful death claim against Schindler "whether a safer, practical alternative design existed in 1997."  (Doc. 139, at 3.)

Hannemann has pointed to the fact that Ford equipped the vehicles that it sold in Europe with a brake override system starting with 2005 model year vehicles.  Accordingly, Mr. Hannemann has sufficiently demonstrated that the proposed alternative design was used by Defendant in similar products and would not interfere with the vehicles' utility.").[7]  This is simply an extension of the more general, widely accepted premise that evidence of alternative designs actually being utilized in the marketplace is admissible to show feasibility.  *See, e.g., Dixon v. International Harvester Co.*, 754 F.2d 573, 584 (5th Cir. 1985) ("The evidence of alternatively designed tractors having additional protection thus was admissible to prove feasibility.").[8]

Nonetheless, in their reply brief, defendants argue for the first time that Kirksey's foreign design evidence should be excluded pursuant to Rule 403, Fed.R.Evid., because "[t]he designs are based on irrelevant foreign standards" and "[e]vidence of foreign designs – based on foreign standards – would confuse the jury."  (Doc. 136, at 10.)  As an initial matter, this argument is

---

[7]     *See also Stallings v. Black & Decker Corp.*, 2008 WL 4530695, *9 (S.D. Ill. Oct. 7, 2008) (recognizing that evidence "of riving knives on European portable circular saws and on American portable circular saws in the 1970s … may demonstrate the addition of a riving knife is technologically feasible"); *Sherry v. Massey-Ferguson, Inc.*, 1997 WL 480893, *2 (W.D. Mich. June 5, 1997) ("Evidence that an alternate tractor design was in production [in Europe] at the time of the subject tractor's manufacture unquestionably is relevant to the feasibility of plaintiff's design theory."); *see generally Cardenas v. Dorel Juvenile Group, Inc.*, 230 F.R.D. 611, 621-22 (D. Kan. 2005) (evidence of engineering changes to car seats sold outside the United States deemed relevant because "one of the issues in this case is whether a safer, feasible alternative design was available"); *Brownlow v. General Motors Corp.*, 2007 WL 2712925, *7 (W.D. Ky. Sept. 13, 2007) (evidence of alternative design "routinely used in the European brands of GM products" deemed to be "highly relevant" in products liability case).

[8]     *See also Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1033 (5th Cir. 2011) (recognizing that "the use of an alternative design by another manufacturer may establish technological feasibility"); *Simo v. Mitsubishi Motors North America, Inc.*, 245 Fed.Appx. 295, 299 (4th Cir. Aug. 15, 2007) (plaintiff adequately established existence of alternative feasible design via evidence that "several other SUVs already on the market had centers of gravity sufficiently low that the vehicles would not roll over untripped"); *Maxwell v. Howmedica Osteonics Corp.*, 713 F. Supp.2d 84, 91-92 (N.D.N.Y. 2010) (feasibility of alternative designs may be shown by "identifying makers of similar equipment who have already put into use the alternative design") (citation and internal quotation marks omitted); *Fisher v. Kawasaki Heavy Industries, Ltd.*, 854 F. Supp. 467, 474 (E.D. Mich. 1994) ("the fact that the alternative designs are not in use would be a factor in determining feasibility of these proposed alternative designs").

improper because it is newly raised in a reply although it was available earlier.[9]  If defendants sought to exclude foreign design evidence (as opposed to foreign legal standards evidence), then they should have developed and presented such an argument in their Motion in Limine, rather than waiting until their reply to spring it on plaintiff.  Even if this argument were procedurally proper (which it is not), it remains unconvincing.  Under the Rule 403 balancing test, foreign escalator design evidence is highly relevant in this case.  Again, a critical issue here is whether safer alternative escalator designs existed at the relevant times.  Evidence that manufacturers in other countries were building and installing such safer designs during the relevant time period would be probative on issues of feasibility and knowledge.  On the other side of the Rule 403 ledger, defendants' vague suggestions of jury confusion arising because the foreign designs "are based on irrelevant foreign standards" appear unfounded.  The Court perceives no reason why it would be necessary or even likely that the jury would hear about foreign standards in connection with these foreign designs, the admissibility of which would be for the limited purposes of showing that safer escalators were feasible and (perhaps) that defendants knew or should have known about them.[10]  Defendants have not shown that the probative value of the "foreign design" evidence is substantially outweighed by a danger of jury confusion or undue prejudice; therefore, it will not be excluded on Rule 403 grounds.

For the foregoing reasons, defendants' Motion in Limine to Exclude Evidence of Foreign Escalator Standards or Designs is **denied**.  Plaintiff does not intend to introduce evidence of foreign standards, and the evidence of foreign designs may be highly relevant and admissible.

## III.    Motion to Exclude Evidence of Actions or Knowledge of Defendants' Parents, Subsidiaries or Affiliates.

Part three of defendants' Motion in Limine seeks to bar evidence of the actions or mental state of companies related to defendant Schindler Elevator Corporation.  In support of this

---

[9]      *See, e.g., Brown v. CitiMortgage, Inc.*, 817 F. Supp.2d 1328, 1332 (S.D. Ala. 2011) (explaining that "it is improper for a litigant to present new arguments in a reply brief" and that "[n]ew arguments presented in reply briefs are generally not considered by federal courts").

[10]      Of course, if defendants want to argue that safety features found on European escalator designs were forbidden by the laws or regulations of the United States or Alabama during the relevant time period, they may present evidence to that effect.  But evidence of foreign standards themselves would remain irrelevant.

Motion, defendants argue that Schindler Elevator Corporation is a "separate corporation and the North American operating entity of the Switzerland-based Schindler Group," which is a global corporation. (Doc. 128, at 10.)  Defendants object that the knowledge or actions of Schindler Group or other affiliated Schindler companies cannot be imputed to "Schindler Elevator Corporation" and that such knowledge and actions are therefore irrelevant.  Defendants also tout a substantial likelihood of confusion if evidence of the actions of affiliated corporations with similar names is presented to the jury.

Plaintiff's response is twofold.  First, she disclaims any intent to present evidence of the "actions" of Schindler Group.  (Doc. 133, at 16 ("Plaintiff has is [*sic*] not alleging any actions of the Schindler [G]roup, unless knowledge and design of guarding, and its use in other markets, is considered action.").)  To be sure, as defendants assert, Alabama law generally does forbid one corporate entity from being held liable for the actions of another.  *See generally Ford v. Carylon Corp.*, 937 So.2d 491, 498 (Ala. 2006) ("[a] parent corporation generally cannot be held liable for the acts of its subsidiary").  But plaintiff's response unambiguously specifies that she does not seek to hold Schindler Elevator Corporation liable for the acts or omissions of any other Schindler entity.

Second, plaintiff maintains that the close working relationship between Schindler Elevator Corporation and other Schindler entities on issues of design means that "Schindler's United States operations had pre-existing knowledge, or had that knowledge readily available, as to guarding solutions for escalators." (Doc. 133, at 15.)  In support of this proposition, plaintiff points to evidence that "the various Schindler entities operate collectively." (*Id.*)  For example, plaintiff cites the testimony of defendant Schindler's employee David Evans, who works in application engineering.  Evans testified that "[t]he initial designs for our product types" are created at Schindler Group facilities in Vienna, Austria, and Shanghai, China, the latter of which also contains "our global R and D center." (Doc. 133, Exh. 1E, at 14.)  Evans' group at Schindler Elevator Corporation then "take[s] the designs that exist and change[s] them … to specific site conditions." (*Id.*)  Evans explained that Schindler Group designs new products in Vienna and Shanghai, and that Evans and his office at Schindler Elevator Corporation rely on those Schindler Group R&D offices for their research and development needs. (*Id.* at 36-37.)  He further indicated that those Schindler Group R&D offices send Evans' team new designs as a matter of course when they are finished. (*Id.* at 37-38 ("We see designs coming through, we are

in receipt of the designs, we don't just receive them when we want to use that design, we receive them as a matter of course when a design is complete.").

Plaintiff's point, then, is that Schindler Group's knowledge of escalator designs may be attributed to defendant Schindler Elevator Corporation in this case because of the manner in which those entities work together and the fact that Schindler Group's R&D centers in Austria and China forward their designs (which would include designs for guarding and safety features) to Schindler Elevator Corporation as a matter of course when they are complete.  This is a far cry from defendants' characterization that Kirksey is trying to impute the knowledge of nonparty Schindler Group to defendant Schindler Elevator Corporation for no reason other than their parent / subsidiary relationship.  Plaintiff is not asking the jury to conclude that Schindler Elevator Corporation knows what Schindler Group knows through some magic or alchemy inherent in their status as affiliated entities, but is rather asking the jury to conclude that such knowledge exists because specific testimony shows that Schindler Elevator Corporation relies on Schindler corporate for all R&D, and Schindler corporate sends all designs (which would presumably include guarding and safety features) to Schindler Elevator Corporation in the ordinary course of business without the latter even requesting them.  That would be a reasonable and permissible inference to draw from such evidence.

The wrinkle, of course, lies in the temporal aspect of this testimony.  As noted, Kirksey's sole claim against defendant Schindler Elevator Corporation relates to "sale, design, manufacture, and installation of the subject escalator in 1997."  (Doc. 139, at 2-3.)  What matters, then, for purposes of knowledge being passed on from Schindler Group to Schindler Elevator Corporation is not whether and to what extent that happens in 2016 (which is apparently the time frame of David Evans' testimony cited by Kirksey), but whether and to what extent that happened in 1997 and earlier.  The knowledge of one company or the other today – and the pathways, conduits and linkages between them – is not relevant to that inquiry.  In briefing the Motion in Limine, neither side offers evidence tending to show whether the intercorporate relationship, allocation of labor, and information flows described in Evans' testimony as of 2016 held equally true in 1997.  If plaintiff can make such a showing at trial, then evidence of Schindler Group's knowledge about guarding and alternative designs may be relevant and

admissible.[11]  If she cannot, then it will not.  Defendants, as movants, have presented no evidence either way; therefore, the Motion in Limine is **denied** on this point, provided, however, that defendants may renew their objection to evidence of other Schindler entities' knowledge at trial to the extent that plaintiff does not make a showing that such knowledge would have been passed to Schindler Elevator Corporation in 1997.

**IV.   Motion to Exclude "Safe Ride" Video and Literary Articles.**

As the next subpart of their Motion in Limine, defendants seek to exclude the following exhibits on grounds of hearsay: (i) the "Safe Ride Video" created by the Elevator Escalator Safety Foundation (the "Video"); (ii) a 2011 report by plaintiff's expert David Cooper entitled "An Investigation into Falls Over or From the Side of Escalators: Recommendations for Fall Prevention Involving Minors" (the "Cooper Report"); (iii) a 1993 article written by Dr. John Fruin and published in a magazine called *Elevator World*, entitled "Open Side Guarding of Escalators" (the "Fruin Article"); and (iv) a 1966 *Toronto Star* article about boys riding handrails on escalators (the "*Toronto Star* Article").  Defendants' position is that such materials are inadmissible hearsay that do not qualify under any exceptions to exclusion.

With regard to the Video, Kirksey maintains that it is not hearsay because it is the statement of an opposing party, pursuant to Rule 801(d)(2), Fed.R.Evid.  A superficial weakness in this argument is that everyone agrees the Video was created by the Elevator Escalator Safety Foundation, which is not a party to this action.  Kirksey responds that that the Video nonetheless qualifies as an opposing party's statement because it "is one the party manifested that it adopted or believed to be true."  Rule 801(d)(2)(B).  To show that Schindler adopted the Video, plaintiff points to a screen-capture from Schindler's website containing the following language:

"**Materials available from Schindler**

---

[11]    Defendants' alternative Rule 403 objection to such evidence is **overruled**. Contrary to defendants' contention, the Court perceives no reasonable likelihood that the jury may be confused or misled, or that defendants will be unfairly prejudiced, if evidence about what a different Schindler entity knew is presented at trial.  Defendants' position that such confusion will arise "because many affiliated corporations share similar names" (doc. 128, at 11) is not well taken.  The Court is confident that the parties are capable of presenting their evidence and arguing their case in a manner that does not jumble "Schindler Elevator Corporation" into "Schindler Group" and that enables the jury to remain cognizant of the distinctions between and among particular Schindler entities.

> "Schindler has prepared a number of useful tools which can help passengers, as well as those who own and manage buildings, use elevators and escalators more safely and efficiently.  These materials are available from Schindler at no charge, and may be ordered directly from Schindler.

*       *       *

> "**A Safe Ride:** DVD and companion pamphlet produced by the Elevator Escalator Safety Foundation, with considerable support from Schindler. Similar to our 'Ups & Downs' with added emphasis on usage by children and seniors.

> "Please contact us to order any of the above materials from Schindler, at no charge."

(Doc. 133, Exh. 4A.)  Under any reasonable interpretation, this language on Schindler's website evinces adoption of the Video.  Not only was the Video produced "with considerable support by Schindler," but also Schindler's prefatory remarks described it as being among "a number of useful tools" that "Schindler has prepared."  Moreover, in two places, Schindler volunteered to supply a copy of the Video to any member of the public "at no charge" upon request.  Faced with these representations manifesting adoption or belief, Schindler's insistence that it "merely placed a description of the video on its website and provided a copy to opposing counsel when requested" (doc. 136, at 13) understates its manifestations of adoption and belief by a considerable margin.[12]  Accordingly, the Video is properly admissible pursuant to Rule 801(d)(2) as a statement in which Schindler manifested its adoption or belief.  The Motion in Limine is **denied** as to this evidence.

With regard to the Cooper Report and the Fruin Article, plaintiff apparently intends to introduce both documents (which she has designated Plaintiff's Exhibits 51 and 1, respectively) into evidence.  Defendants maintain that these exhibits are inadmissible hearsay.  Plaintiff's initial response is to invoke the "learned treatise" exception to hearsay; however, even if plaintiff

---

[12]     This conclusion is reinforced by a July 21, 1997 letter from Schindler's President, James L. Cocca, to the Consumer Product Safety Commission, in which he indicated that Schindler "provides both financial and extensive non-financial support" to the Elevator Escalator Safety Foundation, and boasts that Schindler's own "Ups & Downs" safety video "has become the backbone of 'A Safe Ride', the Foundation's recently released videotape promoting safety and educating passengers regarding proper escalator usage."  (Doc. 133, Exh. 4C, at 3.)  This letter undermines Schindler's present contention that it never manifested that it adopted the "A Safe Ride" Video or believed it to be true.  After all, by Schindler's admission, the "backbone" of the "A Safe Ride" Video was generated by Schindler itself.

were correct as to the application of that exception, it would not allow her to introduce the

Cooper Report and the Fruin Article into evidence.  *See* Rule 803(18), Fed.R.Evid. ("If admitted,

the statement may be read into evidence ***but not received as an exhibit***.") (emphasis added).[13]

Plaintiff also proposes to introduce the Cooper Report and Fruin Article pursuant to Rule

703, Fed.R.Evid.  Defendants' objection on this point is that an expert's "mere reliance on

inadmissible evidence does not render such evidence admissible."  (Doc. 128, at 12.)  That

statement is accurate as far as it goes; however, Rule 703 does allow such evidence to be

disclosed in appropriate circumstances.  Indeed, the Federal Rules of Evidence allow an expert to

---

[13]     For what it is worth, plaintiff appears capable of laying the proper foundation to
qualify the Cooper Report and Fruin Article as "learned treatises" within the meaning of Rule
803(18).  *See generally Allen v. Safeco Ins. Co. of America*, 782 F.2d 1517, 1520 (11th Cir. 1986)
(adopting a "liberal interpretation of Rule 803(18), favoring admissibility"); *Costantino v. David
M. Herzog, M.D., P.C.*, 203 F.3d 164, 170-71 (2nd Cir. 2000) ("The rationale for this exception is
self-evident: so long as the authority of a treatise has been sufficiently established, the factfinder
should have the benefit of expert learning on a subject, even though it is hearsay.").  Under Rule
803(18), "[a] statement contained in a treatise, periodical, or pamphlet" falls within the "learned
treatise" exception to hearsay if it is "relied on by the expert on direct examination" and "the
publication is established as a reliable authority by the expert's admission or testimony, by
another expert's testimony, or by judicial notice."  Rule 803(18), Fed.R.Evid.  Both the Cooper
Report and the Fruin Article are "contained in a treatise, periodical, or pamphlet;" plaintiff's
expert David Cooper will testify that he relied on them; and he will testify that they are "reliable
authorities."  That appears sufficient to trigger the liberal Rule 803(18) exception,
notwithstanding defendants' objections that these materials lack "sufficient assurances of
trustworthiness," that Cooper himself is a paid expert witness, and that the Fruin Article "is
merely a magazine article" (doc. 136, at 14-15).  *See generally Costantino*, 203 F.3d at 172-73
(recognizing that "the authoritativeness inquiry is governed by a 'liberal' standard" and that "the
authoritativeness inquiry is a freewheeling one and may be conducted by 'any means'").
Accordingly, if plaintiff lays the anticipated foundation at trial and wishes to read portions of the
Cooper Report and Fruin Article into evidence pursuant to Rule 803(18), she may do so,
provided, however, that the exhibits themselves will not be received into evidence for the jury's
perusal.  *See* Advisory Committee Note to Rule 803(18) ("the great weight of authority has been
that ***learned treatises are not admissible as substantive evidence***" and the rule creates a
"limitation upon receiving the publication itself physically in evidence") (emphasis added).  This
conclusion is not affected by plaintiff's reliance on the residual hearsay exception found at Rule
807 of the Federal Rules of Evidence.  In particular, the Court finds that admitting the Cooper
Report and Fruin Article as substantive evidence would comport with neither Rule 807(a)(3)
(requiring that evidence admitted under residual exception be "more probative on the point for
which it is offered than any other evidence that the proponent can obtain through reasonable
efforts") nor Rule 807(a)(4) (requiring that "admitting it will best serve the purposes of these
rules and the interests of justice").

engage in hearsay testimony based on the type of evidence reasonably relied on by those in his or her field. *See, e.g., United States v. Floyd*, 281 F.3d 1346, 1349 (11th Cir. 2002) ("hearsay testimony by experts is permitted if it is based upon the type of evidence reasonably relied upon by experts in the particular field."); Rule 703, Fed.R.Evid. ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). The upshot is that, insofar as plaintiff's experts have relied on the Cooper Report and Fruin Article in forming their expert opinions in this case, they may disclose portions of those documents to the jury. *See* Rule 703 ("if the facts or data would otherwise be inadmissible, the proponent of the opinion ***may disclose them*** to the jury" under certain circumstances) (emphasis added).[14]

What this means is that upon a proper foundational showing, plaintiff may elicit testimony from expert witnesses that discloses certain relied-upon contents of both the Cooper Report and the Fruin Article. To the extent that defendants' Motion in Limine seeks categorically to bar such disclosure on hearsay grounds, it is **denied**. To the extent, however, that the Motion seeks to prevent plaintiffs from admitting those documents (*i.e.*, Plaintiff's Exhibits 51 and 1) into evidence, the Motion in Limine is **granted** because nothing in Rule 703 would allow the written materials themselves to be admitted, as opposed to certain portions of such "basis evidence" being disclosed by plaintiff's testifying experts.[15]

---

[14]     *See also Williams v. Illinois*, --- U.S. ----, 132 S.Ct. 2221, 2239-40, 183 L.Ed.2d 89 (2012) (under Rule 703, "'basis evidence' that is not admissible for its truth may be disclosed even in a jury trial under appropriate circumstances"); *United States v. An Easement and Right-of-way Over 6.09 Acres of Land*, 140 F. Supp.3d 1218, 1258 (N.D. Ala. 2015) ("in giving their opinions, experts are authorized to consider *and at times reference* evidence that is hearsay or that would otherwise be inadmissible as independent evidence") (emphasis added).

[15]     Plaintiff's alternative theory that the Fruin Article is admissible under the "ancient documents" exception to the hearsay rule is not persuasive. To be sure, that exception covers "[a] statement in a document that is at least 20 years old and whose authenticity is established." Rule 803(16), Fed.R.Evid. The Court is unaware of any case in which a party has successfully relied on Rule 803(16) to obtain admissibility of a hearsay article in a trade publication; rather, the rule is typically confined to ancient letters, contracts, maps, title documents, wills and so on. Even if the exception were appropriately extended to reach any written article that happens to be more than 20 years old, the Court would still exclude the Fruin Article itself as substantive evidence pursuant to Rule 403, Fed.R.Evid.

Finally, with respect to the *Toronto Star* Article from 1966, plaintiff properly invokes the "ancient documents" exception to the hearsay rule, as found at Rule 803(16) of the Federal Rules of Evidence.  Contrary to defendants' objection, Rule 803(16) has been held applicable in the context of newspaper articles.  *See, e.g., Ammons v. Dade City, Fla.*, 594 F. Supp. 1274, 1280 n.8 (M.D. Fla. 1984) ("The Advisory Committee notes to Rule 803(16) specifically embrace the inclusion of 20 year old newspaper articles under the ancient document exception …. Other courts have similarly relied upon newspaper accounts in interpreting history.") (citations omitted); Advisory Committee Note to Rule 803(16) (observing that in *Dallas County v. Commercial Union Assur. Co.*, 286 F.2d 388 (5th Cir. 1961), the court was "upholding admissibility of 58-year-old newspaper story").  The Motion in Limine is therefore **denied** insofar as defendants seek exclusion of the *Toronto Star* Article on hearsay grounds.

## V.     Motion to Exclude ASME Meeting Minutes.

As part five of their Motion in Limine, defendants oppose plaintiff's use of evidence of ASME Sub-Committee Meeting Minutes from August 26, 1997 (the "ASME Minutes"). Defendants' objections are twofold, to-wit: (i) the ASME Minutes are hearsay and "Plaintiff should be required to lay a proper foundation" for their admission; and (ii) the ASME Minutes are "wholly irrelevant to any issue remaining for trial" because the subject escalator was designed, manufactured and installed before those minutes were created.  (Doc. 128, at 13-14.)

As to relevance, defendants' objection is **overruled** and their Motion in Limine is **denied**.  It is true enough that the ASME Minutes are dated August 26-27, 1997 (*see* doc. 70, Exh. W), which postdates installation of the Sears escalator at the Mobile, Alabama store. However, the relevant contents of those ASME Minutes include references to a March 1995 meeting at which the A17/B44 Escalator and Moving Walk Committee made certain proposals and offered certain rationales pertaining to escalator guardrails, which matters were referred to the A17 Code Coordination Committee (the "Committee").[16]  Those proposals and rationales are

---

[16]     One member of this Committee was George A. Kappenhagen, Code Consultant North America for Schindler Elevator Corporation.  (Doc. 70, Exh. W.)  The ASME Minutes reflect that Kappenhagen reported on the proposal at a June 1995 meeting.  Thus, plaintiff's theory is that the ASME Minutes demonstrate Kappenhagen's actual knowledge and awareness of the unreasonable risk of falls over the side of escalator handrails and the need for additional guarding solutions in 1995, thereby placing Schindler on notice of the issue well before (Continued)

probative of Schindler's knowledge and foreseeability prior to the manufacture and installation of the subject escalator; therefore, defendants' relevance objection is misplaced.

With respect to hearsay, plaintiff challenges defendants' conclusion by asserting that the ASME Minutes are not hearsay because they are not offered for the truth of the matter asserted and because they qualify as statements of a party opponent. Neither assertion is persuasive. The "truth of the matter asserted" argument overlooks the reality the ASME Minutes cannot be probative of "Schindler's knowledge of the history of falls and the need for guardrails" (doc. 133, at 24) in 1997 – the purposes for which plaintiff purports to seek their admission into evidence – unless the contents of those ASME Minutes are true (*i.e.*, that the Committee actually received, considered and discussed this specific proposal prior to 1997; and that one or more Schindler representatives were part of that committee and in attendance). Notwithstanding plaintiff's denial, there is no reasonable question that Kirksey seeks to introduce the ASME Minutes to prove the truth of the matter asserted. As for plaintiff's suggestion that the ASME Minutes are non-hearsay pursuant to Rule 801(d)(2) because they are an opposing party's statement, the evidence does not support a conclusion that Schindler ever manifested its adoption or belief in the validity of the proposals described in the ASME Minutes, much less the accuracy of those Minutes. Merely because a Schindler employee (George Kappenhagen) voted in favor of the proposal does not constitute adoption of the ASME Minutes by Schindler; therefore, Rule 801(d)(2)(B) does not apply. Nor are the ASME Minutes admissible under Rule 801(d)(2)(D) (covering statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed") because (i) the ASME Minutes are not a statement made by Kappenhagen, and (ii) even if they were, there is no factual basis for a conclusion that Kappenhagen was acting as Schindler's agent or employee in connection with his Committee service when that statement was made.

In light of the foregoing, plaintiff cannot introduce the ASME Minutes into evidence unless she satisfies an exception to the hearsay exclusion. The exception she apparently intends to invoke is Rule 803(6), Fed.R.Evid., which applies to business records made at or near the time

---

Schindler built and installed the subject escalator. Defendants' Motion in Limine does not rebut this reasoning.

of the event, kept in the course of a regularly conducted activity, and as a regular practice of that activity.  The potential sticking point is the rule's requirement that "all these conditions [must be] shown by the testimony of the custodian or other qualified witness," with certain exceptions not addressed by the parties here.  *See* Rule 803(6)(D).  The Court agrees with defendants that plaintiff cannot introduce the ASME Minutes into evidence unless she meets the specific foundational prerequisites of Rule 803(6)(D).  Curiously, however, defendants' Motion in Limine merely asks that Kirksey be required to lay such a foundation, and makes no arguments (until the reply, which is too late) that she is incapable of meeting that burden.  On this record and these briefs, the Court cannot discern how plaintiff intends to establish the necessary predicate, or indeed if she intends to go that route at all.  It is therefore impossible to determine on the strength of the briefs whether Kirksey will or will not be able to lay the requisite foundation.  Accordingly, the Motion in Limine is **denied** insofar as defendants seek exclusion of the ASME Minutes at this time, provided, however, that the issue may be revisited at trial upon an appropriate showing.[17]

## VI.    Motion to Exclude "Golden Rule" Arguments.

Defendants next seek a ruling that precludes plaintiff from eliciting prejudicial sympathy from the jury by asking them to put themselves in the shoes of Jakobe Kirksey, his friends or his family, effectively suggesting to jurors that they could also be victims of defendants' alleged

---

[17]    Notwithstanding the foregoing, the parties are hereby given the following guidance with regard to admissibility of the ASME Minutes at trial: (i) in response to plaintiff's representations that her experts relied on the ASME Minutes as part of the basis for their opinions and will testify at trial that such records were of a type reasonably relied on by those in their expert fields, such a predicate may pave the way for disclosure of the relied-upon contents of the ASME Minutes (not admissibility of the ASME Minutes themselves) pursuant to Rule 703, Fed.R.Evid.; (ii) defendants' objections to the ASME Minutes are not waived or time-barred; (iii) nothing in the information provided by plaintiff in her Response (doc. 133) would support a determination that defendants ever stipulated that the specific foundational requirements of Rule 803(6) are satisfied with respect to the ASME Minutes; (iv) the Court has already ruled that Joseph Stabler may testify only in rebuttal in his expert capacity, but that plaintiff is free to call him in her case-in-chief to offer fact testimony authenticating the ASME Minutes and meeting other foundational requirements of Rule 803(6); and (v) the Court has been given no evidence or argument that might reasonably support application of the Rule 807 residual exception to hearsay with respect to the ASME Minutes.  The parties should govern themselves accordingly with respect to any arguments or disputes vis a vis admissibility of the ASME Minutes.

wrongdoing.  These so-called "golden rule" arguments have been held improper.  *See, e.g., McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1071 n.3 (11th Cir. 1996) ("an impermissible golden rule argument is an argument in which the jury is exhorted to place itself in a party's shoes *with respect to damages*") (citation and internal quotation marks omitted); *United States v. Hunte*, 559 Fed.Appx. 825, 833 (11th Cir. Mar. 13, 2014) ("There is no doubt that these 'golden rule' remarks were improper, as they directly suggested that the jurors had personal stakes in the outcome of the case and they placed the prosecution together with the jury in a joint effort to combat fraud.").  Plaintiff consents to this Motion.  (Doc. 133, at 24.)  Accordingly, the Motion in Limine is **granted** insofar as both parties are barred at trial from making "golden rule" arguments with respect to damages.

## VII.   Motion to Exclude "Unit of Time" or Per Diem Arguments.

Part seven of defendants' Motion in Limine would exclude plaintiff from arguing or suggesting that the jury use "an arbitrary figure to [*sic*] on a per day basis to determine an ultimate damages award."  (Doc. 128, at 15.)  Defendants reason that, because Kirksey's claims are confined to wrongful death, her sole remedy is punitive damages and it would be improper and speculative for the jury to award such damages pursuant to a "per diem penalty."  In response, plaintiff states that she consents to this request, as long as it applies equally to defendants.  For that reason, the Motion in Limine is **granted** as to this issue.  Both sides are precluded from arguing, referencing or mentioning "per diem" or "unit of time" concepts with respect to computation of damages.

## VIII.   Motion to Exclude Evidence that Escalator was Improperly Maintained.

Another sub-issue raised in defendants' Motion in Limine relates to evidence that the subject escalator was improperly maintained at the time of Jakobe's fall.  In particular, defendants seek exclusion of "improper maintenance" evidence on relevance grounds because Kirksey's negligent maintenance claim against Schindler was dismissed on summary judgment, and there is no evidence that any deficiencies in the escalator's maintenance were related to, much less proximately caused, Jakobe's accident.

Kirksey responds by confirming that she "does not intend to attempt to make a 'negligent maintenance' claim at trial."  (Doc. 133, at 25.)  Nonetheless, she asserts that if defendants were to present argument or evidence that "the escalator was in fact properly maintained" (*id.*), then that action would open the door for plaintiff to present "improper maintenance" evidence in

rebuttal.  The Court has previously alluded to precisely this scenario in rulings in this case.[18] Defendants balk that plaintiff should not be able to put on such evidence merely because defendants offer evidence that the escalator was "code-compliant," by which they mean only that "the escalator complied with all applicable <u>design</u> codes and that Sears was never cited by the State of Alabama for any code violations prior to the incident."  (Doc. 136, at 20-21.)

This counterargument highlights the imprecision problem which the Court has addressed separately in adjudicating plaintiff's motions in limine.  At the risk of redundancy, the undersigned again points out that the term "code-compliant" can mean different things to different people, because of the divergent array of "codes" (state codes, international codes, proposed codes, design codes, building codes, escalator codes, and so on) potentially in play. The parties are strongly encouraged to avoid imprecise, overbroad language, and to use appropriate qualifiers and descriptors to specify what kind of codes they are talking about if and when they raise evidence and argument that the escalator was or was not "code-compliant." Should defendants present evidence or argument that might reasonably cause the jury to believe that the escalator was "well-maintained" or compliant with all codes (or even all state escalator codes), then such a showing may open the door for plaintiff to present evidence that the escalator was not well-maintained or not compliant with Alabama escalator codes, even if those violations were not cited by the State of Alabama and did not proximately cause Jakobe's fall.  If the parties tread carefully, use precise language, and ask appropriate follow-up, narrowing questions of their witnesses to eliminate confusion about what is and is not meant by the term "code-compliant," then this issue may never come to the fore.  If, however, they do not, then the Court will not categorically foreclose plaintiff from the ability to set the record straight if defendants have led or allowed the jury to gain a contrary impression.  For that reason, the Motion in Limine is **denied** as to defendants' request for an absolute bar on evidence that the escalator was improperly maintained or in violation of any codes.

---

[18]    *See* Order dated September 20, 2016 (doc. 137), at 29 ("If defendants put on expert testimony that the Sears escalator complied with all applicable code requirements (even as to escalator features that did not proximately cause Jakobe's fall), then it is neither irrelevant nor unhelpful for plaintiff to put on expert testimony in rebuttal of those opinions.").

IX.    **Motion to Exclude Evidence of Retailer's Standard of Care as to Design, Purchase, Installation or Maintenance of Escalator.**

In part nine of their Motion in Limine, defendants seek an order precluding Kirksey from offering any expert testimony concerning "retail industry standards of care and/or a retailer's duty to provide safe retail premises." (Doc. 128, at 17.) As grounds for this request, defendants posit that plaintiff's designated experts are not qualified to testify as to "a retailer's standard of care regarding the design, purchase, installation or maintenance of an escalator." (*Id.*)

In the Order of September 20, 2016 resolving defendants' *Daubert* challenges to plaintiff's expert witnesses, the Court excluded plaintiff's expert Traci Campbell's opinion that Sears failed to "provide a safe place of business which was free from recognized hazards that were likely to cause death or serious physical harm to its business invitees." (Doc. 137, at 17.) As grounds for that ruling, the September 20 Order explained that Campbell's excluded "opinion amounts to a commentary on a retailer's standard of care and whether Sears breached that standard of care," but "nothing in Campbell's CV or expert report establishes any qualifications she might have to offer those particular opinions." (*Id.*) Insofar as defendants' Motion in Limine is taking aim at this particular opinion of Campbell's, the Motion is redundant of the previously-decided *Daubert* motions. Aside from that one isolated opinion, defendants have not identified language in any of plaintiff's expert reports or depositions where any of them have professed any intent to testify to opinions within the scope of this aspect of the Motion in Limine (*i.e.*, Sears' standard of care as to escalator design, purchase, installation or maintenance). Plaintiff has responded by defending a number of her experts' opinions, but defendants reply that none of those opinions lie within the ambit of this Motion. By all appearances, then, we are left with a Motion in Limine that seeks to suppress expert opinions that none of plaintiff's expert witnesses have ever rendered or sought to render in this case. The Motion is therefore **denied** as unnecessary.[19]

---

[19]    Of course, should any of plaintiff's experts go "off script" at trial and offer opinions that defendants believe relate to "a retailer's standard of care regarding the design, purchase, installation or maintenance of an escalator," then defendants are free to renew their objections that the proponent of such an opinion is not qualified to offer it. For now, however, the briefing vividly demonstrates that plaintiff is unable to discern the types of testimony contemplated by defendants' Motion because she has not marshaled any expert testimony (with the possible exception of the one already-excluded opinion from Campbell) falling within its (Continued)

**X.      Motion to Exclude Caroline T. Pryor as a Plaintiff's Witness.**

Next, defendants ask that the Court preclude Kirksey from calling Caroline T. Pryor, Esq., as a witness at trial.  Defendants correctly observe that plaintiff has named attorney Pryor (who works at the Carr Allison firm in Daphne, Alabama) on her "may call" witness list in the Joint Pretrial Document.  (Doc. 139, at 11.)  On June 14, 2014, Pryor took responsibility for overseeing and coordinating Sears' internal investigation of Jakobe's fatal fall from the escalator at the Bel Air Mall store.  (Doc. 128, Exh. A, ¶ 5.)  She did so because Sears retained Pryor "as its legal counsel to protect its interests in advance of potential litigation" arising from Jakobe's accident.  (*Id.*, ¶ 7.)  Sears' "initial investigation" was undertaken at Pryor's request and under her in-person supervision as Sears' counsel, and all of her actions in this regard "were performed on behalf of Sears as legal its [*sic*] counsel and in anticipation of litigation."  (*Id.*, ¶¶ 8-10.)  Based on these facts, defendants insist that Kirksey may not call Pryor at trial because any testimony plaintiff might seek to elicit from her would be protected by attorney-client privilege and/or work product doctrine.

The parties devote considerable effort in their briefs to addressing the principles of the attorney-client and work product privileges.  Unfortunately, without knowing specifically what information plaintiff's counsel might attempt to elicit from Pryor at trial, it is not possible to apply those doctrines reliably, or to ascertain with any degree of certainty whether such testimony is properly excluded.  Plaintiff does not even state definitively whether she will call Pryor to testify.  If Pryor is called as a witness, then plaintiff vows to be "careful not to seek disclosure of actually privileged attorney-client communications."  (Doc. 133, at 27.)  At this time, the Court has no information and no reason to believe that plaintiff's counsel – who are, by their own reckoning, "sensitive to the attorney-client privilege" and intent on taking care not to encroach upon it (*id.*) – intends to ask Pryor a single question that will call for information protected by the attorney-client privilege.  Defendants have not shown otherwise.

With respect to work product, the landscape is murkier.  Plaintiff implies that if she does call Pryor, it will be because "Pryor personally observed the condition of the accident scene

––––––––––––––––––––––––––

contours.  The Court will not issue hypothetical rulings *in limine* to block expert opinions that plaintiff has never offered or expressed any intent to offer.

starting the immediate next day … as well as observing the actions of the State inspector, the Lerch Bates inspector, and the Schindler mechanics." (Doc. 133, at 28.) Plaintiff further indicates that Pryor's testimony may be useful "[t]o the extent that the accident scene's condition or other facts from that limited post-accident time period become material at trial." (*Id.*) From these broad outlines of possible topics, it appears that plaintiff might wish to have Pryor testify about purely factual matters relating to the investigation. Such testimony may not be subject to work product protection. *See Schreib v. American Family Mut. Ins. Co.*, 304 F.R.D. 282, 287-88 (W.D. Wash. 2014) ("[c]ourts have consistently held that the work product doctrine furnishes no shield against discovery, by interrogatories or by deposition, of the facts that the adverse party's lawyer has learned, or the person from whom he has learned such facts") (citations omitted).[20] Depending on the particular questions that plaintiff's counsel may ask Pryor and the particular information requested, then, the work product doctrine may have no application here.[21]

---

[20]     *See also Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) ("Because the work product doctrine is intended only to guard against divulging the attorney's strategies and legal impressions, it does not protect facts concerning the creation of work product or facts contained within work product. … Thus, work product does not preclude inquiry into the mere fact of an investigation."); *Spirit Master Funding, LLC v. Pike Nurseries Acquisition, LLC*, 287 F.R.D. 680, 687 (N.D. Ga. 2012) (observing that "underlying facts do not enjoy the protection of the work product doctrine" and that "[t]he work product doctrine does not protect factual information from disclosure"); *State Farm Fire and Cas. Co. v. Nokes*, 263 F.R.D. 518 (N.D. Ind. 2009) ("Factual information may not be withheld under the work product doctrine, but must be produced through interrogatories, depositions or other discovery.") (citation omitted); *Suggs v. Whitaker*, 152 F.R.D. 501, 507 (M.D.N.C. 1993) ("while the work product document itself may be privileged, the facts underlying it are not …. Therefore, a witness may be interrogated at his deposition concerning the facts contained in the work product report ….").

[21]     In so concluding, however, the Court does not adopt plaintiff's unpersuasive contentions that (i) the work product doctrine is inapplicable because defendants have not shown that Pryor's involvement was "in anticipation of litigation;" and (ii) the "death knell" of defendants' invocation of work product privilege is their failure to produce a privilege log. As to the former point, the circumstances identified by defendants (and Pryor's averments in her affidavit) make clear that the only reason she went to the Sears store and coordinated the June 2014 accident investigation was in anticipation of litigation. As to the latter point, defendants posit (with no contrary showing from plaintiff) that plaintiff never requested information from Pryor during discovery that lay within the scope of the work product privilege. Indeed, it appears that plaintiff neither took Pryor's deposition nor subpoenaed documents from her; therefore, plaintiff has done nothing that might trigger an obligation by defendants to produce such a privilege log.

Rather than get bogged down in hypothetical exercise about whether these privileges will or will not apply if certain kinds of questions are asked, the Court finds that the most efficient course of action is simply to **deny** the Motion in Limine on this point. It appears that Kirksey intends to question Pryor at trial about matters that lie outside the proscriptions of attorney-client and work product privileges. That said, nothing herein forbids defendants from renewing these objections at trial in the event that plaintiff does call Pryor as a witness and asks questions that implicate principles of attorney-client privilege or work product.

## XI.   Motion to Exclude Deposition Testimony of Jon Halpern.

The eleventh category of information covered by defendants' omnibus Motion in Limine is the deposition testimony of Jon Halpern. In the initial iteration of the Joint Pretrial Document (doc. 103) filed on July 18, 2016, plaintiff disclosed for the first time her intent to rely on excerpts from Halpern's deposition taken in August 2012 in a fatal escalator fall case in New Jersey styled *Vellanti v. Game On! Atlantic City* (the "*Vellanti* Case"). (Doc. 103, Exh. 3, at 1; doc. 133, Exh. 11A.) The parties agree that Halpern testified in the *Vellanti* Case as an expert witness retained by Schindler (which was also a named defendant in that case), but that Halpern was neither an officer nor an employee of Schindler at the time he was deposed. Importantly, Halpern was not designated by Schindler as a Rule 30(b)(6) witness in the *Vellanti* Case, but rather was a retained expert who testified only to his own opinions. Kirksey intends to read into the record a number of potentially damaging statements made by Halpern in that deposition.[22]

In response to the Motion in Limine, plaintiff explains that she intends to use Halpern's deposition from the *Vallenti* Case under Rule 32(a)(8), Fed.R.Civ.P. (Doc. 133, at 33.) That rule allows a deposition taken in an earlier action to be "used in a later action involving the same

---

[22]     For example, Halpern testified that, as to falls over handrails of escalators in open wellways, "[m]y opinion is foreseeable by everyone," and that it was foreseeable by Schindler both that someone could fall over the rail of an escalator and that such a fall could lead to serious injury or death. (Doc. 133, Exh. 11A, at 65-66.) Halpern further testified that he had read the Fruin Article in the 1990s (he worked for a Schindler entity in Switzerland in 1990-92 and 1995-98), and that he understood that escalators could be fully enclosed. (*Id.* at 83, 87-88.) Halpern also opined in the *Vellanti* Case that "any escalator in the world can have a running guardrail placed next to it," and that Schindler must have been aware of that fact because "it's pretty reasonable." (*Id.* at 98.) And Halpern testified that escalator codes are just "minimum requirements" and that Schindler was free to implement additional safety measures so long as they do not violate the code. (*Id.* at 125.)

subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action." *Id.* This provision does not authorize Kirksey's use of the Halpern deposition because this is not "a later action involving ***the same subject matter between the same parties***." *Id.* (emphasis added). The subject matter differs because the *Vallenti* Case concerned a 2009 escalator fall in New Jersey, whereas this case involves a 2014 escalator fall in Alabama. And the parties differ because Kirksey was not a party to the *Vallenti* Case, the *Vallenti* plaintiff is not a party here, and there is no overlap among the defendants other than Schindler. Nonetheless, plaintiff pins her hopes on the second sentence of Rule 32(a)(8), which provides that "[a] deposition previously taken may also be used as allowed by the Federal Rules of Evidence." *Id.*

Plaintiff contends that the Federal Rules of Evidence would allow the Halpern deposition from the *Vallenti* Case to be used at trial here as an opposing party's statement. The Federal Rules of Evidence allow for admission of a statement offered against an opposing party if it "is one the party manifested that it adopted or believed to be true" or "was made by a person whom the party authorized to make a statement on the subject." Rule 801(d)(2)(B)-(C). With respect to Rule 801(d)(2)(B), plaintiff points to nothing in the record supporting a reasonable inference that Schindler ever manifested that it adopted or believed to be true any of Halpern's statements in the subject deposition excerpts from the *Vallenti* Case. Although plaintiff insists that Schindler's acts of hiring Halpern as an expert in the *Vallenti* Case, disclosing his opinions in that case and making him available for deposition in that case must mean that Schindler adopted or believed his statements to be true, Kirksey offers neither law nor facts to support such a conclusion. Indeed, plaintiff identifies not a single decisional authority that has ever construed Rule 801(d)(2)(B) as automatically covering all opinions and testimony offered by an expert retained by a party in previous unrelated litigation. And with regard to the facts, plaintiff does not show that Schindler had any idea Halpern would offer the specific opinions Kirksey seeks to use here until he uttered the words during the *Vellanti* Case deposition. It is common sense that a litigant does not manifest that it adopted or believed to be true a witness's statements simply by designating that individual as a witness, where the litigant was unaware of those specific

statements at the time of such designation.[23]  Thus, Kirksey has not shown that Halpern's

deposition excerpts from the *Vallenti* Case would be admissible pursuant to Rule 801(d)(2)(B).

      As for Rule 801(d)(2)(C), that exception applies to statements "made by a person whom

the party authorized to make a statement on the subject."  *Id.*  Plaintiff has not shown that

Schindler authorized Halpern to speak for it in the *Vallenti* Case.  Certainly, Schindler did not

designate Halpern as a Rule 30(b)(6) witness to testify on Schindler's behalf.  The mere fact that

Halpern was a retained expert does not imply that Schindler specifically authorized him to speak

for the company on all topics raised at his deposition; rather, Halpern was speaking only for

himself in his capacity as a retained expert.  Thus, Rule 801(d)(2)(C) has no application here.

*See, e.g., Kirk v. Raymark Industries, Inc.*, 61 F.3d 147, 164 (3rd Cir. 1995) ("[O]ne can call an

expert witness even if one disagrees with the testimony of the expert.  Rule 801(d)(2)(C) requires

that the declarant be an agent of the party-opponent against whom the admission is offered, and

this precludes the admission of the prior testimony of an expert witness where, as normally will

be the case, the expert has not agreed to be subject to the client's control in giving his or her

testimony.").[24]  Plaintiff has identified not a single case authority to the contrary, and no

---

[23]      An example illustrates the point.  Party A designates Witness X as an expert based on certain opinions Witness X has given Party A.  Party B takes Witness X's deposition. During that deposition, Party B asks questions of Witness X that go beyond the specific opinions Witness X previously gave Party A.  Witness X answers those questions in a manner that he had never previously expressed to Party A and that Party A did not anticipate.  Party A does not call Witness X to testify at trial.  In those circumstances, Party A cannot rationally be said to have manifested agreement or belief in the truth of those specific deposition responses simply by designating Witness X as an expert; after all, Party A was unaware of them until the moment the testimony was given.  Stated differently, a party does not, by the simple act of designating an expert witness, automatically and irrevocably adopt everything that witness may say in the case.

[24]      *See also N5 Technologies LLC v. Capital One N.A.*, 56 F. Supp.3d 755, 765 (E.D. Va. 2014) ("An expert report therefore is not admissible under Rule 801(d)(2) absent a showing—not present here—that the expert was acting as the party's agent or employee or was specifically authorized to make a statement on that subject."); *Durham v. County of Maui*, 804 F. Supp.2d 1068, 1072 (D. Haw. 2011) ("Plaintiffs did not authorize Dr. Blair to make the particular statements in the Blair Report.  Rather, the Blair Report provides Dr. Blair's independent opinions regarding Jessica's medical care; Plaintiffs may or may not ultimately adopt such statements as their own.  The court therefore finds that Rule 801(d)(2)(C) does not apply to the Blair Report."); *Glendale Federal Bank, FSB v. United States*, 39 Fed.Cl. 422 (Fed.Cl. 1997) ("The expert witness, testifying under oath, is expected to give his own honest, independent opinion.  Even at the time of his deposition he remains autonomous. … [Only] when (Continued)

evidence that Schindler specifically authorized Halpern to make the particular statements in the excerpts from his *Vallenti* deposition.  Moreover, the record contains not a shred of evidence that Schindler has ever authorized Halpern to speak for it <u>in this case</u>.  Schindler has not retained Halpern as an expert and has not identified him as a witness in this matter (except that it does intend to call him if Kirksey is allowed to introduce his *Vallenti* Case deposition testimony). Simply put, Halpern is not authorized to speak for Schindler in the matter of Jakobe Kirksey's fatal fall; therefore, his deposition testimony in the *Vallenti* Case is not admissible against Schindler as a statement authorized by an opposing party pursuant to Rule 803(d)(2)(C).

For all of these reasons, the Motion in Limine is **granted** on this point, and the deposition excerpts containing testimony of Jon Halpern in the *Vallenti* Case are **excluded** as hearsay not falling within any recognized exception, and as being otherwise inadmissible under Rule 32(a)(8), Fed.R.Civ.P.

**XII.    Motion to Exclude Evidence of Schindler's Post-Installation Actions.**

Next, defendants request that evidence of Schindler's post-installation actions be excluded as irrelevant to any issues joined for trial.  As grounds for this component of the Motion in Limine, defendants correctly observe that Kirksey's only remaining causes of action

---

an expert is put forward for trial is it reasonable and fair to presume they have been authorized."); *Skyhook Wireless, Inc. v. Google, Inc.*, 2015 WL 10015295, *5 (D. Mass. Feb. 27, 2015) ("Because Google withdrew Dr. Boriello before the trial – and even engaged replacement experts to offer opinions on the same topics … – Dr. Boriello's report and deposition are not party admissions by Google."); *Mann v. Lincoln Electric Co.*, 2010 WL 11234292, *2 (N.D. Ohio May 5, 2010) ("When an expert is put forward as a testifying expert at the beginning of trial, the prior deposition testimony of that expert in the same case is an admission against the party that retained him.  Where an expert witness is withdrawn prior to trial, however, the prior deposition testimony of that witness may not be used. That deposition testimony is hearsay.") (citations omitted); *Minebea Co., Ltd. v. Papst*, 2005 WL 6271045, *1 (D.D.C. Aug. 2, 2005) ("Because, therefore, Minebea withdrew Mr. Wagner as an expert witness prior to trial, his deposition testimony will not be treated as an admission by a party-opponent and is therefore hearsay.  It will not be admitted.").  The old Fifth Circuit case of *Collins v. Wayne Corp.*, 621 F.2d 777 (5th Cir. 1980) – which neither party cited in briefing this issue – is distinguishable because in that case the court made an express finding that a consultant hired by Wayne to investigate a bus accident acted as the party's agent in that endeavor.  *See id.* at 782 ("In this case, Greene was Wayne's agent as Wayne employed Greene to investigate and analyze the bus accident.").  Here, by contrast, Kirksey has never argued, much less shown, that Halpern was acting as Schindler's agent when he gave a deposition in the *Vallenti* Case.

against Schindler specifically relate to "the sale, design, manufacture, and installation of the subject escalator in 1997." (Doc. 139, at 2.)

Plaintiff's counterarguments are unpersuasive. Initially, plaintiff points to a discrepancy between the heading of this section of the Motion (which refers to "Schindler's post-incident actions") and the body of this section of the Motion (which refers to "Schindler's post-installation actions"). Contrary to plaintiff's assertion, this inconsistency in no way renders the Motion violative of Rule 7(b)(1), Fed.R.Civ.P. From a fair reading of the Motion, it is plain that defendants seek exclusion of all evidence of what Schindler did or failed to do following the March 1997 installation of the subject escalator. Alternatively, Kirksey balks that she should be allowed to present evidence of "Schindler's ongoing obligation under its maintenance contract" and to argue that "Schindler surely had a duty to inform its customer that the product was unsafe and in need of modification." (Doc. 133, at 35.) But no such claims are joined for trial in this case. The jury will not be asked to decide whether Schindler breached an obligation under an escalator maintenance contract or failed to fulfill a duty to warn Sears post-installation. Those theories simply are not part of the case. As such, evidence that Schindler failed to maintain the escalator properly or failed to warn Sears of known dangers to the escalator is not relevant. Nor can plaintiff present evidence that "Schindler has assumed a duty to perform post-installation retrofits of escalators with safety devices" (*id.*) because the Joint Pretrial Document identifies no such failure-to-retrofit claim or cause of action. All of this evidence is properly excluded on relevance grounds.

For the foregoing reasons, the Motion in Limine is **granted** as to defendants' request to exclude evidence of Schindler's post-installation actions, with two caveats. First, nothing herein forbids Kirksey from introducing evidence of Schindler's post-March 1997 conduct for the limited purposes of demonstrating Schindler's pre-1997 knowledge of defects or foreseeability (such as, for example, the ASME Minutes). Second, if defendants were to open the door (by, for example, commenting or presenting evidence that "Schindler never can or never has installed post-installation retrofits of safety devices" (doc. 133, at 35)), then Kirksey may be permitted to introduce limited evidence to rebut that proposition and set the record straight. Otherwise, however, plaintiff must tailor her evidentiary presentation and arguments at trial to the specific claims against Schindler identified in the Joint Pretrial Document (all of which are "related to the

sale, design, manufacture, and installation of the subject escalator in 1997" (doc. 139, at 2)), and no others.

### XIII.   Motion to Exclude Evidence that Plaintiff Has Not Disclosed under Rule 26(e).

Part thirteen of defendants' Motion in Limine is a request for exclusion of "[a]ny information not previously provided by Plaintiff per Defendants' discovery requests to Plaintiff, for which Plaintiff has a duty under Federal Rule of Civil Procedure 26(e) to supplement her responses." (Doc. 128, at 24.)  Defendants' Motion identifies no specific documents or information that they contend should be excluded; rather, they simply request a generic declaration that plaintiff will not be allowed to use information that she should have disclosed to defendants but did not.  In essence, then, defendants are asking for a blanket ruling that this Court will enforce the provisions of Rule 26(e).  Such an advisory statement – essentially, confirming that the Federal Rules of Civil Procedure govern this case – would not be constructive and would provide no meaningful guidance to the parties for their evidentiary presentations at trial.  Accordingly, the Motion in Limine is **denied** on this point as unhelpful and unnecessary.  Any assertions that one side or the other has failed to supplement or disclose as required by Rule 26(e) will be addressed on a case-by-case basis during trial, as appropriate.

### XIV.   Motion to Exclude Evidence of Defendants' Insurance Status.

Defendants also request exclusion of "[t]he fact that Defendants are insured or may have insurance regarding any damages awarded Plaintiff in this matter." (Doc. 128, at 24.)  Plaintiff consents to this request; therefore, the Motion in Limine is **granted** in this regard.

### XV.   Motion to Exclude Evidence of Settlement Negotiations.

Both sides are in agreement that the jury should not hear evidence or argument referencing "[t]he fact that settlement discussions have been unsuccessful and/or the terms of any settlement discussions." (Doc. 128, at 24; doc. 133, at 36; doc. 136, at 30.)  Accordingly, defendants' Motion in Limine is **granted** on this issue and all parties are precluded from introducing such evidence or mentioning such facts at trial.

### XVI.   Motion to Exclude Evidence of Filing of Motion in Limine.

Both sides further agree that the jury should not hear information or receive evidence about the parties' filing of Motions in Limine in this case to attempt to exclude certain evidence and arguments.  The Court does not perceive any valid reason why it would be appropriate to inform the jury about pretrial motion practice in this case, particularly as it relates to evidentiary

matters or categories of arguments and information that the jury will or will not be allowed to receive; therefore, the Motion in Limine is **granted** on this topic, and all such evidence and references are excluded from trial.

XVII.   **Motion to Exclude Correspondence between Counsel, Court Staff and Mediator.**

By agreement of the parties, the Motion in Limine is **granted** to exclude all parties from introducing into evidence or otherwise referencing at trial any "[c]orrespondence by and between counsel for the parties of record, [c]ourt staff, and mediators."  (Doc. 128, at 25.)

XVIII.   **Motion to Exclude References to Plaintiff's Obligation to Pay Counsel or Expenses.**

Via Motion in Limine, defendants ask that plaintiff be excluded from making "[a]ny reference to the fact that Plaintiff will have to pay her attorney or pay litigation expenses out of any recovery had in this case."  (Doc 128, at 25.)  Plaintiff consents to this restriction.  On that basis, the Motion in Limine is **granted** to preclude any such references during trial.

XIX.   **Motion to Bar Plaintiff from Requesting Stipulations in Presence of Jury.**

The next component of defendants' Motion in Limine is a request "[t]hat Plaintiff not be permitted to request stipulations in the presence of the jury."  (Doc. 128, at 25.)  Plaintiff opposes this Motion as having no value and potentially delaying the trial.  The Court agrees with defendants that stipulation discussions between counsel are best conducted either when trial is in recess or at sidebar conferences.  There is no proper reason why counsel should be proposing or discussing possible stipulations in front of the jury; furthermore, such discussions raise unreasonable risks of unfair prejudice or contamination of the jury.  More broadly, it is expected that the parties will work together <u>before</u> trial to identify topics for potential stipulation, and that they will confer as appropriate <u>before</u> trial to ascertain whether any such stipulations are achievable and, if so, what their contours will be.  The Motion in Limine is **granted** to prohibit both sides from requesting in the jury's presence that opposing counsel agree to stipulations.

XX.   **Motion to Bar Plaintiff from Referencing Refusal to Stipulate.**

Just as it is inappropriate for counsel to broach the topic of potential stipulations with opposing counsel in front of the jury, so too it is improper for either side to introduce evidence of, or otherwise reference, their adversary's declination of any proposed stipulations.  Whether a party has refused to enter into a stipulation to which another party thinks they should have agreed is not a proper subject for examination of witnesses or closing argument.  The Motion in Limine

is **granted** to bar all parties from making any reference or introducing any evidence to show that another party failed or refused to enter into any proposed stipulations.

## XXI.   Motion to Forbid Plaintiff from Referencing Discovery Disputes.

As an additional element to their Motion in Limine, defendants ask for a ruling that "Plaintiff not be permitted to bring up alleged discovery disputes." (Doc. 128, at 25.) All parties are in agreement that the jury should not hear anything about discovery disputes that may have occurred earlier in this litigation. Accordingly, the Motion is **granted** on this point. The parties are barred from offering into evidence or referencing in the presence of the jury any discovery disputes they may have encountered at any time during the lifespan of these proceedings, from the date of Jakobe's fall through the date of trial.

## XXII.   Motion to Preclude References to Ethical or Moral Obligations.

Part twenty-two of defendants' Motion in Limine seeks to exclude plaintiff from introducing evidence or referencing "any moral or ethical obligation on the part of Defendants' [*sic*]." (Doc. 128, at 25.) Defendants do not identify any witness or evidence that Kirksey has disclosed regarding the ethical or moral obligations of Sears and Schindler. It appears no such evidence exists. The Motion is **denied** insofar as it seeks to bar plaintiff from introducing evidence that Kirksey has never suggested she intends to present at trial.[25] To the extent that defendants seek an order barring plaintiff from making any argument impugning the ethics or morality of defendants' conduct, the Court declines to do so. It is, after all, a cornerstone of applicable law that punitive damages awards are properly based on the jury's assessment of the reprehensibility of the defendants' conduct. *See, e.g., Target Media Partners Operating Co. v. Specialty Market Corp.*, 177 So.3d 843, 880 (Ala. 2013) (for purposes of punitive damages award, "[t]he degree of reprehensibility of the defendants' conduct should be considered. The

---

[25]       The cases defendants cite in their reply are inapposite. In *Davis v. Duran*, 277 F.R.D. 362 (N.D. Ill. 2011), the plaintiff sought to introduce expert testimony from a police practices specialist that the defendant police officer "had a moral and ethical obligation to testify honestly and accurately about what happened." *Id.* at 373. Similarly, in *In re Trasylol Products Liability Litigation*, 2010 WL 1489793 (S.D. Fla. Feb. 24, 2010), the court excluded expert testimony that the defendant had breached "ethical standards" to conduct additional pharmaceutical safety trials. *Id.* at *7-9. Here, by contrast, there is no indication that Kirksey intends to elicit opinion testimony from any expert or fact witness about whether Sears and Schindler behaved in a manner that comports with ethical or moral standards.

relation of this conduct, the degree of the defendants' awareness of any such conduct and any concealment or cover-up, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.") (citations omitted); *Ross v. Rosen-Rager*, 67 So.3d 29, 42 (Ala. 2010) ("Perhaps the most important *indicium* of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.") (citation omitted). Defendants have identified no authority that would forbid a plaintiff from arguing reprehensibility of conduct for purposes of punitive damages in moral or ethical terms. Because arguments that defendants behaved immorally or unethically bear on the reprehensibility analysis, and because the degree of reprehensibility of defendants' conduct is perhaps the most important indicium of reasonableness of a punitive damages award under Alabama law, defendants' Motion in Limine is **denied** to the extent that defendants seek to preclude plaintiff from couching reprehensibility arguments in moral or ethical terms.

XXIII. **Motion to Exclude References to Defendants' Counsel's Areas of Specialization or Representation of the Same or Similar Parties in Other Matters.**

The parties concur that plaintiff should not make any references or present any evidence on the topic of whether defendants' attorneys represent Sears and/or Schindler in other matters, why they represent other manufacturers or insurance companies in other lawsuits, or whether they specialize in escalator litigation. (Doc. 128, at 25; doc. 133, at 38.) Accordingly, the Motion in Limine is **granted** on this point. Each side must refrain from commenting on opposing counsel's areas of specialization, client list, and involvement in other similar cases.

XXIV. **Motion to Exclude References to Apologies or Lack Thereof.**

In part twenty-four of their Motion in Limine, defendants move that Kirksey be forbidden from requesting or demanding that defendants apologize, or from characterizing defendants as "unapologetic." For her part, plaintiff has no intent "to request that Defendants or their counsel 'apologize' for their misconduct." (Doc. 133, at 38.) The Motion in Limine is unnecessary to forbid plaintiff from doing something she has no intention of doing, and is therefore **denied** as to the request to bar plaintiff from asking defendants to apologize. As for the portion of this Motion seeking to preclude plaintiff from describing defendants as unapologetic, defendants' remorse (or lack thereof) appears germane to the reprehensibility inquiry that applies in the punitive damages analysis. (*See* § XXII, *supra*.) Certainly, defendants have come forward with no authority that would limit or prevent a plaintiff in a wrongful death case under Alabama law from introducing evidence that Sears did not apologize to Kirksey and from arguing that Sears

was unapologetic.  Such facts and argument appear germane to the question of reprehensibility, which is a critical indicium for the award of punitive damages.  On this showing, the Motion in Limine is **denied** as to plaintiff's ability to introduce evidence or make arguments that Sears did not apologize or was not apologetic.

## XXV.  Motion to Exclude References to Defendants' Financial Status.

Finally, defendants request in their Motion in Limine that the Court enter an order precluding plaintiff from making "[a]ny reference to Defendants' net worth, sales, revenues, amount of assets, or other financial information, including the net worth of any owner, employee, or witness of Defendants."  (Doc. 128, at 25.)  Plaintiff agrees to this limitation; therefore, the Motion in Limine is **granted** on this point.  That said, nothing herein forbids or in any way constrains plaintiff from introducing evidence or argument reflecting Schindler Group's stature in the escalator industry.[26]

## XXVI. Conclusion.

For all of the foregoing reasons, defendants' 25-part Motion in Limine (doc. 128) is **granted in part**, and **denied in part**, as set out in detail herein.

DONE and ORDERED this 6th day of December, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[26]      In their reply, defendants protest that any reference to Schindler Group as "a leading global provider of escalators" would be improper because Kirksey should not be allowed to present evidence about other Schindler entities at all.  This matter has already been addressed *supra*.  Evidence concerning other Schindler entities is relevant insofar as Schindler Elevator Corporation (the named defendant in this case) relied on those other Schindler entities for R&D and received product designs and/or safety information from those Schindler entities as a matter of course during the relevant time period.  The industry stature of those other Schindler entities supplying information to defendant Schindler may therefore be relevant as bearing on the knowledge provided to, or otherwise made available to, defendant Schindler.